Nos. 25-3573, 26-1122

# In the United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

LAMONICA MCIVER,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of New Jersey
No. 25-cr-0388-JKS (Hon. Jamel K. Semper)

**PUBLIC APPENDIX: VOLUME I OF V (A1-A56)**

Samuel F. Callahan
Orion de Nevers
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. N.W.
Washington, D.C.  20001

Amanda J. Raines
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
ARNOLD & PORTER
KAYE SCHOLER LLP
One Gateway Center, Ste. 1025
Newark, NJ  07102

*Counsel for Defendant-Appellant LaMonica McIver*

# INDEX

## Volume I of V (Bound with Appellant's Opening Brief)[1]

First Notice of Interlocutory Appeal, Dkt. 60 (Dec. 29, 2025) .........................A1

First Order on Motions to Dismiss, Dkt. 45 (Nov. 13, 2025) ...........................A3

First Opinion on Motions to Dismiss, Dkt. 44 (Nov. 13, 2025) ........................A5

Second Notice of Interlocutory Appeal, Dkt. 67 (Jan. 20, 2026) ...................A46

Second Order on Motions to Dismiss, Dkt. 64 (Jan. 5, 2026).........................A48

Second Opinion on Motions to Dismiss, Dkt. 63 (Jan. 5, 2026).....................A49

## Volume II of V (Publicly Filed Documents)

District Court Docket Sheet.........................................................................A57

Criminal Complaint, Dkt. 1 (May 19, 2025) ...............................................A65

Indictment, Dkt. 12 (June 11, 2025)...........................................................A73

Order Directing Defendant to Submit Letter Detailing Discovery Requests
as to Selective and Vindictive Prosecution, Dkt. 25 (Aug. 26, 2025)........A80

Defendant's Letter re: Discovery Requests as to Selective and Vindictive
Prosecution, Dkt. 26 (Sept. 10, 2025)........................................................A81

    Ex. A, Defendant's Sept. 3, 2025 Letter re: Discovery (Dkt. 26-1) ....A83

    Ex. B, Government's Sept. 9, 2025 Letter re: Discovery (Dkt. 26-2).A90

Exhibits to Government's Response in Opposition to Motions to Dismiss,
Dkt. 27 (Sept. 15, 2025)

    Ex. A, Certificate of Pardon (Dkt. 27-1) ..............................................A92

    Ex. B, Certificates of Pardon (Dkt. 27-2) .............................................A95

---

[1] The district court's first opinion and order denied Congresswoman McIver's motion to dismiss on the basis of selective and vindictive prosecution in full and denied Congresswoman McIver's motion to dismiss on the basis of legislative immunity on Counts One and Three, reserving judgment on Count Two. The court's second opinion and order denied Congresswoman McIver's motion to dismiss Count Two on the basis of legislative immunity.

Defendant's Letter re: Additional DHS Extrajudicial Statements,
Dkt. 35 (Oct. 6, 2025) ....................................................................A120

    Ex. A, "DHS is Fighting Back Against Antifa Violence"
    (Dkt. 35-1)..............................................................................A122

    Ex. B, "DHS Reminds Congressional Members of ICE's Guidelines
    to Schedule Tours of ICE Detention Facilities (Dkt. 35-2)...............A127

    Ex. C, DHS X Post, Sept. 26, 2025 (Dkt. 35-3) ..................................A130

Defendant's Letter re: Removal of Extrajudicial Statements,
Dkt. 41 (Nov. 6, 2025) ...................................................................A133

Order Directing Government to Produce Discovery,
Dkt. 47 (Nov. 19, 2025) .................................................................A137

Transcript of Motion Hearing held on October 21, 2025,
Dkt. 54 (Dec. 10, 2025)..................................................................A139

Transcript of Status Conference held on November 17, 2025,
Dkt. 55 (Dec. 10, 2025)..................................................................A219

Defendant's Letter Motion for Discovery, Dkt. 57 (Dec. 23, 2025) ............A246

## Volume III of V (Public Digital Media Files)[2]

Exhibits to Congresswoman McIver's Motion to Dismiss Based on Legislative Immunity, Dkt. 19 (Aug. 15, 2025)[3]

    Ex. A, NEPTZ.avi (Dkt. 19-3)..............................................................A257

    Ex. B, CD Axon Body Camera Pre and Arrest.mp4 (Dkt. 19-4)......A258

    Ex. C, Axon_Body_4_Video_2025-05-09_1418_D01AA954X.mp4 (Dkt. 19-5)..................................................................................................A259

    Ex. D, Axon_Body_4_Video_2025-05-09_1418_D01AA942W.mp4 (Dkt. 19-6)..................................................................................................A260

    Ex. E, AG Axon Body Camera BARAKA Enters Gate.mp4 (Dkt. 19-7)..................................................................................................A261

    Ex. F, TA Axon Body Camera Pre-Arrest.mp4 (Dkt. 19-8)..............A262

    Ex. G, AG Axon Body Camera Pre-Arrest.mp4 (Dkt. 19-9) .............A263

    Ex. H, JR Axon Body Camera Arrest.mp4 (Dkt. 19-10) ...................A264

    Ex. I, AG Axon Body Camera Arrest.mp4 (Dkt. 19-11) ....................A265

    Ex. J, Axon_Body_4_Video_2025-05-09_1547_D01AA739X.mp4 (Dkt. 19-12)................................................................................................A266

Exhibits to Congresswoman McIver's Reply in Support of Motion to Restrain Extrajudicial Statements, Dkt. 31 (Sept. 25, 2025)

    Ex. W, Axon_Body_4_Video_2025-05-09_1415_D01AA350X, (Dkt. 31-11).................................................................................................A267

---

[2] All video files contained in Volumes III and V filed under seal are provided to the Court on flash drives per the Court's Standing Order on the Submission of Audio and Video Files.

[3] The video exhibits attached to Congresswoman McIver's Motion to Dismiss on the Basis of Legislative Immunity are available on the district court's website and can be viewed at this link: https://www.njd.uscourts.gov/content/mciver-defense-exhibits-mtd.

Exhibits to Congresswoman McIver's Supplemental Brief in Support of Motion to Dismiss Based on Legislative Immunity, Dkt. 51 (Dec. 9, 2025)

    Ex. AA, USA-0000065 (Dkt. 51-5) ......................................................A268

    Ex. BB, USA-0000064 (Dkt. 51-6) ......................................................A269

    Ex. CC, TARC Axon Body Camera Arrest (Dkt. 51-7) .....................A270

    Ex. DD, TA Axon Body Camera Arrest (Dkt. 51-8) ..........................A271

    Ex. EE, Entry Lot 5-9-25 1448 (Dkt. 51-9) ........................................A272

    Ex. FF, Entry Lot 5-9-25 1459 (Dkt. 51-10).......................................A273

    Ex. GG, Entry Lot 5-9-25 1506 (Dkt. 51-11).......................................A274

    Ex. HH, U2 5-9-25 1534 (Dkt. 51-12) .................................................A275

**Volume IV of V (Documents Filed Under Seal)**

Exhibits to Congresswoman McIver's Supplemental Brief in Support of Motion to Dismiss Based on Legislative Immunity, Dkt. 51 (Dec. 9, 2025)

    Ex. X, USA-000353 (Dkt. 51-2) ...........................................................A276

    Ex. Y, USA-000334 (Dkt. 51-3) ...........................................................A283

Order Granting Motion to Seal Exhibits to Congresswoman McIver's Supplemental Brief, Dkt. 56 (Dec. 11, 2025)................................................A287

Exhibits to Defendant's Letter Motion for Discovery, Dkt. 57 (Dec. 23, 2025)

    Ex. 1, USA-0000014 (Dkt. 57-1) ..........................................................A288

    Ex. 2, USA-0000028 (Dkt. 57-2) ..........................................................A290

    Ex. 3, USA-0000339 (Dkt. 57-3) ..........................................................A294

    Ex. 4, USA-0000333 (Dkt. 57-4) ..........................................................A304

    Ex. 5, USA-0000353 (Dkt. 57-5) ..........................................................A321

    Ex. 6, USA-0000342 (Dkt. 57-6) ..........................................................A328

Order Granting Motion to Seal Exhibits to Motion for Discovery, Dkt. 62 (Jan. 5, 2026) ......................................................................................A331

**Volume V of V (Digital Media Files Filed Under Seal)**

Exhibits to Congresswoman McIver's Supplemental Brief in Support of
Motion to Dismiss Based on Legislative Immunity, Dkt. 51 (Dec. 9, 2025)

Ex. Z, USA-0000078 (Dkt. 51-4) ........................................................ A332

Ex. II, USA-0000069 (Dkt. 51-13) ...................................................... A333

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Hon. Jamel K. Semper |
| *v.* | |
| LaMONICA McIVER. | Crim. No. 2:25-cr-00388-JKS |

### CONGRESSWOMAN LaMONICA McIVER'S NOTICE OF APPEAL

Defendant Congresswoman LaMonica McIver hereby notices her appeal to the United States Court of Appeals for the Third Circuit from the order entered on November 13, 2025. Dkt. 45. This Court previously granted Congresswoman McIver's motion under Federal Rule of Appellate Procedure 4(b)(4) to extend by 30 days her time to file any notice of appeal from that order, up to and including December 29, 2025. Dkt. 49.

Dated: December 29, 2025

ARNOLD & PORTER KAYE SCHOLER LLP

By: _____
Lee M. Cortes, Jr.
Paul J. Fishman
One Gateway Center | Suite 1025
Newark, NJ 07102
Telephone: 973-776-1901
Lee.Cortes@arnoldporter.com
Paul.Fishman@arnoldporter.com

Counsel for Congresswoman LaMonica McIver

1

**A1**

**CERTIFICATE OF SERVICE**                                    A2

I certify that true and accurate copies of this motion were sent by ECF service to counsel

of record to all parties in this matter on December 29, 2025.

_____
Lee M. Cortes, Jr.

**A2**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

UNITED STATES OF AMERICA,

     *Plaintiff,*

      v.

LAMONICA MCIVER,

     *Defendant.*

Crim. No. 25-388

**ORDER**

November 13, 2025

---

**SEMPER**, District Judge.

This matter having come before the Court on Defendant LaMonica McIver's motion to dismiss for legislative immunity under the Speech or Debate Clause (ECF 19) and motion to dismiss for selective enforcement and selective prosecution, and vindictive prosecution (ECF 20), and the Court having considered the submissions of the parties and held oral argument on October 21, 2025, for the reasons stated in this Court's Opinion dated November 13, 2025,

**IT IS** on this 13th day of November 2025,

**ORDERED** that Defendant's motion to dismiss (ECF 19) is **DENIED** as to Counts One and Three, and the Court reserves judgment on Count Two; and it is further

**ORDERED** that Defendant's motion to dismiss (ECF 20) is **DENIED**; and it is finally

**ORDERED** that an in-person status conference is scheduled for November 20, 2025 at 10:30 a.m. in Newark – Courtroom 3 of the Frank R. Lautenberg, U.S. Post Office and Courthouse.

                            */s/ Jamel K. Semper*
                            **HON. JAMEL K. SEMPER**
                            **United States District Judge**

**A3**

2

Orig: Clerk
cc:    Parties

2

**A4**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr><td>

UNITED STATES OF AMERICA,

      *Plaintiff*,

         v.

LAMONICA MCIVER,

      *Defendant*.

</td><td>

Crim. No. 25-388

**OPINION**

November 13, 2025

</td></tr>
</table>

**SEMPER**, District Judge.

      **THIS MATTER** comes before the Court on Defendant LaMonica McIver's ("Defendant") motions to dismiss the indictment against her for legislative immunity under the Speech or Debate Clause (ECF 19) and for selective enforcement and prosecution, as well as vindictive prosecution. (ECF 20.)  Defendant's latter motion includes a discovery request for its selective enforcement, selective prosecution, and vindictive prosecution claims if the Court concludes that dismissal is not yet warranted.  (*Id.* at 28.)  The Court held oral argument on October 21, 2025.  (ECF 37.)  For the reasons stated below, Defendant's motion for selective enforcement and vindictive prosecution (ECF 20) is **DENIED**, Defendant's motion for legislative immunity (ECF 19) on Counts One and Three is **DENIED**, and the Court will reserve ruling on Count Two of the indictment.

