Nos. 25-3573, 26-1122

# In the United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

LAMONICA MCIVER,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of New Jersey
No. 25-cr-0388-JKS (Hon. Jamel K. Semper)

**DEFENDANT-APPELLANT'S OPENING BRIEF**

Samuel F. Callahan
Orion de Nevers
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. N.W.
Washington, D.C.  20001

Amanda J. Raines
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
ARNOLD & PORTER
KAYE SCHOLER LLP
One Gateway Center, Ste. 1025
Newark, NJ  07102

*Counsel for Defendant-Appellant LaMonica McIver*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES ........................................................ 2

STATEMENT OF RELATED CASES AND PROCEEDINGS ................... 2

INTRODUCTION ............................................................................ 3

STATEMENT OF THE CASE ........................................................... 7

    A.    Congresswoman McIver's Congressional Oversight Authority ........................................................................ 7

    B.    Congresswoman McIver's Congressional Oversight Investigation of Delaney Hall ........................................ 9

    C.    The Executive Branch's Response to the May 9 Events at Delaney Hall ........................................................... 14

    D.    The Justice Department's Dismissal of Assault Charges Against January 6 Defendants ...................................... 17

    E.    Procedural History ....................................................... 19

SUMMARY OF ARGUMENT ......................................................... 20

STANDARD OF REVIEW .............................................................. 22

ARGUMENT ............................................................................... 22

I.    The Indictment Violates the Speech or Debate Clause ........... 22

    A.    The Speech or Debate Clause Confers Broad Immunity on Legislative Acts ..................................................... 22

    B.    The Entirety of Congresswoman McIver's Congressional Oversight Investigation is a Legislative Act ................. 25

    C.    A Trial Would Necessarily Place Legislative Acts At Issue ........ 30

        1.    The Charged Conduct Could Not Be Proven Without Evidence of Legislative Acts .............................. 31

        2.    The Elements of The Charged Offense Require Evidence of Legislative Acts ..................................... 33

D.    Congresswoman McIver Was Engaged in Legislative Conduct Throughout Each Count of the Indictment....................38

      1.    Counts One and Three Charge Legislative Acts ...............38

      2.    Count Two Charges Legislative Acts..................................41

II.    The Indictment Violates the Separation of Powers .............................45

III.    The Indictment Violates the Doctrines of Selective and Vindictive Prosecution .........................................................................47

    A.    There is Clear Evidence of Selective Prosecution and Enforcement ........................................................................47

      1.    The January 6 Defendants Are Appropriate Comparators ...........................................................................................48

      2.    The Government's Differential Treatment of Congresswoman McIver Turns on Protected Conduct .....51

      3.    The District Court's Comparator Analysis Was Fundamentally Flawed ........................................................54

    B.    There is Clear Evidence of Vindictive Prosecution ......................60

    C.    Discovery is Warranted Because There is At Least Some Evidence of Selective and Vindictive Prosecution ........................64

CONCLUSION....................................................................................................66

CERTIFICATE OF BAR MEMBERSHIP ................................................67

CERTIFICATE OF SERVICE......................................................................68

CERTIFICATE OF COMPLIANCE............................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bennun v. Rutgers State Univ.,*
941 F.2d 154 (3d Cir. 1991) ...................................................................58

*Bogan v. Scott-Harris,*
523 U.S. 44 (1998).................................................................................24

*Burdick v. United States,*
236 U.S. 79 (1915).................................................................................57

*Coffin v. Coffin,*
4 Mass. 1 (1808) ...............................................................................5, 46

*Doe v. McMillan,*
412 U.S. 306 (1973)...............................................................................35

*Eastland v. U.S. Servicemen's Fund,*
421 U.S. 491 (1975)...................................................3, 20, 22, 23, 24, 39

*Frederick Douglass Found., Inc. v. D.C.,*
82 F.4th 1122 (D.C. Cir. 2023) ...........................47, 48, 49, 51, 58, 59

*Gov't of V.I. v. Lee,*
775 F.2d 514 (3d Cir. 1985) ...............................4, 20, 26, 28, 29, 30

*Gravel v. United States,*
408 U.S. 606 (1972)...............................................................................39

*Harvard v. Cesnalis,*
973 F.3d 190 (3d Cir. 2020) ..................................................................58

*Helstoski v. Meanor,*
442 U.S. 500 (1979).................................................................................1

*Kilbourn v. Thompson,*
103 U.S. 168 (1880)...........................................................................23, 24

*Neguse v. ICE*,
 2025 WL 3653597 (D.D.C. Dec. 17, 2025)......................................42, 44

*Neguse v. ICE*,
 2026 WL 575509 (D.D.C. Mar. 2, 2026) ........................................17, 63

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 597 U.S. 1 (2022)..................................................................................24

*Nixon v. Fitzgerald*,
 457 U.S. 731 (1982)..............................................................................45

*In re Sealed Case*,
 80 F.4th 355 (D.C. Cir. 2023) ..............................................................27

*Supreme Ct. of Va. v. Consumers Union of U.S., Inc.*,
 446 U.S. 719 (1980)..............................................................................45

*Thomas v. Chi. Park Dist.*,
 534 U.S. 316 (2002)..............................................................................58

*Trump v. United States*,
 603 U.S. 593 (2024) ........................................... 1, 5, 45, 46, 47, 55

*United States v. Abrego*,
 802 F. Supp. 3d 1055 (M.D. Tenn. 2025) ............................................63

*United States v. Adams*,
 870 F.2d 1140 (6th Cir. 1989)..................................................60, 63, 66

*United States v. Boone*,
 738 F.2d 763 (6th Cir. 1984).................................................................35

*United States v. Brewster*,
 408 U.S. 501 (1972)......................................................................5, 24, 31

*United States v. Esposito*,
 968 F.2d 300 (3d Cir. 1992) ............................................................60, 61

*United States v. Feola*,
 420 U.S. 671 (1975)...............................................................................34

*United States v. Giusini*,
2025 WL 275683 (D.D.C. Jan. 23, 2025) ........................................................57

*United States v. Goodwin*,
440 F.2d 1152 (3d Cir. 1971) ................................................................34, 35

*United States. v. Goodwin*,
457 U.S. 368 (1982) ............................................................................60, 63

*United States v. Haggerty*,
528 F. Supp. 1286 (D. Colo. 1981) ..............................................................54

*United States v. Helstoski*,
442 U.S. 477 (1979) ............................................20, 23, 24, 30, 36

*United States v. Hoffer*,
869 F.2d 123 (2d Cir. 1989) ....................................................................35

*United States v. Johnson*,
383 U.S. 169 (1966) ..............................................23, 26, 33, 46

*United States v. Jones*,
159 F.3d 969 (6th Cir. 1998) ....................................................................65

*United States v. McDade*,
28 F.3d 283 (3d Cir. 1994) ..................................................................27, 41

*United States v. Menendez*,
831 F.3d 155 (3d Cir. 2016) ............................22, 23, 25, 27, 40, 41, 44

*United States v. Meyer*,
810 F.2d 1242 (D.C. Cir. 1987) ............................................................63, 64

*United States v. Ojala*,
544 F.2d 940 (8th Cir. 1976) ....................................................................54

*United States v. Paramo*,
998 F.2d 1212 (3d Cir. 1993) ....................................................................61

*United States v. Warnagiris*,
2025 WL 341990 (D.D.C. Jan. 30, 2025) ........................................................52

v

*United States v. Washington,*
    79 F.4th 320 (3d Cir. 2023) ........................................................35

*United States v. Washington,*
    869 F.3d 193 (3d Cir. 2017) .........................................22, 47, 59, 64

*Youngblood v. DeWeese,*
    352 F.3d 836 (3d Cir. 2003) .............................................4, 25, 28

**Constitutional Provisions**

U.S. Const. art. I, § 5, cl. 2 ...........................................................24

U.S. Const. art. I, § 6, cl. 1 .......................................................22, 26

**Statutes**

18 U.S.C. § 111 ...........................................................................35

18 U.S.C. § 111(a) ..........................................................................6

18 U.S.C. § 3231 ............................................................................1

28 U.S.C. § 1291 ............................................................................1

FCCA, Pub. L. No. 118-47, div. C, tit. V, § 527,
    138 Stat. 460 (2024) ...................................................8, 5, 42, 44

**Executive Branch Materials**

Proc. No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025) .................19, 52, 57

*Scope of Congressional Oversight and Investigative Power With
    Respect to the Executive Branch,*
    9 Op. O.L.C. 60 (1985) ................................................................7

**Legislative Materials**

Homeland Security Improvement Act, H.R. Rep. No. 116-163,
    116th Cong. (2019) ......................................................................42

Rules of the House of Representatives, 119th Cong. Rule X, cl.
    1(j) (2025) ....................................................................................8

Rules of the House of Representatives, 119th Cong. Rule X, cl. 3(g)(2) (2025)..................................................................................8

**Other Authorities**

@AlinaHabba, X.com (Apr. 10, 2025, 10:06 PM), https://x.com/AlinaHabba/status/1910514829674131833..............................53

@AlinaHabba, X.com (May 19, 2025, 7:56 PM), https://x.com/AlinaHabbaDOJ/status/1924615111198576645.....................16

Am. Compl., *Baraka v. Habba*, 25-cv-6846 (D.N.J June 4, 2025), Dkt. 4.................................................................................................15

*Before recent Delaney Hall uprising, detainees frequently complained about conditions*, Bergen Record (June 18, 2025)....................9

*Brad Lander Is Arrested by ICE Agents at Immigration Courthouse*, N.Y. Times (June 17, 2025)........................................62

*Cuts to Woke Programs*, White House, https://www.whitehouse.gov/wp-content/uploads/2025/05/Cuts-to-Woke-Programs-Fact-Sheet.pdf..................................................................................54

*Dem lawmakers make surprise visit to ICE detention center*, The Hill (June 17, 2018) ..............................................................42

*DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults*, DHS (July 15, 2025), https://perma.cc/7YZP-PGWS ......................................................17

*DHS Debunks Fake News Narratives About Law Enforcement During Police Week*, DHS (May 16, 2025), https://perma.cc/9XKE-3K3U......................................................16

Fox News, X.com (Mar. 25, 2025, 9:54 AM), http://x.com/FoxNews/status/1904547557570650524...................................54

*ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility*, DHS (July 14, 2025), https://perma.cc/3GNL-PWE6 .....................................17

*Jan. 6 Archive: The Capitol Charges*, NPR, https://apps.npr.org/jan-6-archive/database.html .....................................18

Josh Chafetz, *Democracy's Privileged Few* 90 (2007) .....................................26

Justice Manual § 9-85.110, *Investigations Involving Members of Congress* (2024); *Policies and Procedures in Criminal Investigations Involving Members of Congress and Staff*, DOJ (Nov. 7, 2023), https://www.justice.gov/archives/dag/media/1323861/dl?inline ..................54

Letter from Congresswoman McIver et al., to Hon. Benjamine Huffman, Acting Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Jan. 24, 2025).....................................61

Letter from Congresswoman McIver et al., to Hon. Kristi Noem, Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Feb. 19, 2025) .....................................9