**A5**

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Defendant represents New Jersey's 10th Congressional District in the United States House of Representatives, where she serves on the Committee on Homeland Security.[2]  Since joining Congress in 2024, Defendant has focused on executive immigration action in New Jersey.[3]  On May 9, 2025, Defendant and two House Representatives more senior to her ("Representative-1" and "Representative-2"; collectively, the "Representatives") conducted an unannounced congressional oversight inspection of Delaney Hall, a Newark, New Jersey immigration detention facility under the authority of the Department of Homeland Security ("DHS").   The Representatives and Defendant were statutorily permitted to conduct the unannounced congressional oversight visit at Delaney Hall, pursuant to the Further Consolidated Appropriations

---

[1] The facts and procedural history are drawn from the indictment (ECF 12, "Ind."), Defendant's briefs in support of her motions to dismiss (ECF 19-1, "Mot. I"; ECF 20-1, "Mot. II"), the Government's brief in opposition (ECF 27, "Opp."), Defendant's reply briefs (ECF 30, "Reply I"; ECF 32, "Reply II"), as well as the exhibits attached to the respective parties' papers, including video surveillance of the subject incident.  (ECF 19-3—19-12, "Def. Ex. A" – "Def. Ex. J".)

[2] House Rules state that members of the Committee on Homeland Security "shall review and study on a primary and continuing basis all Government activities, programs and organizations related to homeland security that fall within its primary legislative jurisdiction"— including "homeland security policy" and "administration."  Rules of the House of Representatives, 119th Cong. Rule X, cl. 1(j), 3(g)(2) (2025).

[3] In February 2025, Defendant conducted an inspection visit of an Immigration and Customs Enforcement ("ICE") detention center in Elizabeth, New Jersey with Representative-1 and Representative-2.  (Mot. I at 6.)  She met with ICE officials in Newark on March 28, 2025 to discuss oversight of the facilities.  (*Id.*)  Defendant has also written letters to DHS Secretary Kristi Noem to express concern over ICE's operation in New Jersey including its treatment of detainees in private detention centers.  (*Id.*)

A6

Act ("FCAA").[4] *See* Pub. L. No. 118-47, 138 Stat. 360 (1994).[5]  Upon arriving at Delaney Hall, Defendant and the Representatives entered through the front security gate ("Security Gate") and were directed to the administrative office, where they waited for over an hour to conduct their inspection.  (Def. Ex. B, 00:00:06-1:05:15.)  As Defendant and the Representatives waited in the administrative office, a guard opened the Security Gate and allowed the Mayor of Newark ("Mayor") and his security detail to enter the secure premises of Delaney Hall.  (Def. Ex. E, 00:28.)

Approximately forty protestors, spectators, and media members amassed outside the Security Gate a few feet from where the Mayor and his security detail stood waiting for Defendant and the Representatives.  (Ind., Count 1¶ 6; Def. Ex. E, 00:29-00:40.)  As the Mayor stood within the secured area, DHS officials and Immigration and Customs Enforcement ("ICE") agents, including the Special Agent in Charge in New Jersey ("V-1"),[6] arrived at Delaney Hall.  (Opp. at 2.)  V-1 and approximately fifteen ICE and DHS officials approached the Mayor and his security detail on foot.  (Def. Ex. F, 02:33.)  V-1 advised the Mayor he was not authorized on the premises and that he would be arrested if he did not leave.  (*Id.*, 3:50-4:05.)

---

[4] The Government concedes that Defendant and the Representatives had statutory authority to access Delaney Hall and "conduct an unscheduled inspection tour of the facility in conjunction with [their] Congressional oversight responsibilities."  (Opp. at 1) (*see also id.* at 18, 57) (Transcript, "Tr." at 9:18-20) ("THE COURT: . . . as far as I can tell from the government's brief this defendant had a statutory right to be there. [GOVERNMENT]: Correct, Judge.").

[5] Section 527 of the FCAA specifically prohibits DHS from using funds "to prevent" a Member of Congress or their designated employee "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress[.]"  138 Stat. 360 § 527(a). The FCAA also states that Members of Congress are not required "to provide prior notice of intent to enter a facility described in subsection (a) for the purpose of conducting oversight."  *Id.* § 527(b).

[6] As identified in Indictment Crim. No. 25-388.  (*See generally* Ind.)

3

A7

As this conversation ensued, Defendant and the Representatives exited the administrative office and walked approximately 100 feet toward the Security Gate to join the discussion between the Mayor and V-1.  (Def. Ex. B, 1:08:15; Def. Ex. F, 04:33.)  V-1 informed the group that "members of Congress had lawful authority to be in the secured area of Delaney Hall, but that [the Mayor] did not."  (Ind., Count 1 ¶ 9; Def. Ex. G, 3:00-3:15.)  Defendant and the Representatives advised V-1 that they had been waiting for over an hour to exercise their congressional oversight, and that they believed DHS officials had delayed their inspection.  (Def. Ex. F, 4:49-5:55.)  Moments later, V-1 asked the Mayor to put his hands behind his back to which Defendant stated, "You're not arresting him. . . hell no . . . hell no."[7]  (Def. Ex. G, 3:07-3:35; Def. Ex. F, 7:22-8:28; Ind., Count 1 ¶ 10.)  The Mayor and his detail were directed outside the Security Gate and remained in the public parking lot among the protestors, while Defendant and Representative-2 walked toward the administrative office with several DHS agents.  (Id. ¶ 11; Def. Ex. F, 8:35-9:30.)  While still at the Security Gate, Representative-1 told the Mayor that "we will be your eyes and your ears."  (Def. Ex. F, 9:20-9:25.)

Moments later, V-1 gathered a group of DHS agents near the Security Gate, informed them that the Deputy Attorney General had authorized the Mayor's arrest, and instructed the agents to switch on their body worn cameras.  (Def. Ex. B, 1:17:05-1:17:30; Opp. at 3.)  As V-1 and DHS agents exited the secured premises through the Security Gate, Defendant and the Representatives reversed their course from the administrative office back toward the unsecured public parking lot where the Mayor stood among the protestors, walked alongside V-1, and immediately approached the Mayor and his security detail.  (Def. Ex. B, 1:17:52; Def. Ex. A, 1:26:36-1:27:03.)  After an

---

[7] During this discussion, some of the nearby amassed protestors were yelling expletives at V-1, including one person who said, "you let him in you piece of s--t." (Def. Ex. G, 3:05-3:15.)

**A8**

unidentified male in the crowd yelled out, "circle the Mayor," the Defendant, the Representatives, and some protestors encircled the Mayor as V-1 and the agents pushed their way through the crowd to apprehend the Mayor.  (Def. Ex. I, 00:46-00:50; Def. Ex. A, 1:26:56-1:27:02.)  Defendant placed herself between V-1 and the Mayor, and as V-1 attempted to effectuate the Mayor's arrest, Defendant told the surrounding agents, "you're touching a federal official," and repeatedly stated "don't touch us."  (Def. Ex. I, 0:59-1:30.)  As V-1 was attempting the arrest, Representative-1 briefly stood near the Mayor's right shoulder, and Defendant wedged herself between V-1 and the Mayor's left shoulder.  (*Id.*, 1:12-1:21.)  During this exchange, Defendant and V-1 had physical contact that is the basis for Counts One and Three.  The Government alleges Defendant faced the Mayor and "placed her arms around him in an effort to prevent HSI from completing the arrest[,]" and that during "her attempt to thwart the arrest" she "slammed her forearm into the body" of V-1.  (Ind., Count 1 ¶¶ 12, 13.)  The indictment further alleges that Defendant "reached out and tried to restrain V-1 by forcibly grabbing him."  (*Id.* ¶ 13.)  Defendant alleges that V-1 and the agents engaged in "disproportionate" escalation which created "chaos and a serious scuffle involving a great deal of physical contact."  (Mot. II at 11.)

Following the brief physical contact with Defendant, V-1 handcuffed the Mayor and led him toward the Security Gate through the compressed group of protestors who had surrounded him moments earlier.  (Def. Ex. A, 01:28:03.)  The situation became dynamic as DHS agents forced their way to the Security Gate by pushing away hostile protestors.[8]  During the scuffle, Representative-2 told agents, "You cannot push me," while walking back toward the Security Gate with Defendant.  (Def. Ex. I, 1:45-1:54.)   As this occurred, two DHS agents surrounded

---

[8] Protestors in the public parking lot were captured on body worn camera referring to DHS agents "F-----g Nazis," "Fascists," and "New Jersey's Gestapo" following the Mayor's arrest.  (Def. Ex. I, 3:02-3:15; Def. Ex. H, 2:20-2:39.)

**A9**

Representaitve-1 to shield her from the shoving of the crowd. (Def. Ex. A, 1:28:03-1:28:41.) After V-1 brought the handcuffed Mayor through the Security Gate into the secured area outside the facility, Defendant and Representative-2 attempted to reenter the Security Gate. (Def. Ex. A, 1:28:05-1:28:25.) Several protestors pushed agents who surrounded the Security Gate. (*Id.*, 1:28:08-1:28:18.) The Government alleges that Defendant "pushed past" an ICE Deportation Officer ("V-2")[9] "as she returned inside the secured area of Delaney Hall." (Ind., Count 2 ¶ 3.) Surveillance video shows that as Defendant and Representative-2 tried to reenter the facility through the Security Gate, V-2 blocked Defendant from entering by forcibly pushing her back into the public parking lot, and Defendant responded by pushing V-2 in return. (*Id.*, 1:28:08-21.) Defendant was only able to reenter the facility when Representative-2 wrapped his arms around her and pulled her through the Security Gate. (*Id.*, 1:28:15-24.) Defendant and the Representatives were subsequently allowed to conduct their congressional oversight inspection of Delaney Hall later that day.[10] (Mot. I at 11.) The Mayor was charged with trespassing in violation of 18 U.S.C. § 13 and N.J. Stat. Ann. § 2C:18-3. (Opp. at 4.) On May 21, 2025, the U.S. Attorney's Office dropped the charges against the Mayor. (*Id.*)

On May 19, 2025, a federal Complaint charged Defendant with three counts of assaulting, resisting, impeding, and interfering with a federal officer, in violation 18 U.S.C. § 111(a)(1). (*See* ECF 1.) On June 10, 2025, a federal grand jury returned an indictment charging Defendant with the same. (*See* Ind.) On August 15, 2025, Defendant filed two motions to dismiss the indictment,

---

[9] As identified in Count Two of the indictment. (Ind., Count 2 ¶ 3.)

[10] During oral argument on October 21, 2025, the Defense asserted it had not yet received and reviewed all the surveillance video depicting Defendant's oversight inspection following the alleged criminal conduct. (Tr. at 20:1-14.) The factual record of the oversight inspection is incomplete.

for legislative immunity under the Speech or Debate Clause (*see* Mot. I) and for selective enforcement, selective prosecution, and vindictive prosecution. (*See* Mot II.) On September 15, 2025, the Government filed a consolidated opposition. (*See* Opp.) On September 25, 2025, Defendants filed two reply briefs, addressing each motion to dismiss respectively. (*See* Reply I; Reply II.) The Court held oral argument on October 21, 2025. (*See* ECF 37.)

## II.    LEGISLATIVE IMMUNITY

Defendant asks this Court to dismiss the indictment against her because all counts require the presentation of evidence that is protected by the Speech or Debate Clause.[11] (Mot. I at 11.) Defendant first argues that her oversight visit to Delaney Hall was a manifestly legislative act because she "unquestionably had congressional authority" to inspect the facility. (*Id.* at 16.) Defendant then argues that even if this Court were to conclude that her activities at Delaney Hall were ambiguously legislative, the content, form, and purpose of her visit confirm that "her predominant purpose was legislative." (*Id.* at 14.) She argues that "the indictment's charges are inextricably connected" to her legislative acts and must be dismissed. (*Id*. at n.8.)