*Members of Congress Break into Delaney Hall Detention Center*, DHS (May 9, 2025), https://perma.cc/G6MH-2KXF.....................................15

*Newly Appointed New Jersey DA Alina Habba-Live From the White House*, Human Events (Mar. 27, 2025), https://podcasts.apple.com/ca/podcast/newly-appointed-new-jersey-da-alina-habba-livefrom/id1585243541?i=1000701160703 .....................................53

*Rep. LaMonica McIver questions DHS Secretary Kristi Noem*, PBS (May 14, 2025), https://www.pbs.org/video/rep-lamonica-mciver-questions-dhs-secretary-kristi-noem-zqgr8l/.....................................62

*Temperatures rise over House Democrats' scuffle with ICE agents*, The Hill (May 14, 2025).....................................62

viii

*Trump Defends His Pardons for Jan. 6 Attack on Capitol*,
Politico (Jan. 21, 2025, 8:33 PM),
https://www.politico.com/news/2025/01/21/trump-defends-
pardons-jan-6-00199843 .................................................................................52

*Trump Defends McIver Charges*, Axios (May 20, 2025),
https://www.axios.com/2025/05/20/trump-lamonica-mciver-doj-
charges-ice ....................................................................................................53

U.S. Atty's Off., Dist. of Columbia, *48 Months Since the Jan. 6
Attack on U.S. Capitol* (Jan. 6, 2025), https://perma.cc/S9EF-
ZK43 .....................................................................................................18, 19

*US senator forcefully removed from DHS event in LA,
triggering Democratic outcry on Capitol Hill*, CNN (June 12,
2025), https://www.cnn.com/2025/06/12/politics/alex-padilla-
removed-noem-press-conference.................................................................62

*Watch: Newark mayor arrested outside Delaney Hall in ICE
protest*, NJ Spotlight News (YouTube, May 9, 2025),
https://www.youtube.com/watch?v=IYF0wTbG9Ug..................................13

## JURISDICTIONAL STATEMENT

Appellant, Congresswoman LaMonica McIver, appeals the district court's November 13, 2025, and January 5, 2026, orders denying her motions to dismiss the indictment. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

The district court's orders denying legislative immunity are appealable collateral orders. *See Helstoski v. Meanor*, 442 U.S. 500 (1979); *Trump v. United States*, 603 U.S. 593 (2024). The district court's November 13 order denying the claims of selective and vindictive prosecution is an appealable collateral order; alternatively, this Court should review that order under the doctrine of pendent jurisdiction, as Congresswoman McIver explained in her response to the government's partial motion to dismiss. Dkt. 14.

## STATEMENT OF THE ISSUES

1.    Whether the district court should have dismissed the indictment because the Speech or Debate Clause immunizes Congresswoman McIver for her conduct while performing legislative acts.

2.    Whether the district court should have dismissed the indictment because the separation of powers precludes charging Congresswoman McIver for official acts.

3.    Whether the district court should have dismissed the indictment or, at a minimum, ordered discovery because Congresswoman McIver is being prosecuted on account of her protected expression, oversight activity, and political affiliation.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Congresswoman McIver is unaware of any related case or proceeding.

**INTRODUCTION**

The Department of Justice is prosecuting Congresswoman LaMonica McIver based on an incident that occurred while she was engaged in what was indisputably a legislative act: an oversight investigation of Delaney Hall, a federal immigration detention facility in her District. Although the government concedes that a federal statute explicitly authorized that visit— which lasted over two hours—the indictment charges Congresswoman McIver for making "brief physical contact" with two immigration enforcement officers during a "68 second" period when those agents intentionally interrupted her inspection to arrest the Mayor of Newark for trespassing—a petty offense he had not committed. A9; A200. Three separate constitutional doctrines bar this prosecution.

*First,* the Speech or Debate Clause, informed by a notorious pre-Founding history of the Crown intimidating legislators, grants absolute immunity for legislative activity—an immunity the Supreme Court has read deliberately "broadly" to shield a wide swath of conduct in the "legislative sphere." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501-03 (1975). Here, the government *admits* that a congressional oversight investigation "brought" Congresswoman McIver "to Delaney Hall"; that her investigation

was a "clearly legislative act"; and that the allegations exclusively concern her conduct "during the pendency of" this legislative visit. D.Ct.Dkt.27 at 57, 61-62. The prosecution thus violates the Speech or Debate Clause by charging Congresswoman McIver for her conduct "in the course of exercising [] legislative authority." *Youngblood v. DeWeese*, 352 F.3d 836, 841 (3d Cir. 2003).

The district court avoided that result only by carving out "68 seconds" of Congresswoman McIver's conduct from her hours'-long investigation. A200. In particular, the court concluded that the Congresswoman's immunity lapsed when she briefly left the facility's secured area and entered its public parking lot where ICE agents were unlawfully arresting the Mayor of Newark. The court also concluded that her immunity did not attach again until she reentered the facility's gate 68 seconds later. That parsing, however, is foreclosed by this Court's controlling precedents, which require analyzing legislative acts "as a whole"—not moment-by-moment. *Gov't of V.I. v. Lee*, 775 F.2d 514, 525 (3d Cir. 1985).

Even if such a carve out were permitted in some circumstances, the practical realities of a trial in *this* matter confirm that this prosecution is incompatible with legislative immunity. Any trial would *necessarily* involve

4

evidence of Congresswoman McIver's and the alleged victims' reasons for being at Delaney Hall; the authority the Congresswoman possessed to be there; how she exercised that responsibility; ICE's interference with her protected oversight visit. In addition, the Congresswoman's intent throughout the charged conduct would be a major focus of the proof by both sides. And all of that would place Congresswoman McIver's legislative activity directly before a jury. The Speech or Debate Clause leaves reviewing that sort of conduct exclusively to Congress, not to a jury in a criminal trial.

***Second,*** the indictment violates the separation of powers under the principles the Supreme Court articulated in *Trump v. United States*, 603 U.S. 593 (2024). Besides the Speech or Debate Clause, which provides absolute immunity for legislative acts, the constitutional separation of powers establishes presumptive immunity for legislators' official acts. Although the Supreme Court announced that principle in the context of executive immunity, the reasoning applies at least as forcefully in the legislative arena, where courts have recognized for centuries the imperative of "insuring the independence of individual legislators," *United States v. Brewster*, 408 U.S. 501, 507 (1972), and the broad scope of legislative immunity, *Coffin v. Coffin*, 4 Mass. 1, 27 (1808).

***Third,*** the Constitution does not permit the Executive Branch to deploy its enforcement or prosecutorial machinery based on an individual's policy views, political expression, party affiliation, or exercise of protected rights. Yet the record is replete with statements and actions by federal officials showing that such considerations are *exactly* why the government is pursuing this case.

The government dismissed indictments against scores of defendants charged under 18 U.S.C. § 111(a)—the same source of the charges here—for engaging in egregious conduct at the U.S. Capitol on January 6, 2021. Many of those cases involved premeditated sustained and violent attacks, the use of dangerous weapons, and significant injuries to federal law enforcement officers by defendants with serious criminal records trying to subvert the peaceful transfer of power. By contrast, Congresswoman McIver is charged with fleeting contact during a chaotic scene that ICE instigated—conduct that caused no injuries and that took place during her lawful exercise of congressional authority. The government has identified no legitimate reason for this differential treatment, but the record supplies the real explanation: the Trump Administration has made abundantly clear that it dropped charges against the January 6 defendants because of their support for the Administration, and that these charges are a response to Congresswoman

McIver's political views and her insistence on exercising her constitutional, statutory, and congressionally authorized oversight responsibility. As a result, this prosecution is unconstitutionally selective and vindictive.

The prosecution is unconstitutional for all three reasons. This Court should reverse.

## STATEMENT OF THE CASE

### A.    Congresswoman McIver's Congressional Oversight Authority

Congresswoman LaMonica McIver is the U.S. Representative for New Jersey's 10th congressional district—home to Newark, where she was born and raised. As a Representative from a state with more than 2.2 million immigrants, and as a member of the House Committee on Homeland Security, Congresswoman McIver has made the safety and vitality of New Jersey's immigrant communities one of her chief legislative concerns. A6. As part of that commitment, she has prioritized oversight of the Department of Homeland Security's ("DHS's") private immigration detention facilities.

Congresswoman McIver exercises this oversight pursuant to constitutional and statutory authority. Under Article I, "Congressional power to conduct inquiries and to exercise oversight respecting the Executive Branch is broad and well-established." *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60,

60 (1985). In addition, as a member of the House Committee on Homeland Security, Congresswoman McIver *must* "review and study on a primary and continuing basis *all Government activities*, programs and organizations related to homeland security." Rules of the House of Representatives, 119th Cong. Rule X, cl. 1(j), 3(g)(2) (2025) (emphasis added).

Finally, since 2020, § 527 of the appropriations statutes for DHS has prohibited that Department from using any funds "to prevent" a Member of Congress "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." Further Consolidated Appropriations Act ("FCAA"), 2024, Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619. Moreover, the statute provides that Members of Congress need not give advance notice of such a visit. *Id.* § 527(b). In other words, there is specific statutory authority for Members to make unannounced visits to ICE detention facilities, and it is DHS's obligation to facilitate that oversight.

Congresswoman McIver first invoked these authorities in February 2025 to inspect an ICE facility in Elizabeth, New Jersey, with fellow Representatives Bonnie Watson Coleman and Rob Menendez. A6. She followed up on that visit in March by meeting with ICE officials in Newark to

8

introduce herself and discuss her oversight mandate and agenda. A6. At around the same time, ICE reached an agreement with a private contractor, the GEO Group, to reopen Newark's Delaney Hall, a 1,000-bed federal immigrant processing and detention center that DHS had closed in 2017 amid "allegations of poor conditions and abuse."[1]

### B.    Congresswoman McIver's Congressional Oversight Investigation of Delaney Hall

On May 9, 2025, Congresswoman McIver, accompanied by Representatives Watson Coleman and Menendez, "conducted an unannounced congressional oversight inspection" of Delaney Hall. A6. Arriving at the facility at around 1:00 p.m., the legislators immediately identified themselves as Members of Congress and explained their oversight purpose. *See* A258 at 1:34-2:08. They waited for several minutes outside the fenced perimeter; they then walked through the gate; and eventually they were escorted across the parking lot to a waiting area inside the building, where they were required to wait "for over an hour." A7-8; A332 at 1:32:56-2:37:47. The Members spent that

---

[1] Letter from Congresswoman McIver et al., to Hon. Kristi Noem, Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Feb. 19, 2025); *Before recent Delaney Hall uprising, detainees frequently complained about conditions*, Bergen Record (June 18, 2025), https://perma.cc/CP9R-BUKA.

time questioning GEO employees about the facility and its operations. *See, e.g.*, A258 at 6:34-15:33.