The Government maintains that the non-legislative act of interfering and impeding with the arrest of the Mayor does not entitle Defendant to Speech or Debate immunity. (Opp. at 57.) The Government concedes that Defendant's inspection of Delaney Hall was "a legislative act" and that "'as a general matter, legislative fact-finding is entitled to the protection of legislative immunity,' to include informal trips in pursuit of that goal." (*Id.*) (quoting *United States v. James*, 888 F.2d 42, 47 n.6 (3d Cir. 2018)). But, the Government argues, "the legislative activities that

---

[11] The Court's decision regarding Defendant's immunity under the Speech Clause is subject to immediate appeal under the collateral order doctrine. *See Helstoski v. Meanor*, 442 U.S. 500, 506–08 (1979). *See also United States v. McDade*, 28 F.3d 283, 288 (3d Cir. 1994) ("[W]e have jurisdiction to entertain the defendant's claim that the Speech or Debate Clause requires dismissal of the entire indictment or particular charges contained in the indictment.").

brought her to Delaney Hall to inspect the facility, although protected," are "separate and distinct from the conduct [that] gave rise to the charges in the indictment." (*Id.*)

**A. Speech or Debate Clause**

The Speech or Debate Clause provides that "for any Speech or Debate in either House" Members of Congress "shall not be questioned in any other place." U.S. Const. art. I, § 6, cl. 1.[12] The Supreme Court has repeatedly recognized that the purpose of the Speech or Debate Clause is to "prevent intimidation by the executive and accountability before a possibly hostile judiciary." *United States v. Johnson*, 383 U.S. 169, 181 (1966); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) ("The purpose of the Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently."); *United States v. Helstoski*, 442 U.S. 477, 491 (1979) ("This Court has reiterated the central importance of the Clause for preventing intrusion by Executive and Judiciary into the legislative sphere."). In *Johnson*, the Supreme Court wrote:

> There is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the Speech or Debate Clause.

---

[12] Article 1, Section 6, Clause 1 of the Constitution reads that Senators and Representatives:

> shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. art. I, § 6, cl. 1.

A12

383 U.S. at 182.[13]  But the Clause was "not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators."  *United States v. Brewster*, 408 U.S. 501, 507 (1972); *see also Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) ("Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good").  Indeed, the Speech or Debate Clause was not intended "to make Members of Congress super-citizens, immune from criminal responsibility."  *Brewster*, 408 U.S. at 516.

Supreme Court jurisprudence instructs that the Clause must be read "broadly" to guarantee Members of Congress immunity from criminal or civil liability based on their legislative acts, *Gravel v. United States*, 408 U.S. 606, 615 (1972), and to create a privilege against the use of "evidence of a legislative act" in a prosecution or before a grand jury.  *Helstoski*, 442 U.S. at 487. Because the privilege "was designed to preserve legislative independence, not supremacy," invocations of it that go "beyond what is needed to protect legislative independence" must be "closely scrutinized."  *Hutchinson v. Proxmire*, 443 U.S. 111, 126–27 (1979).

To that end, the Speech or Debate Clause "prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation

---

[13] The Supreme Court reaffirmed that the Clause's "purpose was to preserve the constitutional structure of separate, coequal, and independent branches of government" a decade after *Johnson*. *United States v. Helstoski*, 442 U.S. 477, 491 (1979).  There, the Supreme Court similarly wrote:

> The English and American history of the privilege suggests that any lesser standard would risk intrusion by the Executive and the Judiciary into the sphere of protected legislative activities. The importance of the principle was recognized as early as 1808 in *Coffin v. Coffin*, 4 Mass. 1, 27, where the court said that the purpose of the principle was to secure to every member "exemption from prosecution, for every thing said or done by him, as a representative, in the exercise of the functions of that office."

*Id.*

9

**A13**

for those acts." *Brewster*, 408 U.S. at 512.  However, the "Speech or Debate Clause does not immunize every official act performed by a member of Congress." *McDade*, 28 F.3d at 295; *see also Brewster*, 408 U.S. at 515 ("In no case has this Court ever treated the Clause as protecting all conduct relating to the legislative process.").  Rather, it protects only acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625.

The privilege applies to legislative conduct beyond the House or Senate floor.  *See Hutchinson*, 443 U.S. at 127 ("[T]he courts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberations.'") (quoting *Gravel*, 408 U.S. at 625).  But it does not extend to "political activities" like constituent services and efforts to win reelection. *Youngblood v. DeWeese,* 352 F.3d 836, 840 (3d Cir. 2003), *as amended* (Feb. 11, 2004).  The Supreme Court has distinguished protected legislative activity from the "entirely legitimate activities" of Members of Congress that the Speech or Debate Clause does *not* protect, which include "a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress."[14]  *Brewster*, 408 U.S. at 512.  These acts "are political in nature rather than legislative," and thus do not enjoy Speech or Debate protection.  *Id.*

---

[14] "The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections." *Brewster*, 408 U.S. at 512.

### B. Legal Standard

In practice, the Speech or Debate privilege affords protection from indictment only for "legislative activities." *Id.* Any "references to past legislative acts of a Member cannot be admitted without undermining the values protected by the Clause." *Helstoski*, 442 U.S. at 487-88 ("Indeed, the Speech or Debate Clause was designed to preclude prosecution of Members for legislative acts."). The Supreme Court has left "no doubt that evidence of a legislative act of a Member may not be introduced by the Government in a prosecution"—indeed, the Government's evidence may not even "mention [] a legislative act." *Id*. at 487, 490. But a prosecution that "does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them" does not offend the Speech or Debate Clause. *Brewster*, 408 U.S. at 510, 512 ("[A] Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts.")

The Third Circuit in *United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016) laid out a two-step framework for identifying legislative acts that are protected by the Speech or Debate Clause, which it reaffirmed two years later in *United States v. James*, 888 F.3d 42 (3d Cir. 2018). First, courts must "look to the form of the act to determine whether it is inherently legislative or non-legislative. Some acts are 'so clearly legislative in nature that no further examination has to be made to determine their appropriate status.'" *Menendez*, 831 F.3d at 166 (quoting *Gov't of V.I. v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985)). "Examples of 'manifestly legislative acts' include introducing and voting on proposed resolutions and legislation, introducing evidence and interrogating witnesses during committee hearings, subpoenaing records for committee hearings, inserting material into the Congressional Record, and delivering a speech in Congress." *Id.* The

11

**A15**

legislator's intent or motive is irrelevant to this analysis. *See id.* ("'[A]n unworthy purpose' does not eliminate Speech or Debate protection.") (quoting *Johnson*, 383 U.S. at 749).

Some acts are "so clearly non-legislative that no inquiry into their content or underlying motivation or purpose is needed to classify them." *Menendez*, 831 F.3d at 166. Examples include the type of "legitimate constituent services" identified by the Supreme Court in *Brewster*, such as securing Government contracts, preparing newsletters for constituents, delivering speeches outside Congress, in addition to "illegitimate activities such as accepting bribes in exchange for taking official action." *Id.*; *see also Brewster*, 408 U.S. at 512, 526. "Even if these non-legislative acts involve policy or relate to protected legislative activity, they are not protected." *Menendez*, 831 F.3d at 166.

If an act is neither manifestly legislative nor clearly non-legislative, then it is "ambiguously legislative," and the court must proceed to the second step of the Speech or Debate analysis. *Id.* "Ambiguously legislative acts—including trips by legislators and informal contacts with the Executive Branch—will be protected or unprotected based on their particular circumstances." *Id.* The second step requires the court to "consider the content, purpose, and motive of the act to assess its legislative or non-legislative character." *Id.* (citing *Lee*, 775 F.2d at 522-24). Acts where the legislator's "primary purpose" is "to gather information in support of future legislation or to engage in policy-based oversight" are protected by the Speech or Debate privilege. *Id*. at 173.

Indeed, the Speech or Debate Clause provides legislators with immunity when they are engaging in "fact-finding, information gathering, and investigative activities[.]" *Lee*, 775 F.2d at 521. The Third Circuit explained this is because "fact-finding occupies a position of sufficient importance in the legislative process to justify the protection afforded by legislative immunity." *Id*. Speech or Debate Clause immunity also applies when legislators are engaging in true

12

**A16**

legislative oversight. *McDade*, 28 F.3d at 302 (Scirica, J., concurring). But "claims of 'oversight' do not automatically result in Speech or Debate protection."[15] *Menendez*, 831 F.3d at 168. "Like all acts by Members, oversight activities exist along a spectrum: the Speech or Debate protection is obvious at the edges where they are manifestly legislative or clearly non-legislative, but it is not obvious in the middle ground where they are ambiguously legislative and consideration of their content, purpose, and motive is necessary." *Id.*

"[I]nformal efforts to influence the Executive Branch are ambiguously legislative in nature" and similarly require examination of their content, purpose, and motive. *Id.* (quoting *Gravel*, 408 U.S. at 625.) In general, efforts by legislators to "cajole" and "exhort" Executive Branch officials "with respect to the administration of a federal statute" are not protected by the Speech or Debate Clause. *Gravel*, 408 U.S. at 625. This includes "efforts to intervene in decisions pending before the Executive Branch that would mainly affect one particular party." *Id.* (citing *McDade*, 28 F.3d at 300). However, informal attempts to influence the Executive Branch "on policy, for actual legislative purposes, may qualify as true legislative oversight and merit Speech or Debate immunity." *Id.* (quoting *McDade*, 28 F.3d at 304 (Scirica, J., concurring)).

On a motion to dismiss an indictment under the Speech or Debate Clause, the district court must examine the indictment to determine whether its charges are predicated upon evidence of legislative acts. *United States v. Menendez*, 132 F. Supp. 3d 610, 620-621 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016); *see also Brewster*, 408 U.S. at 525 (examining the face of the indictment to determine whether "inquiry into legislative acts or motivation for legislative acts is

---

[15] Oversight activity like participation in committee hearings is "clearly protected" by the Speech or Debate Clause. *McDade*, 28 F.3d at 300 (majority opinion) (citing *Eastland*, 421 U.S. at 504–06). Activities on the other end of the spectrum, "such as routine casework for constituents, are just as clearly not protected." *Id.* The *McDade* court determined "whether the Speech or Debate Clause shields forms of 'oversight' falling between these extremes . . . is less clear." *Id.*

A17

necessary for the Government to make out a prima facie case"). The court must analyze the record evidence before it to make this determination. *See Menendez*, 132 F. Supp. at 620. If a charge cannot be proven without evidence of a legislative act, it must be dismissed. *Id.* at 621. If, however, a charge can be proven without evidence of a legislative act, the charge survives and trial must be "wholly purged of elements offensive to the Speech or Debate Clause." *Johnson*, 383 U.S. at 185. A party asserting the legislative privilege, as Defendant does here, bears the burden of establishing the applicability of legislative immunity by a preponderance of the evidence. *See Lee*, 775 F.2d at 524.

### C. Discussion

To assess the legislative nature of the challenged acts, the Court must examine the record evidence before it. *See In re Grand Jury Investigation*, 608 F. App'x 99, 101 (3d Cir. 2015) (requiring district court to conduct a "careful analysis of the record evidence . . . to decide whether the evidence shows that it was a legislative act."). The record evidence before the Court includes video of the incident attached to Defendant's motion to dismiss in the form of surveillance and body worn camera footage. (*See* Def. Exs. A-J.) Consistent with the Third Circuit's two-step approach to the Speech or Debate Clause, the Court must first determine whether Defendant's acts were "manifestly legislative" or "so clearly non-legislative that no inquiry into their content or underlying motivation or purpose is needed to classify them." *Menendez*, 831 F.3d at 166. The Court finds that Defendant's conduct as alleged in the indictment is neither; rather it is ambiguously legislative, requiring the Court to consider its content, purpose and motive to assess the legislative nature of the acts at issue. *See id.* at 168.

Ambiguously legislative acts include "trips by legislators" and "informal contacts with the Executive Branch" which "will be protected or unprotected based on their particular

**A18**

circumstances." *Id.* at 166.  As the Government concedes, Defendant's inspection of Delaney Hall was a legislative act,[16] and "as a general matter, legislative fact-finding is entitled to the protection of legislative immunity[.]"[17]  *Lee*, 775 F.2d at 517.  The alleged criminal conduct did not occur during Defendant's inspection of Delany Hall, instead it occurred during an inexplicable delay of Defendant's oversight inspection.  Although Defendant bears no fault in the delay, her alleged intervention into the Mayor's questionable arrest had no cognizable connection to any legislative function protected by the Speech or Debate Clause.  Defendant briefly left the facility she came to inspect to engage in the alleged conduct that was not in furtherance of congressional "fact-finding" or "information gathering" as set forth in *Lee*.  775 F.2d at 521.  Defendant's active participation in the alleged conduct removes her acts from the safe harbor of mere oversight.  Lawfully or unlawfully, Defendant actively engaged in conduct unrelated to her oversight responsibilities and congressional duties.  Accordingly, Defendant's argument that her "*inspection* of Delaney Hall was manifestly legislative" is misleading and does not account for Defendant's conduct before the inspection commenced.  (Mot. I at 16) (emphasis added).  The Government has charged Defendant for conduct that took place during a brief time frame before the oversight inspection began, not on

---

[16] *See* Opp. at 57 ("As a preliminary matter, the Government does not take issue with McIver's characterization of the inspection of Delaney Hall with her fellow Members as a 'legislative act.'"). Moreover, Defendant was statutorily authorized to enter and inspect the facility to conduct oversight. *See* 138 Stat. 360 § 527.