Meanwhile, Newark Mayor Ras Baraka arrived outside the gate of Delaney Hall, where a crowd of approximately 40 peaceful "protestors, spectators, and media members" had also gathered. A7; A257 at 23:42. The Mayor identified himself to a guard, and after the guard spoke to someone on his phone, he opened the gate and invited the Mayor inside. A7; A257 at 23:42-33:54; A261. The Mayor's invited entry was contemporaneously recorded by an ICE officer on body camera. A261.

Believing the Members were conducting their facility tour, the Mayor patiently waited for them for approximately 40 minutes. During that time, no one asked him to leave or alerted the Members to his presence. A257 at 34:07-1:17:20; A262 at 03:27-3:39.

As the Members and Mayor waited, DHS mobilized a response. ICE's Newark Field Office Director ("FOD") and the Special Agent in Charge of Homeland Security Investigations ("HSI") (identified as "V-1" in the Indictment) made their way to the facility. A258 at 6:24-6:34; A7. They brought a team of armed ICE officers and HSI agents, many of whom wore body armor and masks. Although neither the Members nor the Mayor posed any risk,

10

agents also positioned vehicles stocked with weapons just inside the facility's fenced perimeter. A257 at 29:41-30:13, 40:53-41:05; A258 at 1:12:32-1:15:00.

When they arrived, V-1 ignored the Members and, instead, hurried to the parking lot with the other agents and officers. A258 at 1:05:27-1:06:43. V-1 then approached the Mayor with a team of law enforcement personnel, accused him of trespassing, ordered him to leave the secured area, and threatened to arrest him if he did not do so. A262 at 03:27-3:39; A7. V-1 leveled this threat even though ICE already knew that the GEO guard had invited the Mayor to enter the premises. A261; A314.

The Members, still inside the building, noticed this interaction and "exited the administrative office … to join the discussion." A8. The Mayor explained that he had been admitted to the secured area only to be threatened with arrest. A262 at 4:32-4:59. V-1 countered that the "members of Congress had lawful authority to be in the secured area of Delaney Hall," but that the Mayor "did not." A8. He then "announced that he was going to place" the Mayor "under arrest." A75; *see* A262 at 7:04-7:25. However, after Congresswoman McIver and her colleagues protested that decision and objected that ICE was interfering with their oversight, V-1 acceded and

11

permitted the Mayor to walk "outside the Security Gate" into the public parking lot. A8.

Assuming they had defused the situation, the Members returned to "the administrative office with several DHS agents." A8. In the meantime, V-1 took a phone call and agreed to arrest the Mayor "[e]ven though he stepped out." A258 at 1:16:27-1:17:02. V-1 then announced to the group of ICE Agents: "we are arresting the mayor, right now. By Order of the Deputy Attorney General of the United States." A258 at 1:17:02-1:17:37; *see* A8. V-1 then gathered his complement of agents and led them through the gate into the public parking lot, where the Mayor was waiting amid a growing crowd of civilians. A257 at 1:26:35-1:26:56. The Members, who had returned outside, followed. A257 at 1:26:40-1:26:58; A264 at 00:30-00:40.

As the Members exited the gate, a crowd member called out to "circle the Mayor," prompting "the Representatives, and some protestors [to] encircle[] the Mayor as … agents pushed their way through the crowd to apprehend" him. A8-9; A257 at 1:26:50-1:27:08; A265 at 00:47-00:55. Not surprisingly, the situation quickly became chaotic, resulting in physical contact among many in the crowd, including law enforcement officials and the Members. Almost immediately, Congresswoman McIver admonished agents

12

for "touching a federal official" and instructed them not to "touch us." A9; *see* A265 at 0:58-1:20.

Count One alleges that the Congresswoman then faced the Mayor and "placed her arms around him in an effort to prevent HSI from completing the arrest." A75. It further alleges that the Congresswoman "slammed her forearm into the body of V-1," and "reached out and tried to restrain V-1 by forcibly grabbing him." A75.

Following that "brief physical contact," V-1 "handcuffed the Mayor and led him toward the Security Gate." A9. Congresswoman McIver and Representative Menendez then attempted to return inside the fenced perimeter. A10. As they did, V-2—an ICE Deportation Officer who had been in the center of the crowd—retreated to the gate, arriving before the Congresswoman and blocking her path.[2] Congresswoman McIver encountered him there and made "physical contact" for "two to three seconds." A50. That contact is the basis for Count Two, which alleges that "McIver pushed past V-2 while using each of her forearms to forcibly strike V-2 as she returned inside the secured area." A77.

---

[2] *Watch: Newark mayor arrested outside Delaney Hall in ICE protest*, at 0:54-1:00, NJ Spotlight News (YouTube, May 9, 2025), https://www.youtube.com/watch?v=IYF0wTbG9Ug.

13

The video evidence is inconsistent with that description. Moreover, the indictment omits that, "[i]mmediately after [the Congresswoman's] contact with V-2, she was forcefully shoved by a similarly dressed ICE officer as she tried to lawfully re-enter the Security Gate." A50. She was then finally "able to enter the facility." A50.

As soon as she reentered the gate, Congresswoman McIver notified an ICE supervisor that she had just been assaulted. No one asked for details. Nor did anyone protest the Congresswoman's behavior. To the contrary, ICE officials then escorted the Congresswoman and her colleagues into the building for their facility tour, where they conducted "protected fact-finding related to federal immigration policy." A23; *see* A257 at 1:28:24-1:29:48; A332 at 02:50:46-2:51:05. Having completed that aspect of their investigation, Congresswoman McIver and her colleagues left Delaney Hall around 3:45 p.m., two-and-a-half hours after their arrival. A332 at 03:49:48-3:50:31; A268 at 3:49:32-3:50:46.

### C.    The Executive Branch's Response to the May 9 Events at Delaney Hall

The government responded to the May 9 events at Delaney Hall in chaotic fashion. Even before the Members left the facility, DHS published a press release claiming that "as a bus of detainees was entering the security

gate of Delaney Hall Detention Center, a group of protestors, including two members of the U.S. House of Representatives, stormed the gate and broke into the detention facility. Representatives Robert Menendez, Jr. and Bonnie Watson Coleman and multiple protestors are holed up in a guard shack."[3] These statements were false: there was no bus of detainees; no one "stormed the gate or broke into the facility"; and no protestors entered the secured area, much less the guard shack.

The same day, the government arrested Mayor Baraka for trespassing on federal land, detained him in federal custody for five hours, and filed a criminal complaint against him.[4] It moved to dismiss the complaint only ten days later because the charge was unsupportable:[5] Mayor Baraka had been invited onto the premises; left when V-1 demanded that he do so; and Delaney Hall is not federal land because it is privately leased. In granting the motion to dismiss the complaint, the magistrate judge characterized the charges as an "embarrassing" and "worrisome misstep" by the U.S. Attorney's Office.[6]

---

[3] *Members of Congress Break into Delaney Hall Detention Center*, DHS (May 9, 2025), https://perma.cc/G6MH-2KXF.

[4] Am. Compl. ¶¶ 43-45, *Baraka v. Habba*, 25-cv-6846 (D.N.J June 4, 2025), Dkt. 4.

[5] *Id.* ¶ 50.

[6] *Id.* ¶ 51.

Nonetheless, in the same statement in which then-Interim U.S. Attorney Alina Habba announced that she would be dismissing the charges against Mayor Baraka, she also said that this was "not the end of the matter," and the government would be charging Congresswoman McIver instead.[7] The government filed that criminal complaint the same day. A65.

DHS simultaneously continued to pursue its false press campaign against Congresswoman McIver. The day after the May 9 events, DHS posted a heavily edited video clip of the Congresswoman returning to the secured area of Delaney Hall that featured instant replays and slow-motion footage, but excluded wide angles that showed her being pushed through the crowd. D.Ct.Dkt.21-1 at 9-11. Less than a week later, DHS issued a press release to "[d]ebunk" the notion that Congresswoman McIver's visit to Delaney Hall "was 'oversight.'"[8]

DHS renewed this campaign in July, issuing another press release suggesting that the Congresswoman's actions were "just another case of

---

[7] @AlinaHabba, X.com (May 19, 2025, 7:56 PM), https://perma.cc/4D2N-3BVT.

[8] *DHS Debunks Fake News Narratives About Law Enforcement During Police Week*, DHS (May 16, 2025), https://perma.cc/9XKE-3K3U.

Democratic lawmakers labeling political stunts as oversight."[9] The next day, DHS published another false post targeting "Democratic members of Congress," claiming that "Representative LaMonica McIver (D-NJ) trespassed on and stormed the Delaney Hall detention facility."[10] The district court ultimately directed the government to remove and stop these false and prejudicial posts. A148-50.

DHS coupled its rhetoric with new formal agency policies attempting to nullify the statute that authorized Congresswoman McIver's unannounced inspection of Delaney Hall. Specifically, DHS purported to require Members of Congress to provide seven days' notice before conducting oversight visits. A federal court has since twice enjoined these unlawful policies. *See, e.g.*, *Neguse v. ICE*, 2026 WL 575509 (D.D.C. Mar. 2, 2026).

### D. The Justice Department's Dismissal of Assault Charges Against January 6 Defendants

This prosecution contrasts starkly with the Administration's treatment of other defendants charged under § 111(a). On January 6, 2021, thousands of

---

[9] *ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility*, DHS (July 14, 2025), https://perma.cc/3GNL-PWE6.
[10] *DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults*, DHS (July 15, 2025), https://perma.cc/7YZP-PGWS.

President Trump's supporters descended on the U.S. Capitol to prevent Congress from certifying the results of the 2020 presidential election. During the attack, "over 140 police officers were assaulted," "the Capitol was damaged, government property was destroyed, and other government property was stolen." U.S. Atty's Off., Dist. of Columbia, *48 Months Since the Jan. 6 Attack on U.S. Capitol* (Jan. 6, 2025), https://perma.cc/S9EF-ZK43. The Justice Department charged more than 1,500 individuals with federal crimes. *Id.* Over 600 of those defendants were charged with assaulting, resisting, or impeding law enforcement officers, including more than 170 who did so using a dangerous weapon or causing serious bodily injury. *Id.*

As of President Trump's 2025 inauguration, hundreds of these cases remained pending. *Id.* But the Justice Department then moved to dismiss every one of them—including approximately 160 charged under § 111(a), the same offense charged here.[11] Those defendants include one who used "a metal bike rack to push against law enforcement officers and repeatedly spray them" with a "chemical spray," another who threw "an explosive device that detonated upon at least 25 officers," and still another who assaulted officers

---

[11] *See Jan. 6 Archive: The Capitol Charges*, NPR (last visited Mar. 30, 2026), https://perma.cc/SB56-JQHY.

"for hours, at times deploying a baseball bat or a riot shield as a weapon and causing serious injury." *See infra* p.49. Many of these January 6 defendants had lengthy criminal records and seriously harmed their law enforcement victims. *Id.*

The Justice Department initiated these widespread dismissals following an Inauguration Day presidential proclamation that characterized the January 6 prosecutions as a "grave national injustice that has been perpetrated upon the American people over the last four years." Proc. No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025). In addition to directing dismissals of pending cases, the proclamation pardoned and granted commutations to the approximately 1,200 individuals who had already been convicted and sentenced. *Id.* During a news conference the next day, the President confirmed the basis for his actions: "these were people that actually love our country." D.Ct.Dkt.20-1 at 5-6.