[17] "The power to investigate and to do so through compulsory process plainly falls within the sphere of legitimate legislative activity." *Lee*, 775 F.2d at 521.  In *Eastland*, the Supreme Court wrote that "this Court has often noted that the power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change" and that "[t]o conclude that the power of inquiry is other than an integral part of the legislative process would be a miserly reading of the Speech or Debate Clause in derogation of the integrity of the legislative process." 421 U.S. at 504-05 (cleaned up).

15

**A19**

the facility's premises but in the public parking lot outside the Security Gate. The Court cannot find that the charged conduct was manifestly legislative.[18]

Defendant further contends that her exercise of congressional authority "comfortably shows that her *presence* at Delaney Hall was 'manifestly legislative activity.'" (Mot. I at 17) (emphasis added). The case law does not support Defendant's broad interpretation. The Third Circuit's holding in *Lee* is instructive, where the court declined to find that the entirety of a legislator's fact-finding trip was protected by the Speech or Debate Clause. *See* 775 F.2d at 522. There, a legislator from the Virgin Islands argued that the conversations and meetings that took place during a trip he took to New York and Washington, D.C. were entitled to immunity because the purpose of his trip was for legislative fact-finding.[19] *See id*. The Court disagreed. In rejecting his argument as too broad, it found that for "conversations to trigger the protection of legislative immunity, they must have involved legislative fact-finding." *Id.* The Court wrote that "it is Senator Lee's purpose or motive that will determine in part whether the trip was a legislative act

---

[18] Cases where legislative immunity has been triggered for "manifestly legislative acts" involve activity "so clearly legislative in nature that no further examination had to be made to determine their appropriate status." *Lee*, 775 F.2d at 522. "While such manifestly legislative acts may have been pursued and accomplished for illegitimate purposes, such as personal gain, the acts themselves were obviously legislative in nature." *Id.*; *see, e.g.*, *Helstoski*, 442 U.S. 477 (introducing proposed legislation); *Eastland*, 421 U.S. 491 (subpoenaing records for committee hearing); *Doe v. McMillan*, 412 U.S. 306 (1973) (inserting material in the Congressional Record); *Gravel*, 408 U.S. 606 (introducing evidence during committee hearings); *Johnson*, 383 U.S. 169 (1966) (delivering a speech on the floor of the House); *Tenney v. Brandhove*, 341 U.S. 367 (1951) (interrogating witnesses during committee hearings); *Kilbourn v. Thompson*, 103 U.S. 168 (1881) (voting on resolutions).

[19] The defendant in *Lee* had received approval from the President of the Virgin Islands legislature for a legislative fact-finding trip to New York and Washington, D.C. to conduct meetings and discuss such official legislative business as consumer affairs, interior matters and issues involving transportation. *See* 775 F.2d at 517. An investigation by law enforcement later revealed that many of the meetings with government officials he claimed took place did not in fact happen. *See id*.

16

A20

at all" and ordered the district court to examine "which acts were proper legislative acts and which were personal and non-legislative acts." *Id.* at 522, 524.

The Court must proceed to the second step of *Menendez*,[20] where it will consider the predominant purpose of Defendant's actions to determine if any of her acts "qualify as 'true legislative oversight' and merit Speech or Debate immunity." 831 F.3d at 169 (quoting *McDade*, 28 F.2d at 304) (Scirica, J., concurring).

### 1. Counts One and Three

Count One of the indictment alleges that when ICE agents were attempting to handcuff the Mayor, Defendant "placed her arms around him in an effort to prevent HSI from completing the arrest" and that during that attempt to prevent his arrest, Defendant "slammed her forearm into the body of V-1" and "reached out and tried to restrain V-1 by forcibly grabbing him." (Ind., Count 1 ¶¶ 12, 13.) The indictment further alleges that though Defendant "initially remained inside the secured area of Delaney Hall[,]" once DHS agents escorted the Mayor to the unsecured area outside the Security Gate and attempted to effectuate his arrest, Defendant "hurried outside towards the agents and attempted to thwart" the arrest. (*Id.* ¶¶ 11, 12.) The Court must evaluate the predominant purpose of these actions, and it relies on the video evidence attached to Defendant's motion when considering "the content, purpose, and motive of the act to assess its legislative or non-legislative character." *Menendez*, 831 F.3d at 166.

---

[20] Defendant argues that "Supreme Court precedent applying the Speech or Debate Clause makes clear that the Third Circuit's two-step test has 'one step too many.'" (Mot. I. at 20) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 19 (2022)). But the Supreme Court in *Bruen* did not apply the Speech or Debate Clause, nor did it even reference the Clause in its opinion. Rather, the *Bruen* court rejected the "two-step" framework that circuit courts had established for analyzing Second Amendment challenges. *Bruen*, 597 U.S. at 17 ("[T]he Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.").

17

**A21**

Defendant argues that "her sole purpose on May 9 was exercising her congressional prerogative to see for herself how ICE was treating the people it was paying a private company to incarcerate." (Mot. I at 17.)  While Defendant acknowledges that she "followed ICE out of the gates of Delaney Hall," she maintains that she did so "to continue her oversight." (Reply I at 4.) Defendant argues this act was "not a *deviation* from her oversight agenda; it was *doubling down* on it[,]" and that her congressional jurisdiction was "in no way limited to facility premises themselves, and undoubtedly includes conducting oversight of ICE's unlawful and irresponsible behavior." (*Id.* at 4, 5) (emphasis in original.)  The Government responds that Defendant is attempting "to blur the distinction between the clearly legislative act of conducting an inspection of Delaney Hall and the non-legislative act of interfering and impeding with the arrest of the Mayor." (Opp. at 61.)

Here, the predominant purpose of Defendant's acts alleged in Count One was not to engage in fact-finding in connection with oversight of the facility.  After DHS officials announced they were arresting the Mayor, Defendant left the secured area of the facility and opposed the arrest outside of the facility.  Defendant's opposition to the Mayor's arrest went further than the Mayor's security detail,[21] who watched as Defendant wedged herself between the Mayor and V-1. (Def. Ex. I, 1:28-1:39.)  Defendant was not acting pursuant to her congressional oversight authority when she exited the Security Gate and made herself an active participant in a "scrum. . . in a public parking lot." (Mot. I at 3.)  As Defendant objected to the Mayor's arrest, the incident deteriorated into "a serious scuffle involving a great deal of physical contact." (Mot. II at 11.)  Defendant's

---

[21] During the Mayor's arrest, two members of his security detail watched as the Mayor was taken into custody. (Def. Ex. I, 1:30-1:56.)  One of the members of his security detail ("Detective") told a DHS agent who was making a perimeter around the Mayor, "I'm a cop relax, bro.  I'm not doing anything.  Relax." (*Id.*, 1:30-1:41.)

A22

strong opposition to the Mayor's arrest is akin to "lobbying on behalf of a particular party" which remains "outside the constitutional safe harbor" of the Speech or Debate Clause. *Menendez*, 831 F.3d at 169. Indeed, Defendant's conduct is analogous to "efforts to intervene in decisions pending before the Executive Branch that would mainly affect one particular party," which are beyond the scope of Speech or Debate protection. *Id.* at 168. Impeding an arrest, whether lawful or unlawful, goes beyond any reasonable definition of oversight and, accordingly, exceeds the safe harbor of legislative immunity.

The Court therefore rejects Defendant's argument that "the indictment's charges are inextricably connected to her legislative acts." (Mot. I at 14 n.8.) Defendant's actions in Count One are wholly disconnected from the oversight she and the Representatives later conducted when touring the facility, where they engaged in protected fact-finding related to federal immigration policy. Defendant's presence at Delaney Hall does not grant constitutional protection for every act performed in connection to that visit. *See Lee*, 775 F.2d at 522; *Brewster*, 408 U.S. at 528 ("The Speech or Debate Clause does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions.") Similarly unavailing is Defendant's argument that her oversight jurisdiction is not "limited to facility premises themselves" and "undoubtedly includes conducting oversight of ICE's unlawful and irresponsible behavior." (Reply I at 5.) Defendant's oversight authority to inspect immigration detention facilities cannot reasonably include a "scrum. . . in a public parking lot" that has no nexus to oversight or legislative activity. (Mot I. at 3.)

Defendant further argues that "the indictment and evidence produced in discovery make clear that neither a court nor a jury could evaluate the evidence in this case without referring to and analyzing [her] legislative acts, placing those acts squarely at issue." (*Id.* at 12.) Specifically, Defendant contends that the "jury would necessarily hear about her focus on immigration policy,

19

**A23**

and her history of congressional oversight in the area," including "her February 2025 visit to another immigration detention facility in Elizabeth, and her meeting the following month" with ICE regional officials. (*Id*. at 3.)  The Government insists that it has no intention to introduce any of these matters into evidence because "those details do not tend to make it more likely that she committed the charged offenses."[22] (Opp. at 59) (citing Fed. R. Evid. 401(b).)  In order to prove that Defendant violated 18 U.S.C. § 111(a)(1), the Government maintains it only needs to introduce evidence that "she used her forearms to forcibly strike a federal Agent who was attempting to arrest someone outside the gate to Delaney Hall, and she used her hands to forcibly grab and pull at that agent's jacket" and that "[n]othing about that touches on oversight activities." (Opp. at 58.)

The Third Circuit has recognized that Supreme Court jurisprudence (as well as its own) "clearly establishes that the Speech or Debate Clause permits proof of a defendant's status as a member of Congress." *McDade*, 28 F.3d at 290.  The *McDade* Court wrote that "it follows that the Speech or Debate Clause also permits proof of a defendant's status as a member of a congressional committee or as the holder of a committee leadership position."  *Id.*  While the Speech or Debate Clause "prevents the use of legislative acts against a Member[,]" it does not prevent a legislator "from offering such acts in his own defense, even though he thereby subjects himself to cross-examination."  *Id.* at 295 (citing *United States v. Myers*, 635 F.2d 932, 942 (2d Cir.), *cert denied*, 449 U.S. 956 (1980)).  Therefore, Defendant may offer evidence of her visits to

---

[22] The Government also contends that "the jury will not be asked to evaluate her motives and purposes in conducting the inspection on May 9, 2025, because those motives are irrelevant to whether she violated § 111 when she interfered with and impeded the arrest of the Mayor." (Opp. at 59.)

20

**A24**

other immigration facilities in New Jersey and meetings with federal immigration officials at trial without offending the privilege established by the Speech or Debate Clause.

To prove Count One, the Government need not—and may not—inquire into or introduce evidence of her legislative act of conducting an oversight inspection of the facility, which includes eliciting any details from the fact-finding she or the other Representatives engaged in during their tour, or any conclusions drawn from the same.[23] "Where an act has both legislative and non-legislative components, a court should attempt to separate the legislative components from the non-legislative components." *Menendez*, 132 F. Supp. 3d at 620. If the Court determines that "a particular meeting or event constitutes a legislative act, *i.e.*, that it contained a significant legislative component, then legislative immunity attaches and that particular activity is not admissible in the prosecution, unless [Defendant] himself seeks to introduce it." *Lee*, 775 F.2d at 525 (internal citation omitted).