### E.    Procedural History

The government filed its criminal complaint on May 19, 2025, and the indictment was returned on June 10, 2025. A65; A73. Congresswoman McIver moved to dismiss the indictment on the basis of legislative immunity and selective and vindictive prosecution and enforcement. Dkts. 19-20. The district

19

court denied the selective-and-vindictive motion on November 13, 2025, and denied the legislative immunity motion as to Counts One and Three in the same order. A3. The court ordered supplemental legislative immunity briefing on Count Two, and then denied the motion on that Count in a second order. A48. Congresswoman McIver timely appealed both orders. A1, A46. The government moved to dismiss the selective-and-vindictive aspects of the appeal, which Congresswoman McIver opposed, and this Court referred that jurisdictional determination to the merits panel. Dkts.12-17.

## SUMMARY OF ARGUMENT

**I.** The indictment violates the Speech or Debate Clause, which affords absolute protection for conduct within the "legitimate legislative sphere," immunizing liability for legislative acts and barring prosecutions that would even "mention" such acts at trial. *Eastland*, 421 U.S. at 501-03; *United States v. Helstoski*, 442 U.S. 477, 490 (1979). Legislative acts must be evaluated "as a whole," *Lee*, 775 F.2d at 525, and the government concedes that Congresswoman McIver's inspection of Delaney Hall was "clearly legislative"—a concession that alone requires dismissal. D.Ct.Dkt.27 at 61. Moreover, it would be impossible for the government to try this case without placing the Congresswoman's legislative acts directly before the jury, because

proof of the charges and the defenses depend on those acts, and they will inevitably be part of every witness's testimony. Nor could the government salvage its case by isolating 68 seconds in the middle of the Congresswoman's visit. Even if case law interpreting the Clause permitted atomizing a legislative act into prosecutable fragments, Congresswoman McIver was engaged in continuous legislative oversight throughout her hours-long visit.

**II.** The indictment independently violates the separation of powers. The Supreme Court's reasoning in *Trump v. United States* supports a symmetrical immunity for legislators, and the case for such protection is even stronger in the legislative context. The charged conduct falls squarely within that presumptive immunity for official acts, and the government has not seriously attempted to rebut it.

**III.** This prosecution is also selective and vindictive in violation of the First and Fifth Amendments. The only way to square Congresswoman McIver's indictment for assault with the dismissal of similar charges against January 6 defendants whose conduct was far more egregious is the most obvious explanation: the Administration embraces the political views of that group, but does not like hers. A prosecution that turns on that distinction is unconstitutional. And at minimum, this record easily contains "some evidence"

21

of selective and vindictive prosecution, requiring discovery on those claims. *United States v. Washington*, 869 F.3d 193, 220-21 (3d Cir. 2017).

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions de novo and its factual determinations for clear error. *United States v. Menendez*, 831 F.3d 155, 164 (3d Cir. 2016). Although "review at this stage of a prosecution is ordinarily limited to the allegations in the Indictment," the Court "can consider extrinsic evidence to determine whether the Speech or Debate Clause applies." *Id.*

## ARGUMENT

## I.    The Indictment Violates the Speech or Debate Clause

### A.    The Speech or Debate Clause Confers Broad Immunity on Legislative Acts

The Speech or Debate Clause ensures that "for any Speech or Debate in either House," Members of Congress "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The Clause confers absolute immunity on all "activities" that "fall within the 'legitimate legislative sphere,'" well beyond "literal speech or debate" and the Capitol walls themselves. *Eastland*, 421 U.S. at 501-04. That immunity covers all "legislative acts." *Menendez*, 831 F.3d at 165. In other words, there can be no prosecution for conduct that "took place

22

'in a session of the House by one of its members in relation to the business before it,'" *Eastland*, 421 U.S. at 503 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)).

The reason for this expansive scope is clear: the Supreme Court has, "[w]ithout exception … read the Speech or Debate Clause broadly to effectuate its purposes," *id.*—"to protect the integrity of the legislative process by insuring the independence of individual legislators," *Helstoski*, 442 U.S. at 491-92. Its "central role" is "to 'prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary.'" *Menendez*, 831 F.3d at 165. Courts thus "look particularly to the prophylactic purposes of the clause" in reviewing a "criminal prosecution." *United States v. Johnson*, 383 U.S. 169, 182 (1966).

The Clause does not just foreclose liability: It is also an evidentiary bar that "precludes any showing of how a legislator acted" in the course of legislative activities. *Helstoski*, 442 U.S. at 489 (citation modified). "[R]evealing information as to a legislative act … would subject a Member to being 'questioned' in a place other than the House or Senate, thereby violating the explicit prohibition of the Speech or Debate Clause." *Id.* at 490. So "once it is determined that Members are acting within the 'legitimate legislative

23

sphere,'" the "Clause is an absolute bar to interference" *Eastland*, 421 U.S. at 503. In short, as the Court held in *Helstoski,* the prosecution may not so much as "*mention* [] a legislative act." 442 U.S. at 490 (emphasis added).

To be sure, the Clause does not immunize "all things in any way related to the legislative process," and it does not "make Members of Congress super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516. Acts that are "personal," "political," or that take place outside "the legislative process" exceed the Clause's scope. *Id.* at 507, 512, 526. But the Clause *does*—intentionally—"make prosecutions more difficult." *Helstoski*, 442 U.S. at 488. That was "the conscious choice of the Framers," *Eastland*, 421 U.S. at 510, who chose to counterbalance the Clause's broad protection by vesting Congress with a mechanism "to punish its own members" through a two-thirds vote, *Kilbourn*, 103 U.S. at 182; *see* U.S. Const. art. I, § 5, cl. 2. Accordingly, the immunity for legislative acts is broad and "absolute." *Eastland*, 421 U.S. at 501.[12]

---

[12] Given the Supreme Court's admonition that the legislative immunity analysis may not consider the legislator's "intent and motive," *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998), Congresswoman McIver preserves her argument that this Court's two-step test, which *does* consider the legislator's purpose and motive, has "one step too many," *see New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022). The district court's analysis

### B.   The Entirety of Congresswoman McIver's Congressional Oversight Investigation is a Legislative Act

The indictment must be dismissed in its entirety because it exclusively charges Congresswoman McIver for conduct she undertook "in the course of exercising [] legislative authority," which is "privileged from judicial scrutiny." *Youngblood v. DeWeese*, 352 F.3d 836, 841 (3d Cir. 2003). Indeed, the government *admits* that the allegations charge Congresswoman McIver for her conduct "during the pendency of" a "clearly legislative act." D.Ct.Dkt.27 at 57, 61-62. That concession is accurate—and fatal.

This Court analyzes Speech or Debate Clause claims under "a two-step framework for identifying legislative acts." *Menendez*, 831 F.3d at 166. The Court first examines "the form of the act to determine whether it is inherently legislative or non-legislative." *Id.* When an act is either "clearly" legislative or non-legislative, the inquiry stops immediately: "manifestly legislative acts" are protected; manifestly non-legislative acts are not. *Id.* When an act is "ambiguously legislative," however, the Court undertakes a second step and assesses whether, based on "the content, purpose, and motive of the act," the act's "predominant purpose" was legislative. *Id.* at 166, 173.

---

of Congresswoman McIver's "predominant purpose" during her 68 seconds outside the facility gate was contrary to the Supreme Court's framework. A27.

This analysis requires examining the legislator's conduct at the level of the "particular activity." *Lee*, 775 F.2d at 525. But that analysis does not license minute-by-minute review. The question is whether that activity "*as a whole* is entitled to legislative immunity." *Id.* (emphasis added).

For instance, in the context of "legislative fact-finding," the Court "determines" whether "a particular meeting or event constitutes a legislative act," that is, whether it "contained a significant legislative component." *Id.* The Court's role is not to divide each "meeting or event" into component parts to conduct a play-by-play analysis of which moments were legislative and which were not—even when the legislator attends to "some personal matters during [the] legislative fact-finding." *Id.*

That holistic approach is consistent with the Clause's "prophylactic" purpose, *Johnson*, 383 U.S. at 182, which is not to parse each aspect of legislative conduct, but to prevent the threat of that scrutiny—*i.e.*, "question[ing]"—in the first place. U.S. Const. art. I, § 6, cl. 1. Analyzing a legislator's activity as a whole serves that aim by insulating legislative independence from executive supervision, granting legislators "breathing room" to exercise their independence, and keeping the other branches at arm's length. Josh Chafetz, *Democracy's Privileged Few* 90 (2007). So when "a

Member engages in a legislative act, the court cannot carve out" individual segments of that act for isolated analysis. *In re Sealed Case*, 80 F.4th 355, 373 (D.C. Cir. 2023).

Applying that proper analytical framework, it is clear the indictment charges Congresswoman McIver for undertaking legislative activity. The government concedes that Congresswoman McIver's visit to Delaney Hall was formal congressional oversight, D.Ct.Dkt.27 at 61, which this Court has expressly held is an unambiguously legislative act, *United States v. McDade*, 28 F.3d 283, 299-300 (3d Cir. 1994); *Menendez*, 831 F.3d at 167-68.

The government's district court briefing explained that "legislative activities [] brought [Congresswoman McIver] to Delaney Hall to inspect the facility"; that "conducting an inspection of Delaney Hall" was a "clearly legislative act"; and that the indictment's allegations all describe conduct "she had commenced undertaking" "during the pendency of" that concededly legislative visit. D.Ct.Dkt.27 at 57, 61-62. The district court agreed that "Defendant's inspection of Delaney Hall was a legislative act," and that "legislative fact-finding is entitled to the protection of legislative immunity." A19.

27

The video evidence confirms those descriptions. Congresswoman McIver's oversight investigation began no later than her arrival at Delaney Hall, where the Members explained they had come to conduct congressionally authorized oversight and asserted their right to inspect the facility and inspect its safety, health, and services. A258 at 1:34-2:08. That oversight was not limited to a physical review of the facilities. The Members used their time during ICE's "inexplicable delay" of the facility tour itself, A19, to question staff about the facility's management and conditions, A258 at 6:34-15:33. The court also found that, during the interaction with Mayor Baraka, V-1 himself confirmed the "members of Congress had lawful authority to be" there. A8. The investigation culminated with the Members "touring the facility, where they engaged in protected fact-finding related to federal immigration policy." A23.

Thus, taking Congresswoman McIver's oversight investigation of Delaney Hall "as a whole," *Lee*, 775 F.2d at 525, the entire inspection was a legislative activity authorized under Article I, § 527, and House Rule X. All of the conduct the Congresswoman undertook "in the course" of that activity is immunized from prosecution, *Youngblood*, 352 F.3d at 841.