Finally, Defendant suggests that inquiry into Defendant's motives "would raise significant separation-of-powers concerns considering *Trump*'s holding that courts evaluating claims of *presidential* immunity emphatically 'may not inquire into the President's motives.'" (Mot. I. at 20) (emphasis in original) (quoting *Trump v. United States*, 603 U.S. 593, 618 (2024)). Defendant asks this Court to extend the Supreme Court's ruling on presidential immunity to the area of legislative immunity. But these are two separate immunities applicable to two separate branches of government, scrutinized under two separate legal standards. Article I of the Constitution confers

---

[23] The Supreme Court "in *Helstoski* expressly held that, even where a conversation includes a discussion of both legislative acts and non-legislative acts, the conversation can be examined and the immunized aspects of the conversation deleted." *Lee*, 775 F.2d at 523. In *Helstoski*, the Supreme Court wrote that "[n]othing in our opinion, by any conceivable reading, prohibits excising references to legislative acts, so that the remainder of the evidence would be admissible." 442 U.S. at 488 n.7.

**A25**

legislative immunity for speech or debate, which the courts have interpreted and developed through case law, while the presidential immunity doctrine is a court-created doctrine derived from the executive's Article II powers. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)*; see also Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Moreover, the question of whether the President engages in "official action" is a distinct inquiry from whether a Member of Congress was engaging in a legislative act. *Trump,* 603 U.S. at 617.

Determining whether a criminal prosecution relies on legislative acts is a fact-specific inquiry that requires close examination of the conduct at issue to ensure legislative independence, without making "Members of Congress super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516. Critically, the Speech or Debate Clause "does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Id.* at 528. Here, the Court finds that the conduct charged in Count One is only incidentally related to Defendant's legislative oversight. The Government is not prohibited from introducing evidence of those non-legislative acts at trial.

Count Three does not contain any additional factual allegations, but instead it incorporates the "allegations set forth in paragraphs 1 through 12 of Count One" of the indictment. (Ind., Count 3 ¶ 1.) Count Three similarly alleges that Defendant violated 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 2 by forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with "HSI Special Agents and ICE Deportation Officers while said Special Agents and Officers were engaged in and on account of the performance of their official duties."[24]  (*Id.* ¶ 2.) Therefore, the same facts and law apply with equal force to this charge, and the outcome must be the same.

---

[24] Count One, alternatively, identifies Victim-1 as the subject of her alleged criminal conduct. (Ind. Count 1 ¶ 1(d).)

Defendant has not met her burden of establishing that her predominant purpose in physically opposing the Mayor's arrest was to conduct oversight or gather information for a legislative purpose. No genuine legislative purpose was advanced by Defendant's alleged conduct. Therefore, Defendant's motion to dismiss Counts One and Three of the indictment is **DENIED**.

### 2. Count Two

The Court must similarly examine the predominant purpose of the acts alleged in Count Two. After the Mayor was arrested and brought back inside the secured area, Defendant and Representative-2 were among the crowd that was moving towards the Security Gate. (Def. Ex. A, 1:28:02.) V-2, one of the ICE agents standing guard at the Security Gate, was attempting to prevent protestors in the crowd from entering the Security Gate. (*Id*.) As Defendant attempted to reenter the facility through the Security Gate, V-2 forcibly pushed Defendant back into the public parking lot before Defendant pushed V-2 in response.[25] (*Id*., 1:28:10-1:28:20.) The indictment alleges Defendant "pushed past V-2 while using each of her forearms to forcibly strike V-2 as she returned inside of the secured area of Delaney Hall." (Ind., Count 2 ¶ 3.) Defendant successfully reentered the facility after Representative-2 wrapped his arms around her and pulled her through the Security Gate, as the agents kept protestors from entering the Security Gate. (Def. Ex. A, 1:28:20-1:28:25.) Following her reentry into the secured area of Delaney Hall, Defendant and the Representatives were allowed to conduct their inspection of the facility. (Mot. I. at 11.)

---

[25] Surveillance video reveals a dynamic situation where V-2 struggled through a crowd of hostile protestors before encountering Defendant at the Security Gate. (*See generally* Def. Ex. I.) The Court makes no finding on V-2's intent when he forcibly pushed Defendant as she lawfully tried to reenter the Security Gate. While the inchoate record does not allow for a determination of Defendant's predominate purpose upon reentry into the Security Gate, it is axiomatic that Defendant's statutory right to enter and inspect the facility could not be infringed, even if mistakenly, by V-2. Upon completion of the record, Count Two will be subjected to scrutiny.

*Menendez* requires this Court to assess Defendant's predominant purpose to determine the applicability of Speech or Debate protection. As of the date of oral argument, the factual record is still being developed. Discovery is ongoing, and the parties are in process of reviewing two hours of complete video from the inspection.[26] The facts surrounding that inspection are relevant to Defendant's motive in reentering the facility in Count Two, and whether her intent was related to her oversight duties.[27] Defendant's predominant purpose can only be established by facts that the parties have not yet put before the Court. Accordingly, the factual record is not ripe to determine the applicability of the Speech or Debate Clause for Count Two. Therefore, the Court will reserve on this matter until the factual record is developed further.

### III. SELECTIVE ENFORCEMENT AND VINDICTIVE PROSECUTION

Defendant also moves to dismiss the indictment for selective enforcement and prosecution in violation of her constitutional rights under the First and Fifth Amendments. (Mot. II at 14.) She argues that she is being prosecuted for the content or viewpoint of her speech and for her partisan affiliation. (*Id.* at 20.) In addition, Defendant alleges that she was vindictively prosecuted, and that the indictment should be dismissed on this basis[28] as well. (*Id.* at 27.) In the alternative, Defendant asks this Court, if it determines the existing factual record does not provide clear

---

[26] The Government is in the process of turning over the complete set of surveillance footage from the Members' tour, which took place after the subject incident. (*See* Tr. at 20:1-14.)

[27] A Member of Congress may only "be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." *Helstoski*, 442 U.S. at 487-88.

[28] A claim of vindictive or selective prosecution is not immediately appealable under the collateral order doctrine. *See United States v. Biden*, No. 24-1703, 2024 WL 4541448, at *2 (3d Cir. May 9, 2024) (holding criminal defendants raising selective and vindictive prosecution claims "cannot appeal before final judgment.").

evidence of her claims, to grant additional discovery and hold evidentiary hearings on her claims of selective enforcement and prosecution as well as vindictive prosecution. (*Id.* at 28.)

### A. Legal Standard

The Executive Branch, led by the President, is vested with the exclusive authority to prosecute cases. *See United States v. Nixon*, 418 U.S. 683, 693 (1974). "In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11, (1982)). If probable cause exists, the decision of whether to prosecute or to present charges to a grand jury is generally committed entirely to the prosecutor's discretion. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). This "broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review."[29] *Wayte*, 470 U.S. at 607.

Prosecutorial discretion, however, is not "unfettered." *United States v. Batchelder*, 442 U.S. 114, 124-125 (1979). The charging decision must not run afoul of the rights and protections afforded by the Constitution. *See id.* at 125 ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints."). A claim of selective prosecution is "an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Such a claim is founded on principles of equal protection.[30] *Id.* at 465. In particular, the decision to prosecute may not be

---

[29] The Supreme Court in *Wayte* held that "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." 470 U.S. at 607. These are "substantial concerns" that "make the courts properly hesitant to examine the decision whether to prosecute." *Id.* at 607-08.

[30] Selective prosecution claims, therefore, are analyzed according to equal protection standards. *See Wayte*, 470 U.S. at 608. Although the Fifth Amendment, unlike the Fourteenth, does not contain an equal protection clause, it does contain an equal protection component, and the Supreme

A29

"deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." *Wayte*, 470 U.S. at 608 (internal citations and quotations omitted). An improper basis for selective prosecution includes the exercise of First Amendment rights. *See id*. at 604 (denying selective prosecution claim alleged by "vocal" opponents of a registration program claiming to have been impermissibly targeted for prosecution "on the basis of their exercise of First Amendment rights"). Prosecutorial decisions, therefore, "cannot turn on the exercise of free speech rights."[31] *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023).

To demonstrate selective prosecution, a defendant must show that the prosecution was "motivated by a discriminatory purpose" and had a "discriminatory effect." *Armstrong*, 517 U.S. at 465. To satisfy the discriminatory effect element, the defendant bears the burden of showing that "persons similarly situated have not been prosecuted" for the same offense. *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989). To determine whether individuals are similarly situated, courts assess a variety of factors, including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte*, 470 U.S. at 607. To satisfy the "discriminatory purpose" element, the defendant must also show that "the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary

---

Court's "approach to Fifth Amendment equal protection claims has[. . . ]been precisely the same as to equal protection claims under the Fourteenth Amendment." *Id.* n.9 (citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638, n. 2 (1975)).

[31] "Specifically, selective enforcement of a neutral and facially constitutional law may run afoul of the First Amendment if the government's prosecutorial choices turn on the content or viewpoint of speech." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023).

26

**A30**

factor, or that the prosecution was intended to prevent his exercise of a fundamental right." *Schoolcraft*, 879 F.2d at 68. Each of these elements must be shown with "clear evidence sufficient to overcome the presumption of regularity that attaches to decisions to prosecute." *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012) (cleaned up). This standard is "a demanding one." *Armstrong*, 517 U.S. at 463.

Selective prosecution and selective enforcement claims "are generally evaluated under the same two-part test, which is derived from a line of seminal Supreme Court cases about the collision between equal protection principles and the criminal justice system." *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017). "Meeting this standard generally requires evidence that similarly situated individuals of a difference race or classification were not prosecuted, arrested, or otherwise investigated." *Id.* Though "selective prosecution" and "selective enforcement" have been used interchangeably, the Third Circuit has clarified that these are separate claims, noting that "'[p]rosecution' refers to the actions of prosecutors (in their capacity as prosecutors) and 'enforcement' to the actions of law enforcement and those affiliated with law-enforcement personnel." *Id.* Nevertheless, a "defendant challenging a criminal prosecution at either the law enforcement or prosecution inflection points must provide 'clear evidence' of discriminatory effect and discriminatory intent" or purpose. *Id.*

One form of selective prosecution is vindictive prosecution, which derives from the principle that "an individual certainly may be penalized for violating the law, [but] he just as certainly may not be punished for exercising a protected statutory or constitutional right." *Goodwin*, 457 U.S. at 372; *see also Bordenkircher*, 434 U.S. at 363 ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort[.]"). There are two ways in which a defendant may demonstrate vindictive prosecution.

27

**A31**

"First, a defendant may use evidence of a prosecutor's retaliatory motive to prove actual vindictiveness. Second, in certain circumstances, a defendant may show facts sufficient to give rise to a presumption of vindictiveness." *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993) (internal citations omitted). A presumption of vindictiveness only attaches where there is a "realistic likelihood of vindictiveness." *Id*. "The inquiry here is not whether there is a possibility that the defendant might be deterred from exercising a legal right, but whether the situation presents a reasonable likelihood of a danger that the State might be retaliating against the accused for lawfully exercising a right." *United States v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992). As the Third Circuit has warned, "courts must be cautious in adopting" such a presumption. *Id*.

### 1. Discovery in Support of Defendant's Claims

Not only is the standard for showing selective prosecution a "rigorous" one, but so is the standard for obtaining discovery in support of such a claim. *Armstrong*, 517 U.S. at 468 ("The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim."). Six years after *Armstrong*, the Supreme Court again reiterated the significant burden facing a defendant, explaining that defendant must show "***some evidence*** of both discriminatory effect and discriminatory intent" even to obtain discovery in support of a selective prosecution claim. *United States v. Bass*, 536 U.S. 862, 863 (2002) (emphasis added). The Third Circuit recently explained the nuanced differences between the standard to obtain discovery and the standard to prevail on the merits of a selective prosecution claim:

> A criminal defendant, however, will not often have access to the information, statistical or otherwise, that might satisfy a "clear evidence" burden. Thus, the two component cases that make up the *Armstrong/Bass* test – *United States v. Armstrong* and *United States v. Bass*, both of which arose from selective prosecution challenges – propounded a facially less rigorous standard for criminal defendants seeking *discovery* on an anticipated selective prosecution claim. Instead

28

**A32**

of "clear evidence," a successful discovery motion can rest on "some evidence." "Some evidence" must still include a showing that similarly situated persons were not prosecuted. Furthermore, under *Armstrong/Bass*, the defendant's showing must be "credible" and cannot generally be satisfied with nationwide statistics.