28

The district court reached a contrary conclusion by improperly atomizing Congresswoman McIver's oversight inspection into minute-by-minute increments, stripping "68 seconds" out of her two-and-a-half hour investigation at Delaney Hall for independent analysis. A199-200. The court effectively ruled that Congresswoman McIver's oversight visit stopped when she followed ICE agents through the Delaney Hall gate into the public parking lot, and began again only after she returned through the gate and reentered the secure perimeter. The court viewed Congresswoman McIver's actions during those moments outside the gate as "not tied to potential legislation or any other policy-making purpose." A10; *see* A22.

That is not how the legislative acts analysis works. The district court assumed, without explanation, that the proper unit of analysis for the legislative acts inquiry was the "few seconds" Congresswoman McIver engaged in the "acts alleged in" the indictment. A22, A27, A54; *see* A9. But that is wrong. The district court's frame-by-frame review of Congresswoman McIver's otherwise protected legislative conduct squarely contradicts this Court's framework for evaluating legislative acts, which requires looking at a particular event "as a whole." *Lee*, 775 F.2d at 525. The "event" at issue here,

29

*id.*, was the full investigation of Delaney Hall—not a "few seconds" in the middle of it, A54.

In short, the government's concessions are sufficient to dismiss the indictment. The government agrees that Congresswoman McIver's investigation was a "clearly legislative act." D.Ct.Dkt.27 at 61. And this Court's precedents, grounded in the purposes of the Speech or Debate Clause, require reviewing that act as a whole—not flyspecking every moment of it. The district court's contrary approach was pure legal error. *Lee*, 775 F.2d at 525.

### C.    A Trial Would Necessarily Place Legislative Acts At Issue

Even without this holistic assessment of the charged conduct, the indictment must be dismissed because a trial in this case would place Congresswoman McIver's legislative acts directly before the jury, violating the principle that a prosecution may not even "*[r]eveal[] information* as to a legislative act." *Helstoski*, 442 U.S. at 490 (emphasis added). This prosecution would undoubtedly subject Congresswoman McIver "to being 'questioned' in a place other than the House or Senate, thereby violating the explicit prohibition of" the Clause. *Id.*

### 1. The Charged Conduct Could Not Be Proven Without Evidence of Legislative Acts

It is obvious that when a prosecution charges 68 seconds of conduct that took place in the middle of a congressional oversight investigation, it will be "necessary to inquire into" that investigation at trial. *Brewster*, 408 U.S. at 526. Congresswoman McIver, both of the alleged victims, and most other witnesses who would testify at a trial were present at Delaney Hall only because of "the legislative activities that brought" Congresswoman McIver to "inspect the facility." A11-12. As a result, every witness's testimony would necessarily include testimony about her oversight visit.

Even the indictment makes that clear, as its very first page explains that the Congresswoman "arrived at Delaney Hall allegedly to conduct a congressional oversight inspection." A73. The indictment then states that Congresswoman McIver and her colleagues entered the facility's "secured area and proceeded to an interior reception area" to commence their investigation. A74. When ICE first attempted to arrest the Mayor of Newark and the Members "protest[ed]," the indictment acknowledges that "V-1 explained to them that members of Congress had lawful authority to be" there. A75. And even after describing the 68 seconds of conduct that have become the focal point for this prosecution, the indictment describes that

31

Congresswoman McIver "returned inside of the secured area of Delaney Hall," A77, where she completed her "protected fact-finding," A23. The government chose to detail all this legislative context in the indictment for a reason: the case is unintelligible without it.

The indictment is only the beginning. Almost every witness that the government could call at trial was deployed to Delaney Hall on May 9 because a congressional delegation had arrived to conduct an oversight inspection. Each of them—particularly the two alleged victims—would have to explain as much to satisfy the element of § 111 that they were engaged in their official duties.

The arrest Congresswoman McIver allegedly impeded was itself a product of her oversight visit. The Mayor was on the premises to meet with the Members after their inspection, and the guard invited him inside the gate to wait for them. A7, A262 at 3:51-4:35. And, of course, the only reason the Congresswoman was present at the scene of the arrest was because she was there to do oversight. All of that context explains the 68 seconds on which the government wants to focus; without it, the jury would see nothing but a scrum of agents, lawmakers, and civilians outside a security gate, with no way to

32

understand who these people were, why they were there, or what provoked the confrontation.

Congresswoman McIver would necessarily respond to the government's presentation through cross-examination and witnesses of her own. *See Johnson*, 383 U.S. at 177. That testimony would focus on her oversight activities and authority. It would start with her stated purpose upon arriving at the facility, continue through the oversight she conducted during ICE's "inexplicable delay" and V-1's confirmation of her authority shortly before the 68-second period began, move on to her reasons for exiting and then reentering the secured area, and culminate with the facility tour she ultimately received despite ICE's efforts to thwart it. Delving into these legislative acts would be absolutely necessary at trial.

### 2.    The Elements of The Charged Offense Require Evidence of Legislative Acts

The elements of a § 111 charge confirm what the indictment already makes clear: this case is all about legislative acts. At trial, the government would have to prove both that Congresswoman McIver had the requisite criminal intent, and that the alleged victims were acting in their official capacities. Both showings *require* evidence of legislative acts.

33

**a.** Most obviously, to prove its case the government will have to show that Congresswoman McIver had criminal intent. *United States v. Feola*, 420 U.S. 671, 684 (1975). As part of that showing, the government will be required to prove that Congresswoman McIver's actions were not "defensible" or "justified." *United States v. Goodwin*, 440 F.2d 1152, 1156 (3d Cir. 1971). That is because a "defendant may cast a reasonable doubt upon the existence of mens rea by showing" a justification for her conduct. *Id.* To "sustain its overall burden of proof, the Government must, of course, remove this doubt." *Id.*

Resolving this issue would make Congresswoman McIver's legislative acts and authority the *centerpiece* of any trial. The evidence would necessarily revolve around her legislative conduct investigating Delaney Hall, her reasonable understanding of the scope of her legislative authority in undertaking that investigation, and her responsibilities to oversee DHS activities more generally. That inquiry would involve whether ICE was impairing her visit in violation of § 527; whether she "reasonably believed" that to be the case; whether her congressional authority under House of Representatives Rule X gave her the authority to observe and inquire about ICE's unlawful arrest of the Mayor; and whether she believed she had such authority. The testimony would involve whether the witnesses—including V-1

34

and V-2—were violating § 527 by using ICE funds and resources to impair her inspection, and whether the Mayor's arrest was part of that effort. *Id.* That focus would explicitly invite the jury to "impose liability" if it "disagree[d] with [her] legislative judgment" during the investigation—just what the Speech or Debate Clause prohibits. *Doe v. McMillan*, 412 U.S. 306, 313 (1973).

**b.** In addition, the government would have to prove that the alleged victims were "engaged in … the performance of official duties" during the charged conduct. *United States v. Washington*, 79 F.4th 320, 324 (3d Cir. 2023) (quoting 18 U.S.C. § 111). The "time," "place," and "mission" of the agents is of "critical importance" to that inquiry. *United States v. Hoffer*, 869 F.2d 123, 125 (2d Cir. 1989) (quoting *United States v. Boone*, 738 F.2d 763, 765 (6th Cir. 1984)). Each of those factors inevitably leads back to Congresswoman McIver's oversight.

As for timing, the allegations the district court isolated "occurred during" the midst of the alleged victims' "inexplicable delay of Defendant's oversight inspection." A8, 19. As for place, the agents were at Delaney Hall, a facility otherwise manned by private third-party contractors, because of the Members' demand for an oversight inspection. *See, e.g.*, A7; A277-78; A258 at 6:34-15:33. And as for mission, the agents came to Delaney Hall in direct

35

response to Congresswoman McIver's oversight visit and the events surrounding it. *See, e.g.*, A7; A277-78; A258 at 6:34-15:33. Thus, like the mens rea showing, the government's evidence of official duties would necessarily "[r]eveal[] information as to" Congresswoman McIver's "legislative act." *Helstoski*, 442 U.S. at 490.

**c.** The district court failed to grapple with how a trial in this case would unfold. Despite acknowledging that the government "may not [] inquire into or introduce evidence of [Congresswoman McIver's] legislative act of conducting an oversight inspection of the facility," A25, the court concluded that the government "need not" make that inquiry to prove its case. A25. But the court's only explanation for this conclusion was that the government would not need to introduce evidence of Congresswoman McIver's "visits to other immigration facilities in New Jersey and meetings with federal immigration officials," which the Congresswoman had explained would help confirm her legislative objective for visiting Delaney Hall. A24-25.

That analysis was faulty. The district court's focus on *background* information about Congresswoman McIver's *history* of oversight was far too narrow because it overlooked that this information would be important in gauging Congresswoman McIver's intent, the behavior and credibility of the

government's witnesses, and the prosecution's ability to prove each element of the offense. More importantly, the court failed to recognize that any trial would certainly place before a jury evidence of the legislative acts *undertaken on May 9, 2025 at Delaney Hall* that underlie the indictment. *See* D.Ct.Dkt.19-1 at 22-24; D.Ct.Dkt.32 at 5-6.

In short, neither the government nor the district court ever explained how a trial in this case could possibly be isolated to 68 seconds of conduct; never acknowledged that the government's own indictment narrates a legislative act; never accounted for the fact that every single witness, piece of testimony, and item of evidence would enter the record in the context of a legislative oversight inspection; and never addressed the § 111 elements and the evidence the government would need to prove them. A23-25. Any realistic assessment makes clear that a trial would not merely *mention* legislative acts—it would revolve around them. Indeed, it is impossible for this case to be fairly tried without the jury's hearing the circumstances that led to the physical contact between Congresswoman McIver and the agents. That requires dismissal.

### D. Congresswoman McIver Was Engaged in Legislative Conduct Throughout Each Count of the Indictment

Even if the Court were not required to analyze Congresswoman McIver's oversight investigation as a whole, and even if a trial could somehow avoid any mention of the oversight context, this prosecution *still* would violate the Speech or Debate Clause because Congresswoman McIver's actions were legislative, even viewed through the district court's 68-second lens.

#### 1. Counts One and Three Charge Legislative Acts

Congresswoman McIver was engaged in legislative conduct throughout Counts One and Three of the indictment.

**a.** When the Congresswoman and her delegation exited the gates of Delaney Hall alongside a team of armed and masked ICE agents executing a tactical operation to unlawfully arrest the Mayor of Newark, Congresswoman McIver followed them to *continue* conducting oversight. On the government's own telling, ICE arrested Mayor Baraka after ordering him into a crowd of "gathering protestors" that it had claimed put his "safety" at risk, and then pursued him into that crowd "with more than a dozen agents and officers" to arrest him in a scrum of the agents' own making. D.Ct.Dkt.27 at 2-3.

Congresswoman McIver had a self-evident prerogative to continue her oversight mission while ICE carried out this reckless operation. She was

38

inspecting Delaney Hall in part *because of* reports that officials there were engaging in misconduct. D.Ct.Dkt.19-1 at 6-7, and she obviously had a legislative interest in ICE's illegal arrest of the Mayor of the largest city in her District, particularly when they executed it right in front of her.

That explains why all three Members rushed outside alongside agents as the hazardous arrest unfolded. Congresswoman McIver's oversight responsibilities entitled her to investigate why the agents were arresting the Mayor, why they were doing so in a way that interfered with her oversight visit, and why they had changed their mind after allowing him to leave once she had emphasized that they were "here to do our oversight visit," A262 at 4:32-5:58.