*Washington*, 869 F.3d at 214-15 (emphasis in original) (footnotes omitted). In *Washington*, the Third Circuit joined the Seventh in holding that "motions for discovery seeking information on putative claims of unconstitutional selective enforcement are not governed by strict application of the *Armstrong/Bass* framework." *Id.* at 220. Therefore, on a pretrial discovery request that alleges both selective prosecution and selective enforcement, "the standard guiding the district court's discretion is different" for claims of selective enforcement. *Id.* Thus, "[d]istinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial stage, provide 'some evidence' of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement." *Id.* at 221. However, "the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement." *Id.* In so holding, the Third Circuit declined "to mandate a precise system or order that a district court must follow" but rather left it to the "broad discretion of the district court" that is routinely exercised in "matters of docket control and discovery[.]" *Id.* at 220.

"Although the Third Circuit has not squarely addressed the standard to obtain discovery for a vindictive-prosecution claim, it appears to be the same as for selective prosecution." *United States v. Biden*, 729 F. Supp. 3d 410, 418 (D. Del. 2024), *appeal dismissed*, No. 24-1703, 2024 WL 4541448 (3d Cir. May 9, 2024) (citing *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) ("We see no reason to apply a different standard to obtain discovery on a claim of vindictive prosecution.")). "Thus, a defendant may fail to demonstrate dismissal is warranted for selective or vindictive prosecution, but discovery may nevertheless be appropriate if the defendant comes

29

**A33**

forward with some evidence of the essential elements of the underlying" vindictive prosecution claim. *Biden*, 729 F. Supp. 3d at 418.

### B. Discussion

To establish the discriminatory effect prong of her selective enforcement and prosecution claims, Defendant identifies the individuals prosecuted under 18 U.S.C. § 111(a) in connection with the attack on the Capitol on January 6, 2021 ("the January 6 defendants")[32] as a similarly situated group of individuals who were not prosecuted for the same offense on account of their viewpoint and partisan affiliation. (Mot. II at 17.) Defendant maintains that that her "case stands in remarkable contrast to those January 6 cases dismissed by the government" because her conduct was "manifestly less egregious" and did not result in any injuries or physical harm to officers, thus "there is no conduct-based justification for dismissing the January 6 cases, while continuing to prosecute her." (*Id.* at 19, 20.) The Government responds that the January 6 defendants cannot be considered similarly situated to Defendant because they were pardoned, and thus "on their face do not meet the[] basic criteria" of individuals who "'could have been prosecuted for the offenses for which [the defendant was] charged, but were not prosecuted.'" (Opp. at 15) (citing *United States v. Hedaithy*, 392 F.3d 580, 607 (3d Cir. 2004)).

Defendant further argues that the differential treatment between her and the January 6 defendants "turned on a constitutionally impermissible consideration—namely, the content or viewpoint of speech, or partisan affiliation" which establishes the discriminatory intent prong of

---

[32] Defendant states that she "does not rely on defendants who received pardons or commutations and thus does not implicate any issues associated with the President's constitutional authority to 'grant Reprieves and Pardons for Offences against the United States.'" (Mot. II at 6 n. 12) (citing U.S. Const. art. II, § 2, cl. 1.) Instead, Defendant relies on the January 6 defendants who had been charged with assaulting federal officers in violation of 18 U.S.C § 111(a) and whose cases were pending at the time of the presidential proclamation but "have now been dismissed[.]" (*Id.* at 17.)

her selective enforcement claim.  (Mot. II at 20) (internal citations and quotations omitted).

Defendant contends that the failure of the U.S. Attorney's Office to follow internal consultation

guidelines before filing charges against her, the timing of the charges, as well as statements made

by the Interim U.S. Attorney, President Trump, and DHS all demonstrate the discriminatory

purpose behind the government's prosecution and enforcement action against her.  (*Id.* at 22-26.)

### 1.  Discriminatory Effect

To establish her claims for selective enforcement and prosecution, Defendant must provide

clear evidence that "similarly situated individuals of a difference race or classification were not

prosecuted, arrested, or otherwise investigated."  *Washington*, 869 F.3d at 214.  Defendant has

identified the January 6 defendants as the similarly situated group against whom enforcement and

prosecutorial action was not taken.  The Court will evaluate Defendant's selective enforcement

and prosecution claims separately.

The January 6 defendants are not a similarly situated class of individuals against whom no

enforcement or investigative action was taken.  It is undisputed that the Department of Justice

("DOJ") launched a large-scale investigation of the January 6 defendants and dedicated

considerable financial and employee resources to that effort.  In her brief, Defendant cites an NPR

article describing DOJ efforts in the wake of January 6, 2021 as "the largest criminal investigation

in U.S. history."[33]  (*See* Mot. II. at 19 n.30.)  The Government's brief cites a press release issued

by the former Attorney General Merrick Garland on the fourth anniversary of January 6, 2021,

stating that "[o]ver the past four years, our prosecutors, FBI agents, investigators, and analysts

have conducted one of the most complex, and most resource-intensive investigations in the Justice

---

[33] *The Jan. 6 Attack: The Cases Behind the Biggest Criminal Investigation in U.S. History*, NPR (Mar. 14, 2025, at 17:26 ET), https://www.npr.org/2021/02/09/965472049/the-capitol-siegethe-arrested-and-their-stories.

Department's history."[34]  The Court agrees with the Government's argument that "the massive investigatory action brought against the January 6 Defendants entirely undermines any claim that the January 6 Defendants can be said to be similarly situated for enforcement purposes," particularly compared to the "limited" enforcement action DHS took against Defendant here.[35] (Opp. at 24, 23.)  Accordingly, Defendant's selective enforcement claim fails.

Defendant's selective prosecution claim suffers from a similar "threshold, insurmountable defect" (Opp. at 14) because the January 6 defendants were in fact prosecuted by DOJ before receiving pardons for their crimes.[36]  On January 20, 2025, President Trump issued a Proclamation granting a blanket pardon "for certain offenses relating to the events at or near the United States Capitol on January 6, 2021" and directing "the Attorney General to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021."[37]  DOJ had no discretion when dismissing the January 6 defendants' criminal cases—the Presidential pardon required their

---

[34] Press Release, U.S. DEP'T OF JUST., *Attorney General Merrick B. Garland Statement on the Fourth Anniversary of the January 6 Attack on the Capitol* (Feb. 6, 2025), *available at* https://www.justice.gov/archives/opa/pr/attorney-general-merrick-bgarland-statement-fourth anniversary-january-6-attack-capitol.

[35] The Government describes its enforcement action against Defendant as consisting "largely of downloading the video footage of the body-worn cameras of ICE officers who assisted in the arrest of the Mayor as well as obtaining surveillance footage from Delaney Hall's cameras near the gate to the facility and subsequently reviewing that video" which was "then provided to members of the U.S. Attorney's Office for review." (Opp. at 24.)

[36] The same NPR article that Defendant cites in her brief states that 1,575 people were charged with federal crimes as part of the January 6 investigation, 1,030 defendants pleaded guilty, 261 went to trial, and 1,126 were sentenced by a federal judge. *See supra* note 34.

[37] Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-01950.pdf.

**A36**

dismissal. The Government's brief attests that the "Office of the Pardon Attorney further confirmed that the January 6 Defendants whose cases were pending as of the issuance date of the Pardon are included in the universe of defendants who received pardons as a result, and the Pardon Office has issued certificates of pardon to those defendants upon request."[38] (Opp. at 16.) The Government attaches to its brief twenty-four certificates of pardon that were requested and received by defendants whose cases were still pending at the time of the pardon. (*See* ECF 27-5, Gov. Ex. B.)

Moreover, courts dismissing the remaining January 6 cases have acknowledged that the President had pardoned the defendant appearing before them. *See e.g.*, *United States v. Banuelos*, 763 F. Supp. 3d 1, at *1-2 (D.D.C. 2025) ("The Court does not discern…any defect in either the legal merits of, or the factual basis for, the Government's case" that "the President, in addition to pardoning the Defendant, has ordered the Attorney General to do so."); *United States v. Warnagiris*, No. 21-0382, 2025 WL 341990, at *4 (D.D.C. Jan. 30, 2025) ("On January 20, 2025, President Trump issued a sweeping proclamation pardoning *individuals charged for their conduct at the Capitol on January 6, 2021*")[39] (emphasis added). The January 6 defendants, therefore, are not similarly situated because they were in fact prosecuted and subsequently pardoned.

Irrespective of the pardon, the January 6 defendants are not similarly situated to Defendant because the facts and circumstances surrounding their criminal cases are unambiguously distinct.

---

[38] The Government's brief further avers that on September 2, 2025, the Deputy Pardon Attorney from the Office of the Pardon Attorney informed the U.S. Attorney's Office that "(i) the January 6 Defendants with then-pending cases received pardons under the Pardon and were eligible to receive certificates of pardon, and (ii) that any January 6 Defendant was still considered pardoned even if a certificate of pardon was not requested." (Opp. at 7 n.10.)

[39] The defendant in *Warnagiris* requested and received a certificate of pardon. (*See* ECF 27-1, Gov. Ex. A, at 2.)

A37

Several circuits have adopted the Fourth Circuit's holding that individuals "are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996); *see e.g., Frederick Douglass*, 82 F.4th at 1137; *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008); *United States v. Deberry*, 430 F.3d 1294, 1301 (10th Cir. 2005); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1006 (7th Cir. 2004). Defendant concedes that while she and the January 6 defendants were prosecuted under the same statute, "the similarity ends there." (Mot. II. at 1.) Defendant explicitly differentiates herself from the January 6 defendants, noting that many of those defendants had "serious criminal records," while she has no criminal history. (*Id*. at 19.) Defendant also labels her conduct as "manifestly less egregious than storming the Capitol, throwing explosives, beating officers with bats and riot shields, and spraying them with pepper spray." (*Id.* at 20.) In contrast, Defendant points out that there is no suggestion in this case that any of the alleged victims were hurt. (*Id*.)

The Court is further persuaded by the District Court's opinion in *United States v. Judd* denying a January 6 defendant's motion to dismiss for selective prosecution and enforcement, cited in the Government's brief. 579 F. Supp. 3d 1 (D.D.C. 2021); *see* Opp. at 20. The defendant in *Judd* argued he had been selectively prosecuted for assaulting law enforcement officers outside the Capitol while rioters in Portland against whom the government had dropped charges had committed similar or more severe assaultive conduct. 579 F. Supp. 3d at 7. The court there acknowledged that the "unique context of January 6 render few defendants similarly situated" and ultimately found the two groups of protestors were not similarly situated because the "action in Portland, though destructive and ominous, caused no similar threat to civilians." *Id*. at 8. If the January 6 defendants can be distinguished from another group of civilian protestors, Defendant, a

34

**A38**

Congresswoman with statutory authority to be present at Delaney Hall, is certainly not similarly situated to the individuals prosecuted in connection with January 6.

### 2. Discriminatory Purpose

Because Defendant has not demonstrated that similarly situated individuals were not prosecuted, arrested, or otherwise investigated, her selective enforcement and prosecution claims fail, and the Court need not address Defendant's arguments about the discriminatory intent prong required to prove her claims.[40] *See Biden*, 729 F. Supp. 3d at 422 ("Because Defendant has failed to come forward with 'clear evidence' that he has been prosecuted where others similarly situated were not, he is unable to show discriminatory effect, one of the two necessary elements of a selective-prosecution claim . . . his motion to dismiss the indictment on that basis must be denied."). Defendant has failed to offer clear evidence that the charges in this case had a discriminatory effect, thus her claims of selective enforcement and prosecution must fail.

### 3. Vindictive Prosecution

To prove her vindictive prosecution claim, Defendant must offer evidence of actual vindictiveness—direct evidence that the prosecutor harbored personal animus towards her—or by showing "a reasonable likelihood of a danger" that the government is retaliating against her for lawfully exercising a right that gives rise to a presumption of vindictiveness. *Esposito*, 968 F.2d at 303. Defendant argues that DHS statements and actions beginning on May 9 "provide strong

---

[40] Defendant's principal argument that the charges in this case were motivated by a discriminatory purpose is that the government "cannot pursue charges against her because she is a Democrat who conducts oversight of Executive Branch immigration policy, while dismissing charges brought under the same statute against those whose views they share and who engaged in conduct far more egregious." (Mot. II at 4.) Defendant asserts that this difference in viewpoint is "the sole credible explanation for that difference in treatment." (*Id.*) This argument is belied by the fact that two more senior members of her political party were present on May 9 conducting oversight of executive immigration policy who also surrounded the Mayor and objected to his arrest but were not criminally charged.

evidence that the goal of this prosecution is to deter" Defendant's legitimate exercise of her statutorily protected oversight responsibilities. (Mot. II. at 27.) Defendant further argues that the prosecution's retaliatory animus is demonstrated by the "deliberate and reckless steps" that executive branch officials took to "drive the [Representatives'] visit into chaos" and "has insisted on criminal prosecution as retribution" for Defendant's participation in those events. (*Id.* at 28.)