**b.** Even if overseeing an unlawful arrest were not *itself* protected oversight activity, Congresswoman McIver's actions were calculated to "prevent indirect impairment" of her legitimate legislative oversight—and thus were "an integral part of the" legislative process entitled to immunity. *Gravel v. United States*, 408 U.S. 606, 625 (1972); *see Eastland*, 421 U.S. at 505. The record makes clear that the Mayor's arrest was part of ICE's protracted obstruction of the Members' oversight visit. The Members immediately identified ICE's treatment of the Mayor as "creating a problem"

39

that didn't exist and perpetrating an "act of intimidation" and interference to impede their mission. A262 at 4:32-5:58. Just as a Member would be engaged in a legislative act by responding to a colleague's attempt to prevent their casting a vote or delivering a speech in Congress, a Member engages in equally legislative conduct by mitigating impairment of authorized oversight activity.

**c.** The district court did not acknowledge that Congresswoman McIver had the right to prevent impairment of her oversight inspection. And it disagreed that she could be engaged in oversight by voicing "strong opposition to the Mayor's arrest," which the court viewed as "akin to 'lobbying on behalf of a particular party.'" A22-23 (quoting *Menendez*, 831 F.3d at 169).

That analogy, which compares one lawmaker's premeditated facilitation of bribes with another's on-the-ground oversight during an active investigation, is unsustainable. But even if Congresswoman McIver's actions could be described as "efforts to intervene in decisions pending before the Executive Branch," A23, that would only *help* her. Unlike Senator Menendez's efforts to secure favors for "one particular party," Congresswoman McIver's opposition to the unlawful arrest served "actual legislative purposes" and was "concerned with broader issues of policy"—indeed, the very purpose of preventing ICE misconduct that brought her to Delaney Hall in the first

40

place—and thus "qualif[ied] as 'true legislative oversight'" that would "merit Speech or Debate immunity," *Menendez*, 831 F.3d at 169-70 (quoting *McDade*, 28 F.3d at 304 (Scirica, J., concurring)).

The district court's alternative basis for denying immunity on Counts One and Three was that the conduct took place outside "the secured area of the facility." A19-20, A22-23. But nothing limits Congresswoman McIver's oversight to the investigation of conduct within a DHS facility's gates. She cannot have been divested of immunity simply because ICE chose to arrest the Mayor just outside the gate. And it would make no sense to insulate ICE agents from congressional oversight anytime they rove beyond a particular facility's perimeter. The Speech or Debate Clause protects conduct, not places, and the legislative nature of Congresswoman McIver's actions did not evaporate at the detention center fence. Counts One and Three should have been dismissed.

### 2.   Count Two Charges Legislative Acts

**a.** Section 527 of the FCAA vests Members of Congress with an unusually specific oversight authority. Adopted in response to ICE's interference with legislators inspecting its detention facilities during the 2018

family separation controversy,[13] § 527 authorizes Members to "*enter[]*, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to" house detainees, and simultaneously prohibits DHS from using its appropriated funds to "*prevent*" a Member from doing so. FCAA § 527(a) (emphasis added). That language confers a specific right on Members of Congress to enter DHS facilities "without delay" to conduct oversight. *Neguse v. ICE*, 2025 WL 3653597, at *10 (D.D.C. Dec. 17, 2025). A Member therefore undertakes a legislative act when she "enters" a DHS detention facility "for the purpose of conducting oversight." FCAA § 527 (a).

Count Two charges Congresswoman McIver for just that. Every allegation in Count Two identifies the Congresswoman's conduct "as she returned inside" the facility, A77, as the district court acknowledged, A50. And the record makes clear that she was reentering the facility for the purpose of completing her oversight investigation.

The evidence corroborates that purpose from start to finish. Congresswoman McIver announced her oversight agenda as soon as she

---

[13] Homeland Security Improvement Act, H.R. Rep. No. 116-163, 116th Cong., at 17 (2019); *see, e.g.*, *Dem lawmakers make surprise visit to ICE detention center*, The Hill (June 17, 2018), https://perma.cc/DPE8-9PZA.

arrived at Delaney Hall on May 9, and probed officials about the facility's operations in the lead up to the encounter Count Two describes. A258 at 6:40-15:35, 16:00-17:23; A7. The video evidence proves that throughout Congresswoman McIver's "two to three second[]" interaction with V-2, A50, she was moving toward the facility entrance. The video evidence also shows that her contact with V-2 *never would have occurred* if he had not intercepted the Congresswoman's attempt to re-enter the facility.[14]

The Congresswoman's conduct corroborates her purpose: less than 90 seconds after making her way through the gate, she returned to the building to commence her tour, without making her way toward the Mayor. A257 at 1:28:23-1:29:48; A271 at 4:07-4:37; A332 at 02:50:46-2:51:05. She stopped briefly only to complain to an ICE official that an agent had assaulted her. Count Two thus expressly charges a legislative act.

**b.** Despite acknowledging that § 527 authorized Congresswoman McIver to "enter" the facility, and that Count Two charges her attempt to "lawfully re-enter the Security Gate," the district court concluded that the Congresswoman's "entry and inspection authority under § 527 was not implicated" here. A50, A55.

---

[14] *Supra* n.3 at 0:54-1:00.

The court reached that erroneous conclusion because it focused on the *wrong person's* intent. Instead of focusing on the Congresswoman's effort to re-enter the facility, the court focused on *V-2's* motives. It concluded that *V-2* was not "purposely impeding her when the physical contact occurred," and was instead "attempting to clear a path for V-1 to effect the arrest of the Mayor." A54.

But the question is not whether *V-2* was "prevent[ing]" Congresswoman McIver from entering the facility—it was whether *Congresswoman McIver* was "enter[ing]" the facility "for the purpose of conducting oversight." FCAA § 527 (a). In other words, the legislative immunity inquiry should have focused *only* on Congresswoman McIver's "predominant purpose" in returning to the facility. *Menendez*, 831 F.3d at 173.

Further, and though it is unnecessary to the outcome, the district court also wrongly concluded that "V-2 was not preventing" Congresswoman McIver from reentering the facility because he was not "deliberately" blocking her path. A54 (cleaned up). But what V-2 *intended* is irrelevant to whether he was "preventing" the Congresswoman from entering the facility. *See Neguse*, 2025 WL 3653597, at *25. Indeed, the court recognized as much in its first opinion before reversing course in its second. A27 ("it is axiomatic that

44

Defendant's statutory right to enter and inspect the facility could not be infringed, even if mistakenly"). So although it is a red herring, on any view of the facts V-2 prevented Congresswoman McIver from reentering the facility during Count Two. That Count should have been dismissed.

## II.     The Indictment Violates the Separation of Powers

The Speech or Debate Clause provides sufficient grounds to dismiss the indictment. But an independent constitutional principle—the separation of powers—confirms the same result.

As the Supreme Court has recognized, the "separation-of-powers doctrine justifies a broad[] privilege for Congressmen … in criminal actions." *Supreme Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980). In *Trump v. United States*, the Court applied that principle to the Presidency, holding "that the President is *absolutely* immune from criminal prosecution for conduct within his *exclusive sphere of constitutional authority*," and has "*presumptive* immunity from criminal prosecution for ... acts within the outer perimeter of his *official responsibility*." *Trump*, 603 U.S. at 609, 614 (emphasis added). The latter can be rebutted only when "applying a criminal prohibition … would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'" *Id.* at 615 (quoting *Nixon v. Fitzgerald*,

45

457 U.S. 731, 754 (1982)). Without this immunity, an "enterprising prosecutor in a new administration [could] assert that a previous President violated [a] broad statute," and "prosecutions of ex-Presidents could quickly become routine." *Id.* at 640.

*Trump*'s reasoning applies with equal, if not greater, force to legislators. Since "the Glorious Revolution in Britain, and throughout United States history," immunity "has been recognized as an important protection of the independence and integrity of the legislature"—an even more robust foundation than the precursors to executive immunity. *Johnson*, 383 U.S. at 178. And legislators, unlike the President, face ongoing threats of prosecution *during* their term in office, whereas presidents face only the more remote prospect of later prosecution at the hands of "a new administration." *Trump*, 603 U.S. at 640. And the earliest judicial decisions on legislative immunity reflect that it should extend to official acts, explaining that immunity presumptively extends "to the giving of a vote, to the making of a written report, and *to every other act resulting from the nature, and in the execution, of the office.*" *Coffin v. Coffin*, 4 Mass. 1, 27 (1808) (emphasis added).[15]

---

[15] While *Trump* roots this official-acts immunity in the constitutional separation of powers, the Court also could locate it under the rubric of the

The indictment here plainly charges Congresswoman McIver for conduct during her performance of official acts, and the government has not seriously contended otherwise. A legislator who "acts pursuant to constitutional and statutory authority [] takes official action to perform the functions of [her] office," *Trump*, 603 U.S. at 617, and the indictment charges Congresswoman McIver for conduct she undertook pursuant to her Article I, § 527, and House Committee authority. A6-7. And the Government could not rebut the presumptive immunity that attaches to that official act: A criminal trial in this case would unquestionably deter further legislative oversight.

## III. The Indictment Violates the Doctrines of Selective and Vindictive Prosecution

### A. There is Clear Evidence of Selective Prosecution and Enforcement

Prosecutorial discretion is broad—but "it is not unfettered." *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1141 (D.C. Cir. 2023). Rather, the First and Fifth Amendments forbid criminal charges predicated on "selective prosecution" and "selective enforcement." *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017). A prosecution violates these protections when a defendant "is similarly situated to a person against whom

---

Speech or Debate Clause itself, based on the Clause's text, history, and early judicial interpretations.

47

the law was not enforced" except for their constitutionally protected status or activity. *Frederick Douglass*, 82 F.4th at 1137.

This prosecution violates these constitutional guardrails. The government dismissed § 111 assault cases against hundreds of January 6 defendants charged with committing egregious violence at the U.S. Capitol aimed at overturning a valid presidential election. Yet the government is pursuing this prosecution against Congresswoman McIver for incidental contact at a facility that she had a constitutional and statutory right to investigate. There is only one explanation for the differential treatment: this Administration favors the January 6 defendants' views and partisan affiliation, but disfavors Congresswoman McIver's.

### 1.    The January 6 Defendants Are Appropriate Comparators

The selective prosecution inquiry starts by comparing "similarly situated" defendants to "isolat[e] whether a decision turns on 'unlawful favoritism,' rather than lawful prosecutorial considerations." *Frederick Douglass*, 82 F.4th at 1137. The point of this analysis is to identify "distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions." *Id.* Congresswoman McIver is similarly situated to others, indeed, hundreds of others, against whom § 111 was not

enforced. That is uniquely robust evidence of unconstitutionally differential treatment.