To begin, Defendant has not demonstrated that her prosecution is a result of personal animus harbored by the prosecution. Defendant identifies public statements made in April 2025 by the Interim U.S. Attorney in an interview that "we could turn New Jersey red"[41] as well as a statement from the President after Defendant had been charged that the "days of woke are over."[42] (*Id.* at 23-24.) None of these statements are particularized to Defendant herself. In fact, during President Trump's full exchange with a reporter where he stated the "days of woke are over," when asked if he directed the prosecution of Defendant, the President stated "No. I didn't. The days of woke are over. That woman, I don't, I have no idea who she is."[43] These broad statements are not specific to this Defendant or responsive to her policy positions on immigration, and are therefore not personalized in a way that the requested relief contemplates. Defendant also points to DHS statements criticizing Democratic lawmakers and referring to their oversight visit as

---

[41] HUMAN EVENTS DAILY WITH JACK POSOBIEC, *Newly Appointed New Jersey DA Alina Habba-Live From the White House*, at 4:47-49, (Apple Podcasts Mar. 27, 2025), *available at available at* https://podcasts.apple.com/ca/podcast/newly-appointed-new-jersey-da-alinahabba-live-from/id1585243541?i=1000701160 703 at 4:47-49.

[42] Andrew Solender, *Trump Defends McIver Charges*: *"The Days of that Crap Are Over"*, AXIOS (May 20, 2025), https://www.axios.com/2025/05/20/trump-lamonica-mciver-doj-charges-ice.

[43] *"Trump on McIver Charges: The Days of Woke Are Over"*, WASH. POST (May 20, 2025, at 11:51 ET), www.washingtonpost.com/video/politics/trump-onmciver-charges-the-days-of-woke-are-over/2025/05/20/68660a86-b6e2-4ac7-9641-17bf5289e5f1_video.html.

"political stunts" that "endanger the safety" of ICE personnel. (*See id.* at 27.)[44] But DHS statements and actions are irrelevant to Defendant's instant vindictive *prosecution* claim. The Court agrees with the Government that this evidence "does not involve anyone making prosecutorial decisions and is thus not a proper consideration for a vindictive prosecution motion." (Opp. at 41.) Defendant, therefore, has not presented clear evidence of personal animus.

Next, the Court must determine if a presumption of vindictiveness has attached. The Supreme Court has cast doubt on the applicability of the presumption in pretrial settings.[45] *See generally Goodwin*, 457 U.S. at 372-84 (discussing the propriety of the presumption in cases where a defendant successfully challenges a conviction and faces enhanced punishment upon retrial, but declining to apply the presumption in the pretrial context where the defendant faced additional charges and enhanced punishment after refusing to plead guilty as demanded by the prosecutor). The district court in *Biden* wrote in 2024 that "[t]his Court has found no cases from within the Third Circuit where a presumption of vindictiveness was applied in the pretrial context." 729 F. Supp. 3d at 424 n.7 (declining to apply the presumption of vindictiveness in pretrial motion to dismiss). This Court has identified no such cases from within the Third Circuit since. Moreover,

---

[44] Citing Press Release, *DHS, ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility* (July 14, 2025), https://perma.cc/3GNL-PWE6.

[45] The Supreme Court in *Goodwin* explained that "[t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting" because "[a]t this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized" but once a trial begins "and certainly by the time a conviction has been obtained – it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted." 457 U.S. at 381. "Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision." *Id.*

37

**A41**

the Third Circuit has warned that "courts must be cautious in adopting" a presumption of vindictiveness. *Esposito*, 968 F.2d at 303.

Defendant maintains that the government is retaliating against her for "for lawful oversight activity." (Reply II. at 11.) Defendant argues that "the prosecution here rests on a retaliatory animus" because "the Executive Branch does not like scrutiny of its immigration policies and practices." (Mot. II. at 27-28.) This argument is undermined by the absence of charges filed against the Representatives who were also present on May 9 conducting oversight of the administration's immigration policies. Video evidence shows that Representative-1 and Representative-2 were also in close proximity to the Mayor and also advocated on his behalf, but did not physically contest his arrest. (*See* Def. Ex. A, 1:27:10.) Similarly unavailing is Defendant's argument that the government's circumvention of DOJ's mandatory approval procedure to charge a Member of Congress is evidence of retaliatory motive. (*See id.* at 27.) In early May, before Defendant was charged, DOJ suspended the requirement that federal prosecutors seek approval from the Public Integrity Unit before bringing charges against public officials. (*See* Opp. at 26-27.)[46] Thus, even if a presumption of vindictiveness could be invoked in the pretrial context, Defendant has failed to demonstrate that such a presumption is appropriate here.

Defendant has failed to show that her prosecution is vindictive.

---

[46] Citing Sarah N. Lynch et al., *How Trump Defanged the Justice Department's Political Corruption Watchdogs*, REUTERS (June 9, 2025) (emphasis added), https://www.reuters.com/investigations/how-trump-defanged-justice-departmentspolitical-corruption-watchdogs-2025-06-09/.

A42

### 4. Defendant's Request for Discovery and an Evidentiary Hearing

Defendant seeks discovery for her claims of selective and vindictive prosecution in the event the Court concludes that dismissal is not yet warranted. (*See* Mot. II at 28.) Defendant has submitted discovery requests which ask for communications over a six-month period referring to the incident in question or discussing the Defendant, the Mayor, or the Representatives' oversight visit. (*See* ECF 26-1.) Defendant seeks these communications between "the prosecution team" which she defines as including but not limited to the Attorney General, the Deputy Attorney General, the Assistant Attorney General for the Criminal Division, the Interim or Acting U.S. Attorney for the District of New Jersey, the DHS Secretary, Deputy Secretary, General Counsel, and their staff, in addition to all members of ICE leadership and members of their staff. (*Id.* at 2.)

Defendant is correct that the standard to obtain discovery is different than the standard to prevail on a motion to dismiss the indictment for selective or vindictive prosecution. While Defendant needs to show "clear evidence" that her prosecution was selective or vindictive to obtain dismissal, but she only needs to come forward with "some evidence" to obtain discovery. *Washington*, 869 F.3d at 214; *see also Bass*, 536 U.S. at 863 (requiring "some evidence of both discriminatory effect and discriminatory intent" for a selective prosecution claim). Even with that clarification, the Court is mindful that both standards are considered "rigorous." *Armstrong*, 517 U.S. at 468. Indeed, the standard is so rigorous that as of 2017, the Third Circuit had yet to find "sufficient evidence to permit discovery of a prosecutor's decision-making policies and practices." *Washington*, 869 F.3d at 215; *see also Biden*, 729 F. Supp. 3d at 427 n.10 ("This Court has been unable to locate Third Circuit cases since 2017 permitting such discovery.").

This is not the rare case where discovery of a prosecutor's decision-making practices will be permitted. To obtain discovery, Defendant "must still include a showing that similarly situated

**A43**

persons were not prosecuted." *Washington*, 869 F.2d at 215.  Defendant's motion falls short.  For the reasons discussed *supra*, Defendant has not offered "credible" evidence that similarly situated individuals were not prosecuted, because the January 6 defendants were all pardoned without the opportunity for prosecutorial discretion.  *Id.*  Defendant has not offered "some evidence" of her vindictive prosecution claim either.  She provides the Court with statements made by the Interim U.S. Attorney and President that are not particularized to her or her policy positions on immigration.  To provide discovery based on statements made by executive branch officials related only to her partisan affiliation would render the discovery standard hollow because it would be universally applicable.  Accordingly, Defendant is not entitled to discovery for her selective or vindictive prosecution claims.

The standard for discovery on a selective enforcement claim is even less rigorous and subject to the district court's discretion, although the Third Circuit advised that "the district court must be mindful that the end 'goal' of such a discovery motion is a valid claim of selective enforcement under the heightened substantive standards," which its decision in *Washington* did not "diminish or distinguish."  869 F.2d at 221.  Guided by these principles, the Court cannot find that Defendant's broad request for communications among top DOJ, DHS, and ICE officials beginning on January 20, 2025 is warranted for her selective enforcement claim.  As discussed, Defendant has failed to provide evidence that the January 6 defendants were similarly situated individuals who were not investigated or arrested on account of the vast resources and manpower devoted to investigating those individuals.

Defendant has thus failed to offer the minimal required evidence of discriminatory effect.  That failure is itself enough to deny Defendant's request for discovery and an evidentiary hearing.  *See Bass*, 536 U.S. at 864 ("[B]ecause respondent failed to submit relevant evidence that similarly

**A44**

situated persons were treated differently, he was not entitled to discovery."); *Hedaithy*, 392 F.3d at 607 (denying discovery where defendant "did not present sufficient credible evidence of discriminatory effect").

### IV. CONCLUSION

For the foregoing reasons, Defendant's motions to dismiss the indictment for selective enforcement, selective prosecution, and vindictive prosecution, and for discovery and an evidentiary hearing (ECF 20) regarding the same are **DENIED**. Defendant's motion to dismiss the indictment for legislative immunity (ECF 19) is **DENIED**, and the Court will reserve on the question of whether Defendant is immune from prosecution for Count Two under the Speech or Debate Clause. An appropriate order follows.

/s/ Jamel K. Semper
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig: Clerk
cc: Parties

41

**A45**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Hon. Jamel K. Semper |
| *v.* | |
| LaMONICA McIVER. | Crim. No. 2:25-cr-00388-JKS |

## CONGRESSWOMAN LaMONICA McIVER'S SECOND NOTICE OF APPEAL

Defendant Congresswoman LaMonica McIver hereby notices her appeal to the United States Court of Appeals for the Third Circuit from the order entered on January 5, 2026. Dkt. 64. This notice of appeal is in addition to, and directly related to, the appeal from the Court's order entered on November 13, 2025, Dkt. 45; *see* Dkt. 60, which has been docketed in the Third Circuit as Case No. 25-3573.


Dated: January 20, 2026


ARNOLD & PORTER KAYE SCHOLER LLP


By: _____
Lee M. Cortes, Jr.
Paul J. Fishman
One Gateway Center | Suite 1025
Newark, NJ 07102
Telephone: 973-776-1901
Lee.Cortes@arnoldporter.com
Paul.Fishman@arnoldporter.com

Counsel for Congresswoman LaMonica McIver

1

**A46**

**CERTIFICATE OF SERVICE**

    I certify that true and accurate copies of this notice were sent by ECF service to counsel of record to all parties in this matter on January 20, 2026.

<br><br>

_____
Lee M. Cortes, Jr.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Crim. No. 25-388 |
| *Plaintiff*, | |
| v. | **ORDER** |
| LAMONICA MCIVER, | January 5, 2026 |
| *Defendant*. | |

**SEMPER**, District Judge.

This matter having come before the Court on Defendant LaMonica McIver's motion to dismiss for legislative immunity under the Speech or Debate Clause (ECF 19) and the Court having considered the submissions of the parties, for the reasons stated in this Court's Opinion dated January 5, 2026,

**IT IS** on this 5th day of January 2026,

**ORDERED** that Defendant's motion to dismiss (ECF 19) is **DENIED.**

/s/ Jamel K. Semper
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:  Clerk
cc:  Parties

**A48**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Crim No. 25-388 |
| *Plaintiff,* | |
| v. | **OPINION** |
| LAMONICA MCIVER, | January 5, 2026 |
| *Defendant.* | |

**SEMPER**, District Judge.

**THIS MATTER** comes before the Court on Defendant LaMonica McIver's ("Defendant") motion to dismiss the indictment against her for legislative immunity under the Speech or Debate Clause. (ECF 19.) The Court previously denied Defendant's motion to dismiss Counts One and Three of the indictment, and reserved ruling on Count Two pending further briefing and continued discovery. (ECF 44, "November Opinion" at 23-24.) On November 17, 2025, the Court ordered additional briefing and discovery on Count Two. (ECF 47.) For the reasons stated below, Defendant's remaining motion to dismiss Count Two of the indictment is **DENIED**.[1]

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The Court incorporates the facts and procedural history from its November Opinion herein. (*See* ECF 44 at 2-7.) On May 9, 2025, Defendant, a Congresswoman representing the 10th Congressional District of New Jersey, and two fellow members of Congress ("Representative-1" and "Representative-2"; collectively, "Representatives") made an unannounced oversight visit to

---

[1] The Court's decision is subject to immediate appeal under the collateral order doctrine. *See Helstoski v. Meanor*, 442 U.S. 500, 506–08 (1979).