The relative "culpability" of Congresswoman McIver and the January 6 defendants is clear evidence that no "legitimate prosecutorial factors" distinguish them. *Id.* at 1137-38 (emphasis added). The dismissed January 6 cases included individuals charged with grievous violence. One defendant with a "lengthy and violent criminal history" was seen using "a metal bike rack to push against law enforcement officers and repeatedly spray[ed] them" with a "chemical spray." Mot. ISO Pretrial Detention at 1, 4, *United States v. Boughner*, No. 22-cr-0020 (D.D.C. Dec. 19, 2021), Dkt. 9. Another was charged with "throwing an explosive device that detonated upon at least 25 officers." Statement at 2, *United States v. Ball*, No. 23-cr-0160 (Apr. 27, 2023), Dkt. 1-1. A third "assaulted multiple police officers for hours, at times deploying a baseball bat or a riot shield as a weapon and causing serious injury." Gov's Response at 1-2, *United States v. Lang*, No. 21-cr-0053 (Feb. 21, 2024), Dkt. 127. The government dismissed the charges against all these defendants—and many more charged with similarly egregious conduct.

By any measure, Congresswoman McIver's alleged conduct is far less worthy of prosecution. Even if the indictment's exaggerated allegations were

accurate, they charge the Congresswoman with at most "slamm[ing] her forearm into the body of" an officer; "reach[ing] out and tr[ying] to restrain" that officer "by forcibly grabbing him;" and "push[ing] past" another officer "while using each of her forearms to forcibly strike" him. A75, A77. Nothing in that description comes close to the severity of the January 6 defendants' conduct.

Other relevant factors confirm the point. Congresswoman McIver was lawfully present at Delaney Hall; the January 6 defendants "stormed" the Capitol and "broke into the" chamber. *Supra* n.3. Congresswoman McIver was conducting lawful legislative oversight; the January 6 defendants were attempting to illegally overturn the results of a valid presidential election. Congresswoman McIver's conduct was a reaction to the unlawful actions of federal law enforcement officers; the January 6 defendants' conduct was a premeditated assault on duly stationed federal law enforcement officers. Congresswoman McIver had never been arrested; many of the January 6 defendants had lengthy criminal records. No law enforcement officers were injured at Delaney Hall; many were seriously hurt on January 6.

Every possible legitimate prosecutorial consideration cries out for prosecuting the January 6 defendants over Congresswoman McIver—not the

50

other way around. The "lopsided prosecutorial response" to this conduct "does not comport with the deterrence value or culpability associated with the number of protesters and the scope of" the January 6 defendants' conduct, strongly "suggesting improper selective" prosecution and enforcement. *Frederick Douglass*, 82 F.4th at 1138.

### 2. The Government's Differential Treatment of Congresswoman McIver Turns on Protected Conduct

The differential treatment between Congresswoman McIver and the January 6 defendants plainly "turned on" the Congresswoman's protected rights. *Id.* at 1142. Indeed, while Congresswoman McIver need not show evidence of "motive" to prove a First Amendment violation, in this case there is ample evidence of the government's improper purpose. *Id.* at 1145.

The Trump Administration has been crystal clear about its basis for dismissing the January 6 defendants' charges: those defendants' partisan support for the Administration. The government dismissed the cases because the defendants were charged for attempting to overturn the result of an election that, according to the White House, was "rigged and stolen." Dkt. 20-1 at 20-21. The President himself issued a proclamation directing dismissals of the January 6 prosecutions as "a grave national injustice that has been perpetrated upon the American people over the last four years." 90 Fed. Reg.

51

at 8331. He characterized the January 6 defendants as "people that actually love our country."[16] The Justice Department offered no additional justifications for dismissing the prosecutions, embracing this partisan rationale and justifying its dismissals based only on the President's proclamation. *See, e.g., United States v. Warnagiris*, 2025 WL 341990, at *4 (D.D.C. Jan. 30, 2025).

By contrast, Congresswoman McIver shares no ideology or political views with this Administration. She is a Democratic Member of Congress who has been an active, vocal check on the Administration's immigration policy, and she was charged for her conduct during the course of conducting oversight of its immigration activities under a policy that DHS has repeatedly tried to subvert. Numerous statements from officials throughout the Executive Branch confirm the partisanship of this prosecution:

- ***Department of Homeland Security.*** While Congresswoman McIver's May 9 investigation of Delaney Hall was still ongoing, DHS issued a press release falsely claiming that Members of Congress had "stormed the gate and broke[n] into the detention facility." *Supra* n.3. DHS issued another news release a week later to "[d]ebunk" the "oversight" basis for the visit, even though everyone now agrees Congresswoman McIver was at Delaney Hall to conduct protected oversight. *Supra* n.8. A third press release suggested that Congresswoman McIver's visit was "just another case of Democratic lawmakers labeling political stunts as

---

[16] *Trump Defends His Pardons for Jan. 6 Attack on Capitol*, Politico (Jan. 21, 2025, 8:33 PM), https://bit.ly/3Q9TDwH.

oversight." *Supra* n.9. And a fourth admonished "Democratic members of Congress" like "Representative LaMonica McIver (D-NJ)" for their interactions with "ICE officials." *Supra* n.10.

- ***Department of Justice.*** The Interim U.S. Attorney who brought this case, Alina Habba, started her tenure in the position by expressly connecting her role to potential partisan gains, saying: "We could turn New Jersey red"; "[h]opefully while I'm there," "I can help that cause." Ms. Habba's statement explicitly connected her Office's "law enforcement" priorities to Republican "voting trend[s]."[17] Ms. Habba made good on this pledge within days of her appointment, taking to Fox News to announce her office's investigations of high-ranking Democratic officials in the state.[18]

- ***The President.*** President Trump himself has connected this prosecution to his Administration's political agenda. When the Justice Department announced charges against Congresswoman McIver, the President endorsed the decision by declaring: "The days of woke are over."[19] The President has thus expressly connected this prosecution to his Administration's efforts to end "wokeness"—an ideology the Administration has attributed to "[t]he Democrat[ic] Party" and degraded as fostering "radical gender and racial ideologies that poison the minds of Americans," akin to "cultural Marxism."[20]

The "government's failure to follow its normal prosecutorial procedures" is further evidence of the improper basis for these charges.

---

[17] *Newly Appointed New Jersey DA Alina Habba—Live From the White House* at 8:41-9:00, Human Events (Mar. 27, 2025), https://bit.ly/3PGRRmH.

[18] @AlinaHabba, X.com (Apr. 10, 2025, 10:06 PM), https://x.com/AlinaHabba/status/1910514829674131833 (embedded video at 0:48-58).

[19] *Trump Defends McIver Charges*, Axios (May 20, 2025), https://bit.ly/3PwNx9E.

[20] *Cuts to Woke Programs*, White House, https://perma.cc/SNT2-ZSBL; Fox News, X.com (Mar. 25, 2025, 9:54 AM), http://x.com/FoxNews/status/1904547557570650524.

*United States v. Haggerty*, 528 F. Supp. 1286, 1293 (D. Colo. 1981); *see also, e.g.*, *United States v. Ojala*, 544 F.2d 940, 943 & n.2 (8th Cir. 1976). The Justice Department admits that it bypassed long-standing procedures specifically designed to protect Members of Congress from improper prosecution. Those procedures require prosecutors to consult with the Department's Public Integrity Section before charging a Member of Congress.[21] The government nevertheless jettisoned these protections to charge Congresswoman McIver, even though the charging documents expressly acknowledge that the allegations arose during "a congressional oversight inspection" and that "members of Congress had lawful authority to be" at Delaney Hall. A68-69, A75.

### 3. The District Court's Comparator Analysis Was Fundamentally Flawed

The government identified no legitimate prosecutorial factor justifying its differential treatment of Congresswoman McIver and the January 6 defendants. Instead, the government contended that the January 6 defendants cannot serve as comparators at all because they purportedly were pardoned.

---

[21] Justice Manual § 9-85.110, *Investigations Involving Members of Congress* (2024); *Policies and Procedures in Criminal Investigations Involving Members of Congress and Staff*, DOJ (Nov. 7, 2023), https://perma.cc/ACT3-JTD5.

The district court accepted that threshold legal contention, bypassing the comparator analysis altogether. That was legal error.

**a.** The district court accepted the government's theory that President Trump's decision to *pardon* many of the January 6 defendants meant that they could not be similarly situated within the meaning of selective prosecution jurisprudence. But that theory depends on the mistaken premise that pardoned individuals cannot be comparators for purposes of a selective-prosecution motion. Neither the court nor the government identified any authority for that remarkable proposition.

It is true that pardons can be granted for political reasons, and a court has no power to invalidate a pardon on that ground. *See Trump*, 603 U.S. at 608. But this case does not challenge the validity of any pardon; it challenges the validity of this prosecution. On that question, a pardoned defendant can be a comparator.

Indeed, the exercise of identifying similarly situated defendants in this context is to enable courts to isolate the variables that explain the "prosecutorial decisions with respect to" the particular defendant before the court.

55

Here, the Justice Department and the President have already done the work. They are not interested in prosecuting violent defendants who attacked federal law enforcement officials who were protecting the Capitol from armed and dangerous individuals intent on stopping a basic function of the democratic process. The Department of Justice, DHS, and the Administration *are*, however, interested in prosecuting *this defendant.* The comparators exist: the January 6 defendants. All factors that apply to legitimate prosecutorial decision-making point in one direction. Nothing but an improper purpose under the First Amendment points the other way. The fact that pardons were involved does not change that analysis.

Regardless, the 160 defendants that Congresswoman McIver invoked as comparators were *not* pardoned. The President's proclamation distinguished between (1) "full, complete and unconditional pardon[s]" for individuals "*convicted* of offenses" stemming from the January 6 attacks, and (2) a separate "direct[ion]" to "the Attorney General to *pursue dismissal* with prejudice to the government of all pending indictments." 90 Fed. Reg. 8331 (emphasis added). Courts have since dismissed some of these cases in the second category *without prejudice*; a dismissal that contemplates the possibility of further prosecution and that would be impossible if the

56

defendants were pardoned. *See, e.g.*, *United States v. Giusini*, 2025 WL 275683, at \*3 (D.D.C. Jan. 23, 2025).

Confirming that fact is the longstanding rule that a pardon generally must be *accepted* to be effective. *Burdick v. United States*, 236 U.S. 79, 94 (1915). The government below acknowledged that of the hundreds of January 6 defendants whose cases were pending, only 26 had requested certificates of pardon. So even accepting the district court's premise that all of these defendants could have accepted pardons, there still would be at least one hundred January 6 defendants charged under § 111—including the egregious cases described above—who did *not* accept pardons and whose prosecutions nonetheless were dropped. There is no reason these individuals cannot be considered as part of the comparator analysis to decide whether Congresswoman McIver is being prosecuted for impermissible reasons.

**b.** The court separately concluded that the factual circumstances underlying the January 6 cases were "unambiguously distinct" because those defendants' conduct was *more* culpable than Congresswoman McIver's: they had "serious criminal records" and the Congresswoman's conduct was "manifestly less egregious." A37-38. That is a caricature of the required analysis.