Delaney Hall, an immigration detention center in Newark, New Jersey. Department of Homeland Security ("DHS") officials inexplicably made the Representatives wait in Delaney Hall's administrative office for over an hour. (ECF 44 at 3.) During this delay, DHS officials arrested the Mayor of Newark ("the Mayor") for trespassing shortly after they had allowed him onto Delaney Hall's grounds.[2] (*Id.* at 4.) Moments before the Mayor was arrested, Defendant briefly left the facility's secured area to object to the Mayor's arrest, which DHS officials effectuated in a crowd of protestors. (*Id.* at 4-5.) As the Special Agent in Charge ("V-1") led the handcuffed Mayor towards the facility's secured area, Defendant and Representative-2 followed them back towards the facility's entrance. (*Id.* at 5.)

Defendant encountered and initiated contact with V-2, an Immigration and Customs Enforcement ("ICE") Deportation Officer, as she approached the gates of Delaney Hall (the "Security Gate").[3] (ECF 51-7, "Def. Ex. CC", 00:50.) The physical contact between Defendant and V-2 lasted only two to three seconds (*id.*, 00:52-55) and occurred approximately ten seconds after the conduct that constitutes the Government's charges in Counts One and Three. (Def. Ex. A, 01:27:58-01:28:09.) Immediately after Defendant's contact with V-2, she was forcefully shoved by a similarly dressed ICE officer as she tried to lawfully re-enter the Security Gate. (Def. Ex. CC, 00:55.) Defendant was able to enter the facility shortly thereafter, when Representative-

---

[2] The Government dismissed the Mayor's trespass charges twelve days later. (ECF 44 at 6.)

[3] In its November Opinion, the Court determined that immediately after the Mayor's arrest, Defendant was pushed at the Security Gate without provocation by an ICE official mistakenly identified as V-2. (ECF 44 at 6.) A review of newly submitted body worn camera reveals that V-2 is a similarly dressed but distinct ICE officer. Immediately before Defendant was pushed by the ICE official at the Security Gate, Defendant made physical contact with V-2, who backpedaled into Defendant's path as she approached the Security Gate. (Def. Ex. CC, 00:52.) V-2 was obscured on Defense Exhibit A by the protestors surrounding the Security Gate. (ECF 19-3, "Def. Ex. A", 1:28:05-25.)

A50

2 wrapped his arms around her and pulled her through the gates.  (*Id.*, 01:02.)  After the Mayor's arrest, Defendant and the Representatives returned inside the facility and were allowed to conduct their oversight inspection.  (ECF 44 at 6.)

The Government charged Defendant with three counts of assaulting, resisting, impeding, and interfering with a federal officer in violation 18 U.S.C. § 111(a).  (*See* ECF 1, 12.)  This Court denied Defendant's motion to dismiss Counts One and Three of the indictment in its November Opinion,[4] finding that Defendant's conduct as alleged in those counts was not protected by the Speech or Debate Clause because she was not engaging in a legislative act.  (ECF 44 at 23.)  The Court reserved ruling on Defendant's legislative immunity for her alleged conduct in Count Two pending review of additional footage of the incident.  (*Id.* at 24.)  A copy of the body worn camera video that best captures the conduct in Count Two was provided to the Court at the conclusion of the November 17, 2025 status conference.[5]  (ECF 52 at 2.)  At the status conference the Court also requested the parties submit briefs regarding Defendant's legislative immunity under Count Two, which the Court received on December 9, 2025.  (*See* ECF 51, "Def. Br."; ECF 52, "Govt. Br.")

The Court now considers whether Defendant is immunized from criminal liability for Count Two.

---

[4] The Court also denied Plaintiff's motion to dismiss for selective enforcement and vindictive prosecution, which is not entitled to immediate appeal under the collateral order doctrine and is not the subject of this opinion.  *See United States v. Biden*, No. 24-1703, 2024 WL 4541448, at *2 (3d Cir. May 9, 2024) (holding criminal defendants raising selective and vindictive prosecution claims "cannot appeal before final judgment.").

[5] Defendant includes a copy of this video as Defense Exhibit CC.  (*See* ECF 51-1, "Decl. P. Fishman" ¶ 4.)

3

**A51**

## II. LEGAL STANDARD

The Court incorporates the binding Speech or Debate Clause precedent and the two-step framework the Third Circuit established for identifying legislative acts protected by the Speech or Debate Clause examined in its November Opinion. (*See* ECF 44 at 8-14.)

The Speech or Debate privilege affords Members of Congress protection from indictment for their "legislative activities." *United States v. Brewster*, 408 U.S. 501, 512 (1972). The Third Circuit in *United States v. Menendez* laid out a two-step test for determining legislative acts protected by the Speech or Debate Clause. 831 F.3d 155 (3d Cir. 2016). Courts must first "look to the form of the act to determine whether it is inherently legislative or non-legislative" and, if the act is neither, it is deemed ambiguously legislative, which requires the court to proceed to the second step of the analysis and "consider the content, purpose, and motive of the act to assess its legislative or non-legislative character." *Id.* at 166. The Speech or Debate Clause provides immunity for acts where the legislator's "primary purpose" is "to gather information in support of future legislation or to engage in policy-based oversight." *Id*. at 173.

Accordingly, the Speech or Debate privilege applies when legislators are engaging in "true legislative oversight[.]" *United States v. McDade*, 28 F.3d 283, 304 (3d Cir. 1994) (Scirica, J., concurring). But "claims of 'oversight' do not automatically result in Speech or Debate protection." *Menendez*, 831 F.3d at 168. The Third Circuit has recognized that "oversight activities exist along a spectrum: the Speech or Debate protection is obvious at the edges where they are manifestly legislative or clearly non-legislative, but it is not obvious in the middle ground where they are ambiguously legislative and consideration of their content, purpose, and motive is necessary." *Id*.

## III.    DISCUSSION

The Court has already determined that Defendant's visit to Delaney Hall was an ambiguously legislative act, since she and the other Members of Congress were statutorily authorized to enter and inspect the facility for the purposes of conducting oversight pursuant to Section 527 of the Further Consolidated Appropriations Act ("§ 527").[6]  (ECF 44 at 14.)  Because ambiguously legislative acts are "protected or unprotected based on their particular circumstances[,]" the Court must "consider the content, purpose, and motive of the act to assess its legislative or non-legislative character."  *Menendez*, 831 F.2d at 166 (citing *Gov't of V.I. v. Lee*, 775 F.2d 514, 522-24 (3d Cir. 1985)).

The Government contends that "Defendant's actions as alleged in Count Two were simply the continuation of her actions in Count One, albeit with a different individual being subject to her ongoing efforts to interfere with the Mayor's arrest."  (Govt. Br. at 5.)  Defendant argues that "the contact alleged in Count Two was clearly incidental to the Congresswoman's core purpose of reentering the facility" and that "entering a detention center under § 527 is a formal act of oversight well within the Speech or Debate Clause's protection."  (Def. Br. at 5, 10.)  Defendant asks this Court to dismiss Count Two on this basis.

The video evidence provided to the Court reveals that in her brief interaction with V-2, Defendant was not engaging in cognizable legislative activity.  As the record was developing, the Court initially found that the officer who it believed to be V-2 had initiated physical contact with Defendant at the Security Gate "by forcibly pushing her back into the public parking lot,"

---

[6] Section 527 prohibits DHS from using funds "to prevent" a Member of Congress or their designated employee "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress[.]"  Pub. L. No. 118-47, 138 Stat. 360 § 527(a) (2024).

potentially frustrating Defendant's right to enter and inspect the facility under § 527. (ECF 44 at 6, 23 n.25.) After supplemental discovery, Defense Exhibit CC reveals it was Defendant who initiated physical contact with V-2 outside the facility's gates. (Def. Ex. CC, 00:52.) While Defendant argues that it was "*V-2 who initiated contact with Congresswoman McIver* as she reached the facility's entrance, driving his shoulder into the Congresswoman's chest to block her progress" (Def. Br. at 9) (emphasis in original), video footage shows that V-2 was not facing Defendant or purposely impeding her when the physical contact occurred. (Def. Ex. CC, 00:52.)

The Court does not find that V-2 was interfering with Defendant's right to enter the facility under § 527. Though Defendant argues that V-2 "placed himself squarely between the Congresswoman and the entry" of the Security Gate, "deliberately keeping himself between the Congresswoman and the entryway" (Def. Br. at 9), the facts support the Government's interpretation of V-2's movement toward the Security Gate. (*See* Govt. Br. at 5) ("V-2 [was] attempting to clear a path for V-1 to effect the arrest of the Mayor.") Accordingly, V-2 was not "prevent[ing]" Defendant "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens" in contravention of § 527. 138 Stat. 460 § 527(a). Defendant's conduct as alleged in Count Two is therefore outside the scope of § 527.

The Court cannot find that Defendant's alleged conduct was legislative in nature. When Defendant encountered V-2, and in the few seconds that followed, she was not engaging in "fact-finding, information gathering, [or] investigative activities[.]" *Lee*, 775 F.2d at 521. Her conduct was not tied to potential legislation or any other policy-making purpose. *See Menendez*, 831 F.3d at 169 ("informal attempts to influence the Executive Branch on policy, for actual legislative

6

**A54**

purposes, may qualify as 'true legislative oversight' and merit Speech or Debate immunity.") The physical contact she engaged in outside the facility lacked a legislative prerogative.

In *Menendez*, the Third Circuit affirmed the district court's holding that the defendant's acts were not protected by the Speech or Debate Clause because "the predominant purpose of the challenged acts was to pursue a political resolution" for a physician embroiled in a bribery scheme, and "not to discuss broader issues of policy" or "engage in informal information gathering for legislation." 831 F.3d at 173. Similarly, here, the Court cannot find that the predominant purpose of Defendant's challenged act was legislative. Like in Counts One and Three, Defendant has not established that the purpose of her alleged conduct was "to conduct oversight or gather information for a legislative purpose." (ECF 44 at 23.) Rather, her decision to leave the facility and become involved with the Mayor's arrest was "essentially lobbying on behalf of a particular party" which remains "outside the constitutional safe harbor." *Menendez*, 831 F.3d at 169. Defendant's conduct outside the facility's gates was "disconnected from the oversight she and the Representatives later conducted when touring the facility, where they engaged in protected fact-finding related to federal immigration policy." (ECF 44 at 19.)

Defense Exhibit CC demonstrates Defendant was not engaging in legislative activity while outside the facility's gates, and Defendant's entry and inspection authority under § 527 was not implicated by the contact she initiated with V-2. Therefore, the "content, purpose, and motive of the act" alleged in Count Two all confirm its non-legislative character. *Menendez*, 831 F.3d. at 166. Accordingly, Defendant's conduct is not protected by the Speech or Debate Clause.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the indictment for legislative immunity (ECF 19) is **DENIED**. This decision is subject to interlocutory appeal under the

7

**A55**

collateral order doctrine. *See United States v. McDade*, 28 F.3d 283, 288 (3d Cir. 1994) ("[W]e have jurisdiction to entertain the defendant's claim that the Speech or Debate Clause requires dismissal of the entire indictment or particular charges contained in the indictment."). An appropriate Order follows.

*/s/ Jamel K. Semper*

**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:  Clerk
cc:    Parties

8

**A56**

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2026, I electronically filed the foregoing document and accompanying public materials with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service of public documents will be accomplished by the appellate CM/ECF system. I further certify that I served all sealed materials on the government consistent with this Court's practices.

Dated: March 30, 2026

Paul J. Fishman

*Counsel for Defendant-Appellant*
*LaMonica McIver*