57

"'[S]imilarly situated' does not mean 'identically situated.'" *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (quoting *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir. 1991)). The question is whether the defendants are "alike in all relevant respects," such that "a juror, looking objectively at the incidents, would think them roughly equivalent." *Id.* at 205-06 (cleaned up). The analysis has a simple objective: it "isolat[es] whether a decision turns on 'unlawful favoritism,' rather than lawful prosecutorial considerations." *Frederick Douglass*, 82 F.4th at 1137 (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002)).

That Congresswoman McIver's conduct was less culpable than the January 6 defendants' doesn't undermine her selective prosecution claim—it *proves* it. Neither the district court nor the government identified *any* legitimate prosecutorial basis for distinguishing Congresswoman McIver's prosecutions from the January 6 prosecutions. And the relative culpability of Congresswoman McIver's actions only eliminates a critical "legitimate prosecutorial factor[]" that might otherwise have justified the charging decision. *Id. Frederick Douglass* thus relied on "the culpability of the two groups" as "suggesting improper selective enforcement." *Id.* at 1138. The same conclusion follows here too.

**c.** Last, the district court rejected the selective enforcement aspect of Congresswoman McIver's claim because the Justice Department conducted a "large-scale investigation of the January 6 defendants," whereas the enforcement action here was "limited." A35-36. That reasoning conflates investigation with enforcement.

A selective-enforcement claim does not ask whether the government *investigated* comparator defendants, it asks whether the government ultimately *brought the criminal law to bear* against them. *See Washington*, 869 F.3d at 214. The doctrine addresses the same constitutional harm as selective prosecution—being subjected to criminal sanctions that the government declines to impose on similarly situated individuals—it just proves that differential treatment based on the actions of "law enforcement" rather than "the actions of prosecutors." *Id.* The harm is the charge, not the investigation.

Properly understood, the robust investigation of January 6 defendants doesn't defeat Congresswoman McIver's claim, it sharpens it. A large-scale investigation that yields fully developed cases against extremely culpable defendants, followed by a decision not to proceed, eliminates the most obvious innocent explanations for non-enforcement: The government cannot claim

59

ignorance of the comparators' conduct or insufficient evidence to act. Instead, the government knew what these defendants did, built cases against them, and then walked away—and it has been clear about the sole, partisan reason it did so. That is powerful evidence of selective enforcement.

### B.    There is Clear Evidence of Vindictive Prosecution

The evidence also makes clear that this is an unconstitutionally vindictive prosecution. The Due Process Clause prohibits prosecutions that retaliate against a defendant for "exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). A "retaliatory motivation" is readily apparent here. *United States v. Adams*, 870 F.2d 1140, 1145 (6th Cir. 1989).

Vindictive prosecution claims can be shown in two ways. The defendant can establish "actual vindictiveness" with direct evidence that the prosecutor harbored a personal animus toward the defendant. *United States v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992). Or the defendant can show "a reasonable likelihood of a danger that the [government] might be retaliating against the accused for lawfully exercising a right." *Id.* Once the defendant shows such a "realistic likelihood of vindictiveness," courts apply a "presumption of vindictiveness" and the government must overcome it by showing "legitimate,

60

objective reasons for its conduct." *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993).

The evidence discussed above, and additional evidence of Congresswoman McIver's relationship with DHS over immigration policy, establish both actual and presumptive vindictiveness:

- Congresswoman McIver has exercised vigorous oversight over DHS since the first days of the Trump Administration. In January 2025, Congresswoman McIver wrote to DHS leadership raising "serious questions" about its activities in her District.[22] In February, Congresswoman McIver conducted an oversight inspection of another New Jersey immigration detention facility, and led a bicameral letter to DHS reiterating her concerns.[23] In March, Congresswoman McIver "met with ICE officials in Newark … to discuss oversight of the facilities." A6.

- DHS has opposed this oversight. On May 9, DHS imposed an "inexplicable delay" on Congresswoman McIver's attempt to conduct congressional oversight. A8, A19. The same day, DHS issued a press release falsely claiming that the Members "stormed the [Delaney Hall] gate and broke into the detention facility," calling the visit "a bizarre political stunt." *Supra* n.3.

- DHS escalated this rhetoric between the May 9 investigation and the May 19 filing of criminal charges. On May 14, the same day that Congresswoman McIver questioned Secretary Noem in a Homeland Security Committee hearing over her policies,[24] Secretary Noem spoke to Fox News, accusing all three Members of "committing

---

[22] Letter from Congresswoman McIver et al., to Hon. Benjamine Huffman, Acting Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Jan. 24, 2025).

[23] *Supra* n.1.

[24] *Rep. LaMonica McIver questions DHS Secretary Kristi Noem*, PBS (May 14, 2025), https://bit.ly/4bI0iH5.

felonies" at Delaney Hall, but "call[ing] out" Congresswoman McIver for her Committee role.[25] On May 16, DHS issued a news release to "[d]ebunk" the notion that the visit to Delaney Hall "was 'oversight.'" *Supra* n.8.

- DHS continued its press campaign after the filing of charges, targeting Democratic lawmakers undertaking oversight and publishing unfairly prejudicial statements about Congresswoman McIver. A148-50.

- Starting with Mayor Baraka's arrest on May 9, DHS forcefully detained three Democratic officials investigating its activities in the course of just one month.[26]

- In June 2025, DHS adopted multiple unlawful policies purporting to bar Members of Congress from conducting unannounced oversight of its facilities under the statute Congresswoman McIver acted under at Delaney Hall. *See Neguse*, 2026 WL 575509.

The district court discounted the overwhelming evidence of retaliatory motive by artificially narrowing the universe of relevant actors, ruling that "DHS statements and actions are irrelevant." A41. That categorical rule is unsupportable. "The Supreme Court's decisions concerning vindictive prosecution have focused on the conduct of the government as a whole," recognizing that "the desire to punish defendants for exercising their legal

---

[25] *Temperatures rise over House Democrats' scuffle with ICE agents*, The Hill (May 14, 2025), https://bit.ly/4s1Ghjq.

[26] *See supra* p.15; *US senator forcefully removed from DHS event in LA, triggering Democratic outcry on Capitol Hill*, CNN (June 12, 2025), https://www.cnn.com/2025/06/12/politics/alex-padilla-removed-noem-press-conference; *Brad Lander Is Arrested by ICE Agents at Immigration Courthouse*, N.Y. Times (June 17, 2025), bit.ly/4bGPd91.

rights arises more often from institutional than from personal wellsprings." *United States v. Meyer*, 810 F.2d 1242, 1248 (D.C. Cir. 1987). And Executive Branch agencies may be "able to prevail upon the Department of Justice to institute a prosecution that would not have been undertaken but for [the] exercise of [a protected] right." *Adams*, 870 F.2d at 1146. Courts have thus recognized that DHS statements are directly relevant to vindictive prosecution. *United States v. Abrego*, 802 F. Supp. 3d 1055, 1062-64 (M.D. Tenn. 2025).

Compounding that legal error, the district court then declined to accord a presumption of vindictiveness because Congresswoman McIver's claim arises in the pretrial context. A41. But the Supreme Court has declined to "adopt[] an inflexible" rule for assessing vindictive prosecution, *Goodwin*, 457 U.S. at 381, opting instead for a functional inquiry, *Meyer*, 810 F.2d at 1246. The question in the pretrial context is the same as any other: A "presumption of vindictiveness will lie in the pretrial setting if the defendant presents facts sufficient to show a realistic likelihood of vindictiveness." *Id.*

Finally, the district court placed unjustifiable weight on the fact that other Members of Congress were not charged. Again, the Constitution does not require the government to retaliate against every similarly situated

individual; it is enough that it retaliated against *this defendant* for exercising this right. Indeed, prosecuting the one Member present at Delaney Hall who holds an oversight position on the House Homeland Security Committee—which Secretary Noem singled out during the period between May 9 and May 19—only *underscores* that this prosecution is retaliation for Congresswoman McIver's protected congressional oversight.

### C.    Discovery is Warranted Because There is At Least Some Evidence of Selective and Vindictive Prosecution

Even if the Court were to conclude that the current record does not yet warrant dismissal, a criminal defendant need only introduce "*some* evidence" of selective or vindictive prosecution to obtain discovery on those claims. *Washington*, 869 F.3d at 220-21 (emphasis added). If a case can ever clear that bar, this one does.

The Sixth Circuit's decision in *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998), provides a useful benchmark. There, the court reversed a denial of discovery on a selective prosecution claim brought by a Black defendant whom local law enforcement had referred for federal prosecution. *Jones*, 159 F.3d at 975-78. The defendant's evidence of selective prosecution was racially insensitive conduct by local law enforcement officials at the time of the arrest, officers' statements after the arrest, and evidence that the relevant local police

64

department had declined to refer "eight non-African-American defendants" arrested for similar crimes for federal prosecution. *Id.* The court concluded that although this evidence had "not established a *prima facie* case of discriminatory effect"—and even though the defendant's white co-defendant was also referred for federal prosecution—there was still "some evidence" warranting discovery. *Id.* at 976-78.

The evidence here is more substantial. The Congresswoman has similarly provided contemporaneous evidence from her interaction with law enforcement itself, including DHS's "inexplicable" and unlawful impairment of her oversight mandate, as well as DHS and ICE's publication of false statements as the events were unfolding. A19. She has produced many more subsequent statements, including a series of DHS posts that the district court ultimately had to halt given their falsity and prejudicial effect, statements from the Interim U.S. Attorney expressing her blatantly partisan goals, and applause from the President himself on the political upside of this prosecution. Above all else, she has shown that she is being prosecuted for the same offense as 160 defendants charged under the identical statute for dramatically more egregious conduct, whose cases were dismissed for avowedly partisan reasons.

"It is hard to see" how the Congresswoman "could have gone much farther … without the benefit of discovery." *Adams*, 870 F.2d at 1146.

## CONCLUSION

The Court should reverse and remand with instructions to dismiss the indictment.

Date: March 30, 2026

Respectfully submitted,

Samuel F. Callahan
Orion de Nevers
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. N.W.
Washington, D.C.  20001

Amanda J. Raines
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
ARNOLD & PORTER
KAYE SCHOLER LLP
One Gateway Center, Ste. 1025
Newark, NJ  07102
Tel: (973) 776-1901
paul.fishman@arnoldporter.com

*Counsel for Defendant-Appellant*
*LaMonica McIver*

66

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the Bar of this Court.

Dated: March 30, 2026

Paul J. Fishman

## CERTIFICATE OF SERVICE

I certify that on March 30, 2026, I electronically filed this brief and accompanying materials with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 30, 2026

_____
Paul J. Fishman

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because it contains 12,948 words.

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Century Expanded BT 14-point font.

3.      In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of Appellant's Brief, as electronically filed on March 30, 2026, is identical to the text of the Brief to be submitted in paper copy.

4.      In accordance with Third Circuit Local Appellate Rule 31.1(c), Appellant's Brief, as electronically filed on March 30, 2026, was scanned with a virus detection program, namely Microsoft Defender (Version 1.399.35.0), and no virus was detected.

Dated: March 30, 2026

_____
Paul J. Fishman