

**U.S. Department of Justice**

*United States Attorney's Office*
*District of New Jersey*

---

*Mark E. Coyne*
*Assistant U.S. Attorney*

*970 Broad Street, 7ᵗʰ floor*
*Newark, New Jersey 07102*

*973-297-2002*

July 17, 2026

Patricia S. Dodszuweit, Clerk
U.S. Court of Appeals for the Third Circuit
601 Market Street, Room 21400
Philadelphia, PA 19106-1790

Re:    *United States v. McIver*, Appeal Nos. 25-3573 & 26-1122
       Argued June 24, 2026 before Judges Bibas, Chung and Ambro

Dear Ms. Dodszuweit:

As liaison counsel, I certify on behalf of the parties the accuracy of the attached transcript of the June 24 oral argument in these appeals. The transcript includes the court reporter's certification. Three hard copies will be mailed to the Clerk's Office no later than early next week.

Respectfully submitted,

ROBERT FRAZER
UNITED STATES ATTORNEY

By:    Mark E. Coyne
       Supervisory Assistant U.S. Attorney
       Chief, Appeals Division

cc:    Paul J. Fishman, Esq.
       (by notice of electronic filing)

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

United States of America,      .   Third Circuit: #25-3573
                               .                   #26-1122
        Appellee,             .
                               .
        V.                    .
                               .
Lamonica McIver,              .
                               .
        Appellant.            .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

            Transcript from the audio recording of the oral
argument held June 24, 2026 at the United States Courthouse,
601 Market Street, Philadelphia, Pennsylvania.  This
transcript was produced by Writer's Cramp, Inc., certified
court transcribers for the United States Court of Appeals for
the Third Circuit.

BEFORE CIRCUIT JUDGES:

THE HONORABLE STEPHANOS BIBAS
THE HONORABLE CINDY K. CHUNG
THE HONORABLE THOMAS L. AMBRO


APPEARANCES:

For Appellee:                  Mark E. Coyne, Esq.
                               Office of United States
                               Attorney
                               970 Broad Street-Rm. 700
                               Newark, NJ 07102

For Appellant:                 Paul J. Fishman, Esq.
                               Arnold & Porter Kaye Scholer
                               One Gateway Center-Ste. 1025
                               Newark, NJ 07102

2

**Transcribing Firm:**          **Writer's Cramp, Inc.**
                                **1027 Betty Lane**
                                **Ewing, NJ 08628**
                                **609-588-8043**

**Proceedings recorded by electronic sound recording, transcript produced by transcription service.**

JUDGE BIBAS:  We have two cases for argument this morning.  Ths first one is case numbers 25-3573 and 26-1122, U.S. vs. Lamonica McIver.  Mr. Fishman, take a moment and then start when you're ready.

MR. FISHMAN:  Thank you, Your Honor.  Good morning.  May it please the Court, Paul Fishman from Arnold & Porter on behalf of Congresswoman Lamonica McIver.  On May 9th of last year, Congresswoman McIver, who is a member of Congress and a member of the House Homeland Security Committee, decided that it was time for her to see for herself and hear for herself how ICE was running a very controversial newly reopened detention facility in her district.  So she went -- using the authority that she has in Article 1 of the Constitution, §527 of the DHS Appropriations Act --

JUDGE BIBAS:  I was just wondering if you need time for rebuttal.

MR. FISHMAN:  Oh, I apologize, Your Honor.  I told the clerk three minutes, but I should have drawn it to the attention of the Court.  My apologies.  Under Article 1 Rule 10 of the House and §527 of the Homeland Department Appropriations Bill, she came to Delaney Hall with two of her colleagues --

JUDGE BIBAS:  We're familiar with the facts.

MR. FISHMAN:  No, I understand, Judge.  But the reason that matters, and I don't mean to interrupt the Court,

4

of course, is that from the moment she got there at 1 o'clock in the afternoon, or slightly thereafter, until she left slightly before 4 o'clock, she was there to perform oversight of ICE and DHS.  And because she was doing that --

JUDGE AMBRO:  So you disagree with the claims that out of that 2½ hours, whatever it was, that there was a 68-second pause?

MR. FISHMAN:  There was not a 68-second pause, Judge Ambro.  There was something that happened during 68 seconds, but our view is that from the time she got there 'til the time she left, she was there for one lawful oversight visit and that under Lee, because the job of the District Court is to see whether the overwhelming purpose of the visit was oversight.

JUDGE BIBAS:  Mr. Fishman, let's imagine a hypothetical.  Let's imagine that a Congressman goes into a facility and he comes across a teenage girl and gropes her. Is it because it's only 68 seconds out of 2 hours of oversight that you would say the speech and debate clause would protect the groping?

MR. FISHMAN:  Absolutely not, Your Honor.  And as the Supreme Court said in the Kilbourn case, and it was reiterated again in Johnson, there are extraordinary circumstances during a legislative episode, but no more than it would be if (indiscern.) --

JUDGE BIBAS:  All right, well, let's talk about the video here.  The Government says, and we've watched the video, the Congresswoman is not in the facility.  She goes out of the facility when ICE is dealing with Mayor Baraka, who is not a federal official who is authorized to go into the facility.  There is a dispute about whether he can go in.  And the alleged assault happens outside of the facility while she's gone out.  She is not inside conducting oversight.  So isn't this at least as weak a case as the one that I hypothesized?

MR. FISHMAN:  Respectfully, absolutely not, Your Honor.  First of all, the in the hypothetical that you posed, if that could -- on the floor of the House, if she would -- if somebody was giving a floor on the House and engaged in the reprehensible conduct that you just described, the Supreme Court I think in Kilbourn would say that's not covered.

JUDGE BIBAS:  Okay.

MR. FISHMAN:  So --

JUDGE BIBAS:  So when Senator Preston Brooks caned Senator Charles Sumner, you would say a speech and debate clause did not protect that from prosecution.

MR. FISHMAN:  Well, he was in the wrong house, and then Senator Sumner was not in the process of engaging -- engaged -- being -- he was not engaged in a legislative act at the time, he was merely -- Senator Sumner was merely sitting at his desk.  And so I think the hypothetical, again -- and

6

like I said, Judge, in the history of the speech or debate clause, the number of assault cases -- the number of assaults, as you can see from the Chafetz Book that we cited, are actually relatively prolific.  But the number of prosecutions is relatively zero.  And so the idea that that would necessarily be prosecutable, it seems far fetched to me, the House has always dealt with those issues, as does the Senate, on their own and the Justice Department, or U.S. Attorneys before there was a Justice Department, have not seen fit generally to prosecute those kinds of cases, because they do involve the conduct of legislators in their own space.  Where I also disagree with you, Judge, if I may, is that the Congresswoman's oversight jurisdiction does not end at the perimeter, it doesn't end at the gate, it doesn't end at the fence.  She is permitted -- if she had been inside the fence and had seen an ICE agent beating a detainee ten yards from the fence, she clearly could have walked outside to see what's going on.  That is within her oversight responsibility.

JUDGE BIBAS:  Okay, but Mayor Baraka is not an ICE detainee.

MR. FISHMAN:  No, no, he's not.  Of course.  But we have to under -- we have to take into consideration why that entire episode took place to begin with.  If you look at the speech or debate clauses, Judge, you will never see -- there's never been a case, as far as I can tell, with the possible

7

exception of <u>Gravel</u>, which I'll come back to in a minute, in which the executive branch -- the legislative branch was actually doing oversight of the executive branch, and the executive branch interfered with that oversight.  So that you can't look at what was going on with Mayor Baraka in a vacuum.  ICE does not like the oversight.  They've tried to change the policy despite what the law says on numerous occasions.  And they did -- and while Judge Semper in the District Court characterized as what happened to the Congresswoman and her colleagues as a {quote} "inexplicable delay" {close quote}.  There's nothing inexplicable about it.  She came to Delaney Hall expecting and having a statutory right to an immediate inspection of the facility, and instead she was delayed for well over an hour, and then instead of actually coming to give her the tour, what ICE did was mass 15 or 20 armed, masked agents, with a car full of munitions for an entirely peaceful episode, invited the Mayor into the premises, recorded on an ICE body cam, so they knew he'd been invited in, and then decided they were going to arrest him for trespassing on Federal land.  He -- so --

JUDGE AMBRO:  Okay, we know what the facts are.

MR. FISHMAN:  But --

JUDGE AMBRO:  You've got counts 1, 2 and 3.  It seems that, perhaps, counts 1 and 3 relating to the involvement of representative McIver with Mayor Baraka, are

8

separate from Count 2 in which she's attempting to get back in to do the oversight function.  How is counts 1 and 3 dealing with the -- Mayor Baraka, not -- how is that covered by speech and debate?

MR. FISHMAN:  So first of all, Judge, our view is that the decision of this Court in Lee says that you look at the field visit, if you will, as a whole.  And the Court -- this Court sent that case back to the District Court to determine whether the overwhelming purpose of the legislator from the Virgin Islands' trip to Washington and New York was legislative.

JUDGE CHUNG:  Do we have to accept the reading of Lee to accept your interpretation of what is legislative or not here?  Because in Lee we were careful to say that the Indictment itself charged the trip as a whole, and the Indictment here doesn't seem to address the investigative visit as a whole but rather discrete acts within it.

MR. FISHMAN:  Well, that's because the Justice Department has chosen to isolate those 68 seconds --

JUDGE CHUNG:  Sure.

MR. FISHMAN:  -- but the --

JUDGE CHUNG:  But the Lee as a whole language seemed to rely explicitly on how the Indictment was phrased.  So do we have to accept your reading of Lee to find that these are legislative, or rather to affirm that they were -- I guess

rather to affirm that they were --

MR. FISHMAN:  You do --

JUDGE CHUNG:  -- were reversed, that they were not -- that they were --

MR. FISHMAN:  You --

JUDGE CHUNG:  Too many negatives.

MR. FISHMAN:  That's okay.

JUDGE CHUNG:  I think you get what I'm saying.

MR. FISHMAN:  I do.

JUDGE CHUNG:  We just have to accept your reading of Lee.

MR. FISHMAN:  You do not have to accept my reading of Lee, because the -- when she -- what happened was when they told the -- they told the members that they were going to arrest the Mayor, and the members complained that they were interfering with their oversight visit.  The members -- the agents then changed their minds and decided to let the Mayor leave.  The three members of Congress went back inside the facility waiting for whatever inspection the ICE folks were going to give them on a tour.  Then they -- then -- but that didn't happen, so they went back outside and the agents told them now we're going to arrest the Mayor anyway, even though he's now outside in a crowd.  So --

JUDGE BIBAS:  I think what Judge Chung is driving at is you are trying to very much expand the time horizon that we

10

look at, and the Government is trying to focus us in on 68 seconds.  But your answer now about look at it holistically seems in serious tension with your answer to the groping hypothetical, where you said no, we could carve out the groping from the rest of the oversight visit.  Isn't the Government -- doesn't it make more sense to take the Government's perspective -- if they charge it discretely, we can just look at it discretely, rather than saying we're going to look at the fraction or the ratio that was legislative.

MR. FISHMAN:  So the -- I think the answer to that question is no, Judge, for a couple reasons.  One is what I was going to say to Judge Chung first was that they reacted to what ICE was doing and the three members reacted exactly the same way.  And they decided to go outside and see what ICE was up to after ICE had told them they were not going to arrest the Mayor.  That's legislative oversight.  And so -- and when the District Court found that it wasn't, it was because the Court -- the District Court misinterpreted that the entire visit was a manifestly legislative act and said the whole visit was an ambiguously legislative act, which it was not.  The second reason --

JUDGE AMBRO:  Whether it was -- well, we'll come back to that later on.  Whether it was ambiguously legislative or not ambiguously or completely legislative, you still have arguments either way.  One you would say you don't consider

motive, the second one you would say you do consider her motive in a attempting to get back in.  But let's come back to -- I mean, Judge Bibas at the very beginning gives you an example of somebody doing something outside the entry to let's say the House of Representatives, groping someone.  And you said that can be sectioned out.  Why cannot the attempt to impair the arrest of Mayor Baraka be sectioned out in counts 1 and 3 from the other two hours and a half or two hours and 45 minutes?

MR. FISHMAN:  So the reason I responded as I did to Judge Bibas' question is because the Court in Kilbourn and Johnson said that there were some things that are so extraordinary that we would not count as their being part of the -- covered by the speech or debate clause.  And that's the hypothetical that it -- I found that hypothetical to be in that category.  Here, even if you get to a legislative ambiguity here, and you do look to motive and intent and purpose, as the opinion you wrote in Menendez said, Judge, their motive and their purpose in going outside was not to impair the arrest.  Their motive in going outside was to do oversight.  They said to the agents as they went, what are you doing.

JUDGE AMBRO:  Let's assume initially that's correct.  At some point there is an attempt, arms around the Mayor, et cetera, when he was escorted outside the gate and arrested, to

do something that the Government contends is attempting to interfere with the arrest.  How is that governmental oversight of Delaney Hall and what goes on there?

MR. FISHMAN:  So it doesn't itself have to be legislative oversight.  I'm not saying that assault, or even alleged assault that we deny, of course, that that was an assault, but we're not saying that assault is a legislative act.  We're not -- any more than anybody was saying in the Gravel case, that leaking classified information or publishing classified information was a legislative act.  It's the person who does it, and it's the context in which it occurs.  And --

JUDGE BIBAS:  Let's say on January 6th, 2021, there was a Congressman who was involved in storming the Capitol, okay.  And let's say that Congressman was involved and charged with an assault on a Capitol police officer, right.  I don't believe there were any.  But if that happened, would that then become an ambiguously legislative act?  Does that fall within your, hey, the House can deal with it on its own, it can decide whether to impeach or not, the sergeant at arms, we need to have a hands-off approach to this?

MR. FISHMAN:  The answer is it might, Judge. Because if, for example, someone was giving a speech on the floor and somebody from the Capitol police came in or ICE or another member and pushed the Congresswoman or a senator away from the podium, and that person pushed back in the middle of

a speech, that's not chargeable.  If they were -- if the person says come on over here, I want to talk to you for five minutes and they get into an altercation, and they're still on the floor and there's a little pushing and shoving, not prosecutable.

JUDGE BIBAS:  Okay, but maybe they're not on the floor.  Maybe they're outside the chamber and people are trying to break into the chamber.  Prosecutable?

MR. FISHMAN:  Well, so it depends what the person was doing before that, Judge, and after.  There's a context to it.  The -- and the questions you're asking, respectfully, are exactly the kinds of second guessing that the Supreme Court has counseled against, because the case law is quite clear from the Supreme Court and this Court that the speech or debate clause has to be read broadly to effectuate --

JUDGE BIBAS:  Okay, but Hutchinson vs. Proxmire, those are statements about legislative priorities, and the Court doesn't say, oh, this is ambiguous and we need to look at intent, though I know, defamation liability is not stopped.  That's more legislative than an assault.  And yet still the Court says no, Senator Proxmire is not doing this on the floor, it's statements to constituents, we can parse it out.  Even though it may be connected to explaining why he's doing some things in the Senate.

MR. FISHMAN:  Agreed, and the Court -- the Supreme

14

Court has been quite clear that speeches to constituents, and this Court has in <u>Menendez</u>, constituent service not covered by the speech -- not purely legislative acts for sure, and often not even ambiguous legislative acts.  The -- but with the -- with -- here, though, if Senator Proxmire had been doing that from -- in a committee room, if he'd been doing it actually on the record in a hearing, it would have been exempt.

JUDGE BIBAS:  Okay.  The chamber, committee room, we can treat being maybe inside the Delaney facility like a committee room.  But she is not even inside the Delaney facility.

MR. FISHMAN:  But --

JUDGE BIBAS:  She leaves the Delaney facility, and the Government's contention is gets involved in a fracas around Mayor Baraka.

MR. FISHMAN:  That is their contention, Judge.  But first of all, 527, §527 --

JUDGE AMBRO:  Now wait a minute, that's what the film shows, too.  There was -- she was involved in a fracas.

MR. FISHMAN:  There's physical -- there's no question there's physical contact, and in a situation that ICE completely created during an oversight visit.  And the problem with this case, the way -- the reason I find this case so pernicious is because ICE was prohibited from stopping -- from not giving her an immediate visit.  Prohibited from using any

resources to do that, and instead that's exactly what they did.  And when the Congresswoman and her colleagues reacted in the way that they did, they then decided to continue by charging her with assault.  And the problem is that that undermines the entire purpose of the speech or debate clause.  If that's possible, if that's possible for ICE to do two illegal things, 1) use resources not to give her the immediate visit; and 2) arrest the Mayor with no probable cause and no basis to make an arrest, and they react, then what the Court said in the -- Supreme Court said in the Tenney case, comes into the picture.

JUDGE BIBAS:  Except there were pretrial methods for testing probable cause.

MR. FISHMAN:  But the issue, Your Honor, is if a member of Congress or three members of Congress are engaged in lawful constitutionally and statutorily authorized oversight and they see something, or something happens in front of them, the speech or debate clause requires that they be given that latitude.  If you read -- there's a quote in the Tenney case in which the Court -- Supreme Court says that legislators basically have to have -- should be -- should have no deterrents to their uninhibited pursuit of their office, for the same reason, Judge, that there's qualified immunity for police officers who have to act on a split second.  She's there to see what ICE does, how they behave, why they do what

they do, and in front of her eyes they do something that is completely wrong --

JUDGE BIBAS:  Okay, okay, but even areas like vicarious liability have doctrines about frolic and detour. You separate out the employee who makes a side trip with his delivery van to go and like drop off the dry cleaning, from the employee who is driving to the work site, you know.  You don't hold the employer liable for the person who takes the van to go visit his mistress or something like that.

MR. FISHMAN:  That's true, Judge, but the law -- we have been very clear in this country for 250 years that the evil that the speech or debate clause was meant to avoid was not whether we're worried about people in commerce.  What -- the immunity doctrines under speech or debate, and quite frankly for Judges and law enforcement officers, all contemplate that what would give rise to criminal liability or civil liability in another context by another person, that the people who are in those particular positions, particularly members of Congress, are exempt from that liability.  We've made a value judgment that it is more important to have Congress people -- members of the House and members of the Senate doing that and not stopping at the gate and having their conduct chilled.

JUDGE AMBRO:  There are certain acts that are -- most acts are exempt.  There are certain acts -- which is how

17

this conversation all started with us -- that are not exempt, and we're trying to divine the difference between the two.  It would seem, although we haven't talked about count 2, that that could be significantly different than counts 1 and 3, would you agree?

MR. FISHMAN:  Yeah, it would be different, Your Honor.

JUDGE AMBRO:  Why?  Because?

MR. FISHMAN:  I can talk about count 2, but it's -- but the reason she's outside the facility and has to get back in is because she followed them out while they were doing something illegal.  There's no doubt about why she was trying to get back in at that point.  So I -- that's a different thing.  But the point I think that I maybe haven't made so effectively, in Gravel, Senator Gravel decided that he was going to publish the Pentagon papers in a committee report. For any other person outside of Congress, perhaps, that would have been a felony punishable in jail for a good number of years.  But even though it was something that placed, in the Administration's view, the Department of Justice's view as they expressed in Pentagon Papers, troops at risk, people's lives at risk.  The Court -- the Government didn't even try in the end to argue to the Supreme Court that that was not covered.  So it's not -- the type of conduct is part of the inquiry, but it's not the entire inquiry.  So there are

certain kind of -- that could be outrageous, as --

JUDGE AMBRO:  I understand Gravel from 50 some years ago, that you can extend the speech or debate clause immunity when necessary to prevent an indirect impairment of legislative activity.  The question here, was counts 1 and 3, dealing with Mayor Baraka, an aspect of legislative activity versus count 2, which is she was trying to get back in to do her job.

MR. FISHMAN:  So my answer to that question is unequivocally yes, Judge Ambro, for two reasons.  1) The entire episode is one legislative act, and under Lee it's covered.  And 2) they were out there doing oversight, and if you are in the middle of doing oversight --

JUDGE AMBRO:  But you -- again, you said at the outset that there are instances where it would not be covered.  There are hypotheticals that would not cover.  The question is, is this one, and you're trying to say, okay, it's just all one package, everything gets put in, there's a presumption in her favor, but when does the presumption -- is it rebutted?

MR. FISHMAN:  So the presumption is rebutted at least in the language of Kilbourn and Johnson when there's an extraordinary act.  Even in Johnson, where they found the selling of a speech on the floor to be {quote} "reprehensible".

JUDGE BIBAS:  I'm not sure the presumption is in her

favor.  When I read Gravel, Gravel talks about whether it's an integral part of deliberative communicative processes.  I think if you're dealing with something like an assault, you know, presumptively the assault isn't integral.  You might be able to characterize it that way, but why should we presume that it's legislative, rather than require her to show that that's legislative?

MR. FISHMAN:  Well, I -- she -- the answer is we have shown that.

JUDGE BIBAS:  You have shown.  But what the Government has done is the Government has said, no, this isn't integral.  We can focus in on these 68 seconds and separate it out from all of the oversights.  And the Government is not contesting that all of the things that happened inside Delaney are protected, she has a statutory right, speech and debate, it's oversight.  But the Government is saying it's not integral; we can take this out.  Why are they wrong?

MR. FISHMAN:  Because what made it integral in Gravel was where Senator Gravel did it.  If Senator Gravel had sent the manuscript to his publisher, it would not have been integral.  He did it while he was engaged in a committee hearing that he had called for that purpose.  That's what made it integral to his duties.  It would not have been if he had a press conference, it wouldn't have been if he'd given it to you, it wouldn't have been if he had sent it to his publisher.

What made it integral is not what he did, it was where he did it and the process in which he was engaged when he did it.  So for Congresswoman McIver, she's engaged in a manifestly inherently legislative act, and in that context she then has this altercation, if that's what we want to call it, that would not otherwise have been -- that for somebody else, not a member of Congress, might well be prosecutable, but it's not for her.

JUDGE BIBAS:  All right.  We had you talk for a while about speech or debate.  I'm happy if my colleagues want more on that, but I do want to make sure we have some time for the jurisdictional issues as well as the merits issues on the selective and vindictive prosecution.  It looks to me Hollywood Motor Car seems to say there are only three situations in which we have jurisdiction for interlocutory appeal, bail -- this isn't a bail case -- speech or debate, pros immunity, which we have jurisdiction to that part of the case, but it doesn't by its terms extend to this.  And then third, double jeopardy, right.  There are other rights, you know.  Speedy trial you might have thought would be covered.  You might have thought vindictive prosecution would be covered.  And yet --

JUDGE AMBRO:  Presidential immunity is covered.

JUDGE BIBAS:  Yes, presidential immunity, different immunities, okay, are covered like speech and debate.  But

when it comes to vindictive prosecution, vindictive prosecution, and presumably that applies to selective prosecution, can ordinarily be vindicated after trial on appeal. I mean, it's not a right not to be dragged through the trial in the first place the way that double jeopardy is or the bail right is. So why should we not follow Hollywood Motor Car here and say she can vindicate this right on appeal, we keep the case moving, et cetera, but why is it a right not to be dragged through the trial in the first place?

MR. FISHMAN: So I appreciate the Court's point and I actually agree. I'm a former prosecutor and currently a defense lawyer, that I don't really understand why vindictive and selective prosecution would not necessarily be appealable under these --

JUDGE BIBAS: But --

MR. FISHMAN: But I've read the cases, I've read the cases, right. And then actually, I don't think we need to resort to collateral order jurisdiction here. I think there's -- I think there are plenty of reasons for this Court to exercise its discretion and take pendent jurisdiction over this. First of all, you just said it's not going to slow anything down, Judge; we're already here, and so the ordinary things that would attend in a situation like, it's not going to make this more complicated, it's fully briefed. I'm confident that the Court has read all of that. And so we can

address it today and I'm certainly prepared to do that, as I'm sure Mr. Coyne is.  What I would say is that this is a much more compelling case for pendent jurisdiction than the Menendez case was.

JUDGE CHUNG:  Is pendent jurisdiction available for a criminal case?

MR. FISHMAN:  It was in the Menendez case, Your Honor.  Judge Ambro wrote an opinion in which the Court took pendent jurisdiction over the separation of powers claim when Senator Menendez said the Ethics in Government Act is unconstitutional, I can't be prosecuted for it.

JUDGE CHUNG:  But they didn't directly address the question of whether it could be exercised in a criminal case, so I'd like to hear your -- other than it has happened --

JUDGE BIBAS:  And we've got case law that says drive-by jurisdictional rulings don't have precedential value.  Since it wasn't expressly focused on, why should we go that way here?

JUDGE CHUNG:  So I'd just like to hear your thoughts, other than the fact that it has happened, maybe in a drive-by way, whether it can legally be done.

MR. FISHMAN:  I am confident that Judge Ambro didn't mean in a drive-by way.  But the -- but what I would say, Judge Chung, is if you look at the CTF case, the CTF case in a civil case sets out the standard that if there are special

circumstances that warrant the Court's looking at both issues that are before it at the same time in that way that it should, and these two issues for me are entirely connected. Not because the decision on one necessarily dictates the decision on the other, which was true in the CTF case, but the issue on selective prosecution is that they have picked and decided to prosecute a case in which, honestly, having watched the video, she wouldn't have drawn a flagrant foul in the Knicks-Spurs game last week.

JUDGE BIBAS:  I found these videos very difficult to follow.  There is a lot of confusion, there's a fracas, it's a melee, it's many different angles.  My concern is, speech and -- you know, selective and vindictive prosecution often seem to turn on facts as they come out at trial, right, which -- and they can be vindicated afterwards, you can review the factual record.  But here you want us to rule on these things at this point, and I just don't think we know enough.  I mean, I think the issues can be put to the Jury, the Jury can return them.  But you're putting us in a position of ruling on what looked like some pretty fact-specific issues before we know the facts.

MR. FISHMAN:  Judge, I'm not -- I -- respectfully, I very much disagree with that characterization.  First of all, she doesn't get to argue selective prosecution at trial, so I'm not sure what's going to come out at trial that would then

buttress our argument if she were to get convicted and we're back in this Court a year from now. I don't see how that possibly holds. In particular, the District Court didn't think we had even mustered {quote} "some evidence" {close quote} and so didn't order discovery, which I think was completely wrong because I thought there was more than some evidence.

JUDGE BIBAS: But you run into the Armstrong case on selective prosecution which makes it really hard even to get discovery.

MR. FISHMAN: It's true, Judge, but here's the thing about selective prosecution. The -- what we don't tolerate, and we can't tolerate, is an in -- is an unconstitutional motive for prosecuting someone. Armstrong and most of -- quite frankly, most of the selective prosecution cases are race-based. And the problem in race-based cases as they were in Armstrong, and you look at all the briefing in Armstrong and the District Court and Court of Appeals opinions, it's a struggle to basically create a statistical method of regressing out when something happened. I'm not sure, by the way, it would have passed muster even under Daubert to do it that way, but that's where we are in that jurisprudence. But I don't think anybody disagrees, and the Court in Armstrong itself dropped a footnote that said if there is evidence in the record of unconstitutional motive, if there is some reason

to believe that there was a motive, we don't deal with that here today.  And so the question we have put to this Court is that in a circumstance in which the Government can't claim that it's really worried about people who assault federal law enforcement officers, because it dismissed cases that were so enormously worse than this, against people whose ideology or politics or party are shared by the President and the Attorney General of the United States.  And here, where we have a Defendant who has been a critic of the Department's policies --

JUDGE BIBAS:  Again, if it's a similarly situated test -- I mean there are so many factual distinctions of the January 6th Defendants that I don't know that they count as similarly situated.

MR. FISHMAN:  So but Judge, I -- that -- I think you're reading the similarly situated test in some sense too literally.  The goal of the test is to figure out whether Person A didn't get prosecuted when Person B did and what's the underlying reason for that.  Here the underlying -- I've been doing this for 40 some odd years on -- at both tables.  And I -- when I was engaged to represent the Congresswoman, I struggled to figure out what prosecutorial -- what factor of prosecutorial discretion can possibly justify prosecuting a Congressperson for something that they've dismissed on hundreds of people who share the President's ideology.  Only

26

explanation I have been able to come up with, and the

Government offered none in the District Court, is ideology,

politics, and that she's a critic.  And to come back to the

question that you asked, Judge Chung, about why it matters for

pendent jurisdiction is that being a critic of the

Administration, of course, is what the entire -- is what the

speech or debate clause is also designed to protect.  So you

have two different issues involving the same case, the same

Defendant, the same actors, DHS and the United States

Department of Justice, bringing this power to bear on a member

of Congress, and the very reasons that the speech or debate

clause exists is to prevent the executive branch from coming

after members of Congress with whom they don't agree.  And so

they did that here in two different ways.  One, by exercising

whatever judgment they had that they wanted to stop this visit

from happening in the way it was supposed to happen; and

second, from now bringing a case where the only conceivable

justification is that she is who she is and she thinks what

she thinks and she votes how she votes.  And that's

impermissible.  And I get your point, Judge.  If you have to

go find -- if we have to go find a Republican member of

Congress who was involved in an assault during the last 17

months, because it has to be the same decision maker.  Mr.

Coyne argues, well, they were all prosecuted by the Biden

Administration, but it's the motivation of the decision maker

in her case that matters.  And you can imagine the circumstance, Judge, if for example --

JUDGE AMBRO:  What makes you think that pendent jurisdiction is a better avenue for hearing the merits as opposed to Collateral Order Doctrine?

MR. FISHMAN:  I don't know that it's better, Judge. I just think it's an easier argument for us to make.  I think Collateral Order -- I think Collateral Order Jurisdiction exists here for all the reasons we articulated in our brief.

JUDGE AMBRO:  And I thought the Second Circuit did that in Myers.

MR. FISHMAN:  They did.  And so I think there's -- I think you can do it under either.  But the reason I find this particularly compelling for pendent jurisdiction is because what the executive branch did at Delaney Hall and what they're doing in District Court in Newark is exactly the same thing. They are picking on someone who is a member of Congress who does not agree with their views.  And so that's the problem. And there's no -- what other explanation for this can there be?  So that's why I think the Court should take jurisdiction, and that's why I think the issue on selective prosecution is so clear.  If I can come back for one second, Judge Bibas, to the legislative immunity thing.  We haven't even gotten yet -- and I apologize for that, but the conversation has been going where it's going.  I don't see how the Government tries this

case at all without legislative acts being part of this trial. If you read the Indictment, they mention her legislative acts three times.  When we get to trial, Mayor Baraka was told by victim 1, the agent who swore out the affidavit against him, you're not allowed to be here, they are.  They're allowed to be there because they're members of Congress and they're allowed to be there.  Everybody who was there that day, the Congresswoman, the other two members of Congress, the ICE agents, HSI, everybody who was there was there only because she was there and they were there.  HSI with a car full of munitions doesn't show up to Delaney Hall every day.

JUDGE CHUNG:  That would be a tricky prosecution to present, so tricky that maybe they run afoul of it.  But it seems like why wouldn't the remedy be the same remedy any time inadmissible evidence is offered?  You can move for a mistrial, you could -- if it seems willful, you could ask for greater sanctions.

MR. FISHMAN:  Because the speech or debate clause, Judge, gives Congresswoman McIver the right not to be tried under those circumstances, and that it is -- and it would be unfair in a situation in which the Government has been unwilling to articulate how it could possibly do this.

JUDGE CHUNG:  And if Judge Semper were affirmed, then that would mean they are confined to these very narrow timeframe, and could not ask about any of the context of that

68 seconds. And so sure, that could be very difficult and maybe they would run afoul of it and then they have, in fact, violated the speech and debate clause. But it seems like if Judge Semper -- if we were to adopt Judge Semper's view that there's a remedy for that, that would not necessarily implicate the clause.

MR. FISHMAN: So A) I think the Government should have to give a better explanation than we're going to -- we're able to do it. That's for one. But second, if you look at footnote 14 in Menendez -- I'm sorry, in McDade, the -- this Court said if a Defendant is forced to have to put evidence, and not chooses to, not like Senator Menendez was going to do -- put in evidence of things that were unrelated, or Congressman McDade was going to put in evidence of prior speeches or other speeches. This is a situation in which the entire set of facts turns on why she was there, and there's -- and it will be impossible for them to prosecute her with mens rea or for us to defend mens rea without alluding to -- and not alluding to but actually mentioning why she was there. Everybody who is going to cross-examined is going to get cross-examined with that. That's not us choosing to do it, that's us being forced to do it in order to defend the case. And that's the -- that's what the speech or debate clause prohibits, just as it did in Johnson. Because in Johnson, the Government wanted to put in a little bit of the speech, and

the Congressman wanted -- had to put in the rest of the speech, and that didn't work for the Supreme Court.  And so in this particular circumstance, there -- it's -- As I said, I don't know how the U.S. Attorney's office is actually planning to try the case, because the Government's brief said they don't have to tell us.  But there's -- for me, I can't imagine our going to trial in this case and not having -- being forced in order to defend her fully under the Constitution, it's almost in some ways like the rule of completeness.  There's no way to do this without that coming out, and it can't.  And so that's another -- yet a third reason.  First, it's all a legislative act.  Second, she had the right motive and intent under -- for the 68 seconds.  And third, the trial is not going to work in that way.  It's simply not possible for us to -- for anybody to forecast how that would actually go.

JUDGE BIBAS:  Okay, thank you, Mr. Fishman.

MR. FISHMAN:  Thank you.

JUDGE BIBAS:  We'll get you back on rebuttal.  We've been generous with time with you, and Mr. Coyne, we'll be equally generous with you, too.

JUDGE AMBRO:  Lucky you, you could be up for an hour.

MR. COYNE:  Good morning, Your Honors.  May it please the Court, I'm Mark Coyne on behalf of the United States.  Thank you, sincerely, thank you for the privilege of

being here today in Wilmington, especially given the lovely weather today.  With the Court's leave, I'd like to begin with two factual matters that my good friend --

JUDGE AMBRO:  Can I just ask just a general question at the outset?

MR. COYNE:  Of course, Your Honor.

JUDGE AMBRO:  You've been with your job at the U.S. Attorney's office for a long time.

MR. COYNE:  22 years.

JUDGE AMBRO:  Can you point me to a case where the DOJ has charged someone under 11 -- 111(a) for a similar level of contact with a federal officer?

MR. COYNE:  I don't know if it's a similar level of contact, but just recently we charged somebody for throwing an umbrella at a federal law enforcement officer.

JUDGE AMBRO:  This is somebody whose path is blocked, she's trying to get back in.  At least on count 2.

MR. COYNE:  On count 2.  If you're focusing on -- I'm sorry, Your Honor, if you're focusing on count 2 --

JUDGE AMBRO:  (indiscern.) and she's just trying to -- she's, you know, get out of my way, I need to get back and do my job.  I struggle finding anywhere where -- that I know of, where somebody has been indicted under 111(a) for that type of contact.

MR. COYNE:  So Your Honor, there's obviously the

speech or debate clause component, I think, of that question, and then there is a selective prosecution or vindictive prosecution component of that question.  I'd like to start, if I --

JUDGE AMBRO:  If somebody is walking outside Congress and there's a group -- there's a hearing that's supposed to start, and there's a group of people who are demonstrating and they're impeding your way and you eventually go, I've got to get in there, I can't imagine that that Congressperson would be indicted for an assault for trying to get through a crowd and perhaps using not sharp elbows, just plowing through; that doesn't seem like an assault.

MR. COYNE:  So Your Honor, on whether it's an assault, whether she was acting with the intent to assault, that's a quintessential factual issue for trial.  For me, the speech or debate clause issue is whether we would have to introduce any evidence that would necessarily call into question, necessarily question a legislative act.  And so as Your Honor is pressing the question, in order for her to meet her burden under the speech or debate clause, it's on Representative McIver to demonstrate that that was a legislative act, and I'm going to take respectful issue with characterizing the desire to get back into the facility so she could continue oversight.

JUDGE AMBRO:  Well, that's what she did -- I mean,

that's her actual act.  She did go back in.

MR. COYNE:  She did go back in --

JUDGE AMBRO:  For the purpose of oversight.

MR. COYNE:  -- but I want to contrast, say for example, looking at the videos, her conduct with the conduct of the other two members who were present on the site. Representative Menendez did not use any physical force so far as I can tell to re-enter the facility, and Representative Watson-Coleman also did not use any physical force to re-enter the facility.  And there's --

JUDGE AMBRO:  That's also -- my question goes broader than that.  I don't know if -- is there any case that you know of where anybody else has ever been indicted for this type of thing?

MR. COYNE:  It's -- I mean, I don't want to say every case is sui generis, Your Honor, but this is not a typical case.  I would certainly admit that.

JUDGE AMBRO:  No.

MR. COYNE:  I would -- I would hope not.  I mean, charging a sitting member of Congress is a very consequential act.  Not something that my office took lightly in this case, and certainly not something that I'm taking lightly, defending that choice here today.  I think, though, and I'm going to -- it's a little farther removed, but then Judge Alito's opinion in --

JUDGE AMBRO:  In your Indictment, Counsel, you said she pushed past V2, that's the ICE officer, while using each of her forearms to forcibly strike V2 as she returned inside of the secured area of Delaney Hall.

MR. COYNE:  In the video -- that describes what the video shows, right.  And then there was a confusion below. Judge Semper was initially confused about who victim 2 was because there's a separate effectively altercation where a different agent shoves the representative, she shoves him back.  Judge Semper wanted additional briefing to see whether that was -- that -- believing that was victim 2, that officer, whether there was a viable speech or debate clause challenge. Victim 2 is not that person.  Victim 2 is an agent who had his back to the representative, and she does essentially body him -- forgive me -- body him out of the way.

JUDGE AMBRO:  Now victim 2, the District Court found that V2 was not purposely impeding McIver.  Is that even relevant?

MR. COYNE:  You know, I don't --

JUDGE AMBRO:  Under our case law?

MR. COYNE:  I don't think it's relevant in the sense of you're not looking at -- you're certainly not looking at Representative McIver's -- well, she's bringing into play what her motives actually were in doing that, by raising that argument.  I don't think his motives are necessarily relevant.

But the context here, though, is in -- the scene shows what he was doing was simply trying to help preserve an aisle so that the Mayor could be returned inside the facility while being handcuffed, and to prevent others from interfering with that process.  What the videos also show --

JUDGE AMBRO:  My guess is you don't believe that her action at that point in time was completely legislative, manifestly legislative.

MR. COYNE:  I don't think it's manifestly legislative.  In fact, I go the other way --

JUDGE AMBRO:  Ambiguously legislative to the point where we could take into account her motive for getting back in.

MR. COYNE:  Your Honor, respectfully, I don't believe it was ambiguously legislative.  I concede that it's a closer call on count 2 than it is for counts 1 and 3.  I certainly will concede that.  But I believe --

JUDGE AMBRO:  What makes it inalterably not legislative?

MR. COYNE:  Use of physical force is never, never covered by the speech or debate clause.  That's our position. We're not asking for some special exemption or special exception, as my good friend says and, quite frankly, my former boss at one point says.  We're not asking for some special exception.  We think that's a straightforward

application of the Supreme Court's precedent, this Court's precedent.  I want to -- there is a quote from <u>Gravel</u> that I want to bring to the Court's attention.  "While the speech or debate clause recognizes speech, voting and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts."  That's <u>Gravel</u> 408 U.S. at 626.  Our prosecution theory, we maintain, fits squarely within that language from <u>Gravel</u>.  It doesn't privilege assaultive behavior.

JUDGE CHUNG:  Could I explore the contours of how you understand what is legislative, unambiguously not legislative, let's put it that way.  If you agree with your colleague's assertion that even if outside the facility observing DHS activity is legislative?

MR. COYNE:  I -- Your Honor, I don't actually agree with that, if only because it seems to me the farther you get away from the actual facility, the purpose that --

JUDGE CHUNG:  Why is it --

MR. COYNE:  -- for which the oversight inspection is supposed to take place, I'm not so sure that it is.  But we didn't defend -- we didn't litigate that, or --

JUDGE CHUNG:  I understand that.  I'm just trying to understand your theory of what is or is not legislative.  And

-- but so you think there is some tie to the actual physical location that legislative oversight couldn't also take place outside during the activities?

MR. COYNE:  It's a tough question under this Court's precedent, right, because Lee and other cases, and for that matter, Judge Ambro's opinion for this Court in Menendez do talk about oversight and how -- and it can be expansive. Information gathering can be oversight.  My point here, though, is more -- is not -- even assuming that observing outside the facility, even assuming observing outside the facility can qualify as oversight, and then even though it's not oversight of what's going on inside Delaney Hall, rather it's supposedly oversight of what is a classic, classic executive branch function, which is not at all, you know, in the sphere of Article I.  This is a classic Article II function, which is executing the laws of the United States. The -- you know, it's one thing, as many of the videos show, to be observing, literally observing, and as I think -- I don't want to speak conclusively for this because the videos, there are videos, and we haven't obviously had a trial.  But for example, Representative Menendez seems to be standing back.  Forgive me for emphasizing, but he seems to be a bit removed from the fray in contrast to Representative McIver and Representative Watson-Coleman.  At least Representative Watson-Coleman initially.

JUDGE CHUNG: Yes, and then the question that I -- to your point, it's difficult. The questions I'm asking are purposely sort of in that gray area because I'm trying to gauge where your principles will land in these gray areas. So if -- to your point, if she were observing but just standing very close to the Mayor and they said move, and she wouldn't move, would that require inquiring into her motive, you know, is she not moving because she wants to observe, or is she not moving because she is trying to resist?

MR. COYNE: So if --

JUDGE CHUNG: Would that inquiry violate the speech and debate clause?

MR. COYNE: So I think under Menendez, assuming that observing outside the facility rather than inside the facility counts as a legislative act, and I'm not conceding that it does --

JUDGE CHUNG: I understand that.

MR. COYNE: -- I'm just saying it's a much tougher question --

JUDGE CHUNG: Sure.

MR. COYNE: -- for us. But assuming that it does, or at least it's ambiguous -- you're very much into the second step of the Menendez inquiry, which is, is it ambiguously legislative, and then we go into analysis of a bunch of things including the purpose.

JUDGE CHUNG:  And your colleague suggested in a footnote that Bogan might mean that our test in Menendez is incorrect.

MR. COYNE:  And also quoted, I think, Bruen for one step too many.

JUDGE CHUNG:  Correct, yes.

MR. COYNE:  I know, in all candor, the Solicitor General's Office took the position in opposing cert in Menendez that there was no need to get to the second step and actually that that -- it's not necessary.  But the Solicitor General's Office also defended the ultimate result quite forcefully in Menendez --

JUDGE CHUNG:  That it -- the step wasn't necessary. But I'm just inquiring, is it consistent with Bogan -- I mean, and are we bound by --

MR. COYNE:  I am not going to criticize any member of this Court for reviewing -- and Judge Ambro that also applies, and I hope you didn't take offense to my invocation of drive-by jurisdiction.  I do want to talk about drive-by jurisdiction.  Although I will say this, as one of the Jesuits who taught me in high school told me, even Homer nodded.  And I -- but I'll get back to this, which is I think this area of precedent is -- there's a lot of it over many, many years, over centuries now, and I certainly can understand why, looking at Lee, right, and even to some degree looking at some

language in McDade, this Court concluded -- Judge Ambro, you concluded on behalf of the Court's unanimous opinion that there was a difference between something that is manifestly legislative, always covered, can never be prosecuted if it's -- can never be the basis for a prosecution if it's manifestly legislative.  In addition, as Menendez noted, if it's manifestly not legislative, which we submit covers the conduct here, they always -- there's never a speech or debate clause question.  And then, if it's somewhere in between -- forgive me, I keep hitting this, and I'll lift it up -- if it's somewhere in between, then it's this -- the second separate inquiry is necessary.  And I understand why the Court went there in Menendez, I do.  I can't say that it is the Department's position, at least at the Solicitor General's office, that there really needs to be a step 2 inquiry, because that's not the position the Solicitor General took in opposing cert in Menendez, but I certainly understand why this Court read those precedents that way, to cover acts that are ambiguously legislative, to look at that and then go into this more nuanced fact specific inquiry.  I don't know if that answers your question sufficiently.

JUDGE AMBRO:  At this point (indiscern.) ten years ago, Menendez has been followed, so at this -- you have --

MR. COYNE:  James, (indiscern.).

JUDGE AMBRO:  -- (indiscern.) legislative or

manifestly legislative, inherently not legislative and then ambiguously legislative, and it's ambiguously legislative you can take into account, among other things, the person's motives.

MR. COYNE:  I agree, Your Honor, and James reinforces that, right.  James is the --

JUDGE AMBRO:  James (2018) reinforces that.

MR. COYNE:  Yeah, and James, although James is applying the Virgin Islands analog, it's -- I mean, I read James as essentially applying the speech or debate clause test as this Court articulated in Menendez.  And so I'm not asking this Court to reconsider that.  This Court, you know, these are controlling precedents.  Our position is, the conduct that we have alleged, yes, there's -- and we don't have to prove up at trial, for example, why Representative McIver was there. We don't have to do that, right.  And so much of my good friend's argument hinges on the supposition --

JUDGE AMBRO:  Even in your Indictment, you concede why she was there.

MR. COYNE:  Well, sure, we concede, but we don't have to prove, we don't even have to submit the Indictment to the jurors.

JUDGE AMBRO:  You don't have to prove it if you concede it.

MR. COYNE:  We don't have to -- well, we certainly

42

concede that she was entitled to be there -- she was entitled to inspect the facility . We're taking no issue with that. Yes, she was.

JUDGE CHUNG:  Would it be legislative if she instructed -- let's say she had a body guard or something and said you push that guy.  Push that guy out of my way.

MR. COYNE:  I don't think it would be.  And again, I think when -- as I understand the controlling precedent on the speech or debate clause, it will cover aides who are -- aides stand in the shoes of the member of Congress.  And so if the member of Congress would be protected for -- would be immunized against prosecution for the act in question, for example, if Senator Gravel was too hoarse to speak and asked an aide to read into the record many passages from the Pentagon Papers, that aide would be protected.  But if it's not a legislative act, the aide gets no more benefit than the Senator or the Representative does.

JUDGE CHUNG:  Count 3, it's not clear to me what conduct we're supposed to be examining.  It might even look either duplicitous or multiplicitous as the only force I see alleged is with regard to victim 1 and victim 2.  So maybe it's multiplicitous.  But if it's -- and then if it's assault, there appear to be multiple victims, which maybe that's duplicitous.  It's very hard for me to understand what is the conduct charged and against whom and what am I evaluating as

far as this legislative nature.

MR. COYNE:  So count 3, the misdemeanor count, the most -- you know, the least serious of the counts, it's a misdemeanor count, not a felony count.  At the same time, I -- as I understand it, it covers essentially all of the efforts to hinder, impede the arrest of the Mayor.  And on that score, I just have to be candid with the record, and what I understand the trial proofs, what a trial would look like here, those impeding efforts started even inside the gate. The videos show that at one point it's when the Mayor is told if he doesn't leave, he will be arrested and told several times, and then finally told, okay, I'm going to arrest you. It's not just that Representative McIver says "Hell no, hell no"; she grabs on to the Mayor, as I remember the videos, and prevents -- is preventing at that point the execution of the arrest.  That is taking place inside the secure facility, right.  And so if you're taking -- if we -- if this Court is -- if one operates under the assumption that anything inside the facility is sort of -- at least is within -- very much within the inspection mission that the representatives were there for ostensibly, you know, that -- our proofs do talk about that.  But even there I argue that interfering with an arrest is never a legislative act, no matter where it occurs. That is our through line through this.  And we're not asking, as I said, not -- as my good friend suggests, we are not

44

asking for some special exemption, we are trying to apply faithfully Supreme Court precedent in this area, including Gravel, and this Court's precedent, including Menendez and James.

JUDGE AMBRO:  Let me turn for a moment to the selective or vindictive prosecution.  What is your argument on whether there is even jurisdiction?

MR. COYNE:  There is no jurisdiction over those claims, and I'd like to -- a couple reasons.  I think McDade answers this.  Judge -- then Judge Alito's opinion for this Court said we will not -- this Court will not consider additional claims along with a speech or debate clause claim, unless those additional claims independently satisfy the strict Cohen test as the Court has interpreted it, especially in the criminal context under Cohen, right.  And so -- and Your Honor had mentioned Myer, or Myers, the 1980 Second Circuit decision.  Myers was decided nine years before Midland Asphalt, and Midland Asphalt -- I believe Justice Scalia wrote that opinion for the Court, Midland Asphalt emphasized how strictly the Cohen criteria had to be applied in the criminal context.  And I think -- Judge Easterbrook wrote, I think, a very fine opinion in Schock, we've cited that in our brief. Judge Easterbrook's opinion explains why you can't bring other -- very well why.  It's inconsistent with Abney, the very passage that we've relied upon heavily in our brief, and for

that matter -- although I don't believe Judge Easterbrook's opinion in <u>Schock</u> cited <u>McDade</u>; it might have -- why it's inconsistent with what <u>McDade</u> held in terms of how -- what other issues this Court can consider.  And mind you, <u>McDade</u> made clear that it was not -- it didn't believe the Court had jurisdiction to address complaints, similar to the ones that are being raised right now, about how the trial would look.

JUDGE AMBRO:  If there were an attempt by whatever Government authority you have, whether it be the Federal Government or the State Government, local, federal, it makes no difference, that I don't necessarily care if this person is convicted at trial; I believe, however that if somebody is -- in other words, you're going to do a vindictive prosecution or you're selecting someone out, especially someone in Congress, I want to see them under the pressure of having to deal with this, both the financial and the personal pressure, stress that one goes under.  And that will be enough for me to get my pound of flesh.  You can't consider that before trial?  You're saying you have to wait 'til after trial, you have to go through all that trial and spend all that money and then have an appeal, assuming you lose?

MR. COYNE:  Well, Your Honor, I think, and if we're still talking about appellate jurisdiction, I mean obviously the District Court can consider those allegations before trial and can determine whether they are (indiscern.) --

JUDGE AMBRO:  I'm just asking a practical question. I mean, in that hypothetical I gave you --

MR. COYNE:  I understand, you don't --

JUDGE AMBRO:  -- that seems as if you're picking out a particular individual.  Perhaps that individual has opposed whatever policy the governmental authority has, and you're saying that before trial there is no way to try to stop that in its tracks.

MR. COYNE:  Well, there is -- I mean, in the Court of Appeals there is no way.  We think that's a straightforward application of Hollywood Motor Car and the other Supreme Court precedents we've cited in our brief.  And on that score, we did brief this.  In our brief we didn't just simply incorporate by reference the pretty extensive motion papers, but we think Hollywood Motor Car makes crystal clear the vindictive prosecution claim can't be -- it's not itself appealable under the Collateral Order Doctrine, and --

JUDGE AMBRO:  Is it possibly -- is there a mandamus possibility?

MR. COYNE:  There might -- I mean, mandamus does require, right?  It's either writ of prohibition or writ of mandamus.  It's either requiring the Court to do something or forbidding the Court from doing something.  And I suppose there theoretically might be mandamus relief available, if the record is so stark, so starkly clear that this is a case of

vindictive prosecution, and I would want to -- I don't want to commit the United States in perpetuity to that position, Judge, but mandamus -- the standard is really strict, whether it's a writ of prohibition or writ of mandamus, it's extraordinarily strict.  But I -- standing right here, I can't say that there might not be an extraordinary set of circumstances where the extraordinary writ would be available.

JUDGE AMBRO:  I think there's no doubt it's extraordinary.  In my 26 years I think I've only seen it maybe once.

MR. COYNE:  It's -- it is an extraordinary relief to seek, especially when the United States seeks it.

JUDGE AMBRO:  It's also an extraordinary case.

MR. COYNE:  It is, but -- and I want to get back to Myers, okay, and although it's not quoted in the briefs, I do feel like I want to -- I do want to raise it.  As I pointed out in Myers, which is -- and as I understand my -- and I don't mean any disrespect to your hypothetical, Judge Ambro, but as I understand my good friend's arguments that the other cases, while I've been calling -- in our -- my brief I call it targeting claims, that those are really important, weighty issues, so you've got to hear them.  And Myers certainly lends some support to that notion, right.  It does.  Myers was decided nine years before Midland Asphalt.

JUDGE AMBRO:  (indiscern.) speech and debate and

also separation of power.

MR. COYNE:  Yeah, separation of power.  <u>Schock</u>, by the way, is a speech or debate clause case, too.  That's Judge Easterbrook's opinion much more recently.  There's also an opinion we cited in our briefs, and I'm getting into now pendent appellate jurisdiction, <u>Wittig</u> from the Tenth Circuit.  That opinion is by then Judge Gorsuch, holding that there is no pendent appellate jurisdiction in criminal cases.  But back to this, <u>Myers</u> says what it says.  <u>Midland Asphalt</u> comes down.  Much more recently, admittedly in a slightly different context, the statutory 30-day deadline for filing a notice of appeal --

JUDGE AMBRO:  Did <u>Myers</u> have jurisdiction under collateral estoppel or what?

MR. COYNE:  I thought -- my reading of <u>Myers</u> is it's tough to figure out what Jon -- Judge Newman, sorry.  Forgive me for using his first name.

JUDGE AMBRO:  Great Judge.

MR. COYNE:  Wonderful Judge, and when I clerked on the Second Circuit, we knew him by his initials, J-O-N.  But it's -- for me, looking at it, it reads like it's a bit of a we're going to apply a looser Collateral Order Doctrine standard just because it's a really -- these are really important issues and we're not so worried about lots of litigation, a tsunami of litigation, because how many members

are there at any given time who could be prosecuted and who could be raising speech or debate clause claims. If that's what Judge Newman was relying upon, an extraordinarily gifted jurist, that cannot be squared with Midland Asphalt and any of the subsequent Supreme Court cases on the Collateral Order Doctrine, especially in criminal -- in the context of criminal cases. It may be invoking or relying on pendent appellate jurisdiction principles, and so I want to turn to that here. And I think -- and my point on that is the Second Circuit back in 1999 in a per curiam opinion said this: essentially, and I'm going to quote, even if they were correct -- and the quote begins at "were correct that the substantive issues in this case are important, that fact could not create jurisdiction in this Court where there was none otherwise: there is -- perhaps unfortunately, but nevertheless inexorably -- no such thing 'as interesting question jurisdiction.'" The cite is Cody, Inc. v. Town of Woodbury, 179 F.3d 52, 56, (2d Cir. 1999). It's a per curiam opinion. It is quoting a memorable line from a dissent by Judge Jacobs in 1995, the concluding sentence of which was "There is no such thing as interesting question jurisdiction." I don't mean that to be pejorative. I understand, Your Honor, the concerns that you're raising. But the test is extraordinarily strict on the Collateral Order Doctrine. And so then we're moving to pendent appellate jurisdiction, which I -- if the Court will give me a little

bit of time to address. My problem with relying on that one line, that one sentence in <u>Menendez</u>, and I think, Judge Chung, you said -- you alluded to this in that it -- there was no -- there's no comprehensive explanation for why there is -- why the pendent appellate jurisdiction criteria have been satisfied, or even why it's available in criminal cases. I don't think it is available in criminal cases, at least not when a Defendant is trying to invoke it. And there are at least four Circuits that so hold. And this Court has never --

JUDGE AMBRO: Refresh my recollection, wasn't there a motion?

MR. COYNE: There certainly was, and I want to get to that, Your Honor.

JUDGE AMBRO: And that was granted in the discretion of the Court.

MR. COYNE: It -- you know, I don't know --

JUDGE AMBRO: Before the oral argument?

MR. COYNE: I don't know if the order actually establishes that. What the order says is we are limiting the appeal to these three issues. The first issue was, obviously speech or debate clause, obviously jurisdiction, right, under <u>Helstoski</u>. The second issue was what the order refers to as the separation of powers issue, right. But as I understand, the separation of powers issues, and I did attach -- this is in the reply in further support of our motion effectively to

limit the appeal, I attached then Senator Menendez's briefing in opposition to the Government's motion to limit the appeal as well as the Court's order.  That briefing acknowledged, pointed out that at least in one other circuit, the D.C. Circuit, and actually potentially there's more.  When I took a dive into this preparing for oral argument, I think there may be as many as two -- at least one other circuit had held that where the separation of powers claim of the type that then Senator Menendez was asserting, was one that turned on the rule-making clause, and the argument was that if a particular count of the Indictment turned on interpreting a Senate rule. And Senator Menendez was right, the D.C. Circuit had signed off on a Defendant's interlocutory appeal under the collateral order doctrine under those circumstances.  So Your Honor, I -- Judge Ambro, and I'm sorry, I may be taking more time on it, on jurisdiction than I should, but I don't -- reading what Judge Krause's order for the motions panel said, I read it as saying there is appellate jurisdiction under the Collateral Order Doctrine under the first two -- for the first two issues.  The Court -- the order then went on to say we are exercising mandamus jurisdiction over the venue challenge to one of the counts in the indictment.  Then goes on to say we are declining to exercise pendent appellate jurisdiction over everything else, citing the very passage in Abney that we're relying upon, and citing the very pages of McDade that we're

relying upon.  And so that gets back to my other point which is this Court has not, in a comprehensive opinion, explained -- held in a comprehensive opinion that there even exists pendent appellate jurisdiction in a criminal case, right.

JUDGE AMBRO:  I think the Supreme Court case you're talking about, which post-dated Myers, talked about that the Collateral Order Doctrine is meant to be very narrow and not much more than that, especially in criminal cases.

MR. COYNE:  It's supposed to be very narrow.  Sell is another example of -- you know, and there, it's the right against compulsory medication --

JUDGE AMBRO:  (indiscern.) it's simple, you don't want everybody having an interlocutory appeal on a criminal case because you would have that ad infinitum.  But there are certain extraordinary cases where it is allowed.  You mentioned those at the outset under the Collateral Order Doctrine.  There's another one called Medication (indiscern.) --

MR. COYNE:  Sell, but there --

JUDGE AMBRO:  -- jeopardy, et cetera.

MR. COYNE:  -- but the test requires, among other things, that there is no way to vindicate that right on appeal.  And again, going back to Hollywood Motor Car, they are --

JUDGE AMBRO:  Those can be vindicated on appeal,

right?  Double jeopardy can be vindicated -- or before a trial, excuse me.

MR. COYNE:  Double jeopardy, of course.  If the claim is that my current prosecution is barred by a prior prosecution that resulted either in a judgment of acquittal or for that matter a conviction, yes, that can be appealed. That's Abney, right.  But let me take Sixth Amendment, the denial of the Sixth Amendment right to a speedy trial.  That's not appealable under the Collateral Order Doctrine.

JUDGE AMBRO:  Sure.

MR. COYNE:  Right?  And there are a lot of important rights, and I think Judge Bibas was alluding to this earlier when my friend was at the lectern, that there are a lot of important criminal rights that just are not -- they -- I don't gainsay that they are important, but they are not -- they can still be vindicated.  The alleged deprivation of them can still be vindicated in an appeal from a final judgment.

JUDGE AMBRO:  And so what happens if a lot of people in Congress are indicted for acts or former persons in administrations are indicted for acts --

MR. COYNE:  So Your Honor, the Supreme --

JUDGE AMBRO:  -- and they somehow -- they have to go through trial and go through all that time, expense, and then only then if they lose, appeal?

MR. COYNE:  So Your Honor, a couple of things.

54

There's sort of the legal issue, and then there's the factual issue.  Let me start with the factual issue.  That hypothetical presumes that people like me would bring charges for vindictive reasons.

JUDGE AMBRO:  I'm not saying you.

MR. COYNE:  I understand, Your Honor.  Or would follow orders to bring vindictive prosecutions.  I'm still here.  So is my colleague, Mr. McCarren, who is the longest tenured AUSA in our office.  He's been an AUSA since 1995.  But legally the Supreme Court has made crystal clear, you're not supposed to look at case-specific circumstances, it's the category.  You look at the whole category of claims.  And that's sort of the doctrinal pushback I'm giving you, Judge.  And I want to be clear, I'm not trying to -- I'm not -- I understand why you're asking that question.  I do deeply appreciate it, and I hope a hypothetical like that never comes to pass in this country.  And I will do everything in my power, individually, to ensure it doesn't, at least in the District of New Jersey.

JUDGE AMBRO:  I trust you.

MR. COYNE:  Well, I appreciate that, Your Honor.  I've covered pretty much all I wanted to say about the Collateral Order Doctrine and pendent appellate jurisdiction, but actually one more thing, though.  Even if this Court were to definitively hold, and if the Court does decide that --

sorry -- pendent appellate jurisdiction does apply in criminal cases, right, I'm not -- I am advocating against that, obviously, but I think you would need to issue an opinion explaining why that is so, in part because four other circuits have held that it's not, at least not when a Defendant is trying to invoke the doctrine.  That's one thing.  The second thing is in writing that opinion, if a Defendant can raise pendant appellate jurisdiction to piggy-back otherwise unappealable claims onto something that is appealable on an interlocutory basis, then of course I, as a representative of the United States, so long as I have the privilege of being a representative of the United States, will be able to benefit from that, too.  That was an issue that came up in the second of the United States v. Bergrin opinions, as I know my good friend knows.  His name was at the top of the brief we submitted in that.  We were trying to challenge a grant of a severance, and that severance order also told us which counts we were supposed to try first.  This Court issued a jurisdictional defect inquiry; we submitted a 30-page response explaining why we thought we could pursue this.  We invoked pendent appellate jurisdiction.  We cited United States vs. Maker.  Judge Jordan's response in his opinion for the Court in a footnote said, in essence, the Government says that Maker already decided this.  We have never so held in a precedential opinion; we need not decide

56

that now because we are granting the Government relief for other reasons.  This Court has never, in a precedential opinion, explained why -- if the pendent appellate jurisdiction doctrine does apply in criminal cases, why it does apply in criminal cases.  That's one thing.  The second thing is, assuming it does, you want an example of an opinion that highlights how stringent the criteria are for pendent appellate jurisdiction?  Judge Bibas, your opinion in U.S. v. Brace, a civil appeal.  And the fact -- I just don't see how even if pendent appellate jurisdiction exists in a criminal case, and there are many others, and we cited these -- we cited a plethora of cases confirming how stringent the pendent appellate jurisdiction criteria are applied.  I don't understand how the -- you know, the facts and the legal principles that govern the selective prosecution, the selective enforcement, the vindictive prosecution claims necessarily are either inextricably intertwined with the speech or debate clause challenge here, or that you would need to reach those latter ones in order to provide meaningful review of the speech or debate clause claims.  That's what the test requires, as this Court has said it time and again.  And that's what the Supreme Court said was necessary in Clinton v. Jones in exercising pendent appellate jurisdiction over Paula Jones' cross appeal from then President Clinton's direct appeal.  So that's pretty much all I have to say about

appellate jurisdiction.  Forgive me, I've been an appellate litigator for the United States for most of my career, it's about 22 years now, about 18+ as an appeals guy, but that is a fascinating issue for me.  Unless the panel has further questions for me, I ask that this Court affirm the order below denying the speech or debate clause claim.  I ask that the Court dismiss for lack of appellate jurisdiction all of the other claims that my -- that Representative McIver is raising on appeal, including the claims that are surfacing here at oral argument that effectively evidentiary issues -- we were entitled to some sort of preview of the Government's case.  That too is not -- under McDade, that's not appealable right now either.  And that is, as we all know, a speech or debate clause case.

JUDGE BIBAS:  Thank you.

MR. COYNE:  Thank you, Your Honor.

JUDGE BIBAS:  Mr. Fishman, I believe you reserved three minutes.

MR. FISHMAN:  I did, Judge.  I don't know how to multiply that by the amount of time we've taken, and I don't want to test the Court's patience.  But let me just start first on the pendent jurisdiction question, just because that's where we ended.  I haven't read the briefs in the Menendez case for several weeks.

JUDGE AMBRO:  I think Menendez, what it said is we

have jurisdiction over the speech or debate clause under the Collateral Order Doctrine, citing McDade.  We have pendent appellate jurisdiction over the separation of powers claims, citing a case called CTF Hotel Holdings from 2004 from our Court, and we have jurisdiction over Senator Menendez's request for petition of mandamus under 1651(a).

MR. FISHMAN:  So thank you, Judge.  I have read the opinion within the last 24 hours.  But the briefs, my recollection is that Mr. Coyne made all of the exact same arguments to your panel in the Menendez case that he made just now, and nevertheless, you and your colleagues on that panel --

JUDGE AMBRO:  That was my recollection at the very least.

MR. FISHMAN:  -- jurisdiction.  So while appreciate his second bite at the apple, we are where we are on that question.  So let me start there.  Second, with respect to the assault issue, because Mr. Coyne has now doubled down on the assertion in his brief that use of force is never a legislative act.  That might be right, but we're not arguing that an assault is a legislative act.  Senator Gravel didn't argue that the publishing of classified material was a legislative act.  Where he read it made it a legislative act.  What he was doing makes it a legislative act.

JUDGE BIBAS:  I worry that you are blurring the

distinction between the immunity and the evidentiary privilege.

MR. FISHMAN:  I don't think so.  Because if you do something that would not be -- would be prosecutable, give rise to criminal liability in another context, if any member of Congress walks into a bar, sees an ICE agent and decks him, it's not covered.  And that's not what the law is.  If the member is in the middle of doing an inherently manifestly or even ambiguously legislative act, it's covered.  And the problem with Mr. Coyne's reliance on Gravel is that in his brief he says that -- the quote from Gravel are "acts threatening the security of the person or the property of others."  What Senator Gravel did was threaten the security of people.  So the idea that somehow assault, after 250 years, has magically disappeared from the speech or debate clause, can't possibly be based on that sentence, because Senator Gravel was not -- was immune under those circumstances.  Same thing in the Kilbourn case.  The legislators in the Kilbourn case directed the sergeant at arms to go arrest somebody, which interferes with the security of a person; they were immune.

JUDGE BIBAS:  Can you point to any case where a member of Congress was being prosecuted for assault, battery, or another physical crime, and a Court held that the speech or debate clause barred the prosecution?

MR. FISHMAN:  No, because the Department is not bringing those cases, Judge.  That's the problem.  The issue is -- the inference that I draw from the absence of cases, despite the long and kind of sordid history of members of Congress either being involved in assaults as -- between each other, among each other or with other people, the fact that the Department isn't bringing those cases and hasn't brought those cases when some of those assaults were way worse than this suggests that the conclusion is not that this is fine, but that they shouldn't be bringing them and they should be dealt with in the House or the Senate.

JUDGE BIBAS:  There's another conclusion which is juries don't like these cases, most departments don't want to put up case they're likely to lose in front of a jury.  If this department wants to roll the dice on that, it's its prerogative.  I don't know that we have to draw your inference.  I mean, silence is always ambiguous, almost always.

MR. FISHMAN:  I get that.  But there's not -- it's not that there is silence, it's just that there are two Supreme Court cases in which the security of people or risk of harm to people was actually at issue and --

JUDGE BIBAS:  Yeah, but Pentagon Papers was not about a physical act.  It was about fears of downstream physical contact.

MR. FISHMAN: That's fair, Judge, but I -- but the fact is the line of dictum on which Mr. Coyne hangs his hat is just that, it's dictum in a case where we don't really know what they meant. And by the way, if you look at the paragraph in which that quote is contained, the paragraph is talking about the distinction between legislative aides, and members -- it's really more about that than it is what members themselves might be liable for. And so that's -- so in that sense, it's not actually the right way to go. Let me quickly just jump to -- and the problem is, here's the problem, and Mr. Coyne said it at the beginning of his argument. We just charged the case where a guy threw an umbrella. We know the case in which a guy was arrested for throwing a ham sandwich.

JUDGE AMBRO: I think it was a submarine sandwich, but we get the idea.

MR. FISHMAN: In North Jersey, Judge, we would call it a hero --

JUDGE AMBRO: That was from D.C., right?

MR. FISHMAN: Yeah, exactly.

JUDGE AMBRO: And they later dropped it.

MR. FISHMAN: Well, no --

JUDGE BIBAS: No, it was found and was acquitted.

MR. FISHMAN: Yes, they tried that case, Judge, and that -- and yes, and therein lies the spectacularly terrible thing about the argument that Mr. Coyne is making. I've known

Mr. Coyne for a long time; he's a very trustworthy fellow. That's fine.  I actually gave -- I actually promoted him to be chief of appeals.  Today I may regret that, but back then it seemed like a pretty good decision.  But this Court is not sitting here in a vacuum.  The selective and vindictive prosecution jurisprudence has turned since the <u>Armstrong</u> case on the presumption of regularity.  I don't quarrel Mr. Coyne on this case, but it's very clear from the conversation at Delaney Hall on May 9th of last year when the special agent in charge of HSI got off the phone and said, "Todd Blanche said to arrest the Mayor."  These calls on cases involving members of Congress, we can't be naive about this.  They are not made in Newark.  Mr. Coyne wasn't involved in the charging decision, and by -- as much as I may like him and may think he's smart, this Court cannot base its decisions on the bona fides or good faith of particular prosecutors at particular moments at the particular time.  That's not the way this works.  And the problem in this case, and I can't emphasize this too strongly, is -- and I'm -- at the risk of once again, Judge Bibas, just dipping slightly into the facts, the -- from the moment they got there, the goal of ICE was to thwart -- there is no other inference to be drawn -- thwart their constitutional exercise and statutory exercise of oversight authority.  And then, and - by the way, Mr. Coyne talked about, well, something happened inside the gate, they tried to

prevent the arrest the first time, that's covered.  Now we're back to somewhere in the -- well, they're going to start talking about conduct that's actually during the legislative act, if that's where they are.  But they did everything they could to thwart it, and then he wants to rely on a -- one of the most malleable statutes in the Federal Criminal Code §111(a), Judge Chung, six verbs, right.  It's not just assault.  It's impede, it's interfere, it's obstruct.  If ICE can do what it did and, in fact, do something that draws them outside, and then the U.S. Attorney's office has unfettered Article II discretion, as he described it, to bring a charge, and as Judge Ambro has said now at least two or three times during this argument, the result of that is that a sitting member of Congress has to endure this entire process.  And yes, maybe you're right, Judge Bibas, maybe they will acquit in the end, and I certainly hope that happens if we get there, but we should not get there because the combination of those things are exactly why the Court should exercise pendent jurisdiction over the selective and vindictive prosecution case -- claim.  Because if you put all of those things together, what this does is it gives the Department of Justice and the Department of Homeland Security the ability to interfere, impede, obstruct, thwart members of Congress who are doing exactly what they are allowed to do by law, and then when something happens, say oh, my goodness, this was an

assault.  She threw a ham sandwich.  She threw an umbrella.  She threw an elbow.  Where are we, Judge, in 2026, that's that -- that that's the Government's defense to this patently awful prosecution of a sitting federal Congressperson?  This Court has the power under the speech or debate clause to say no, that's not right.  What she was doing was authorized and what she was doing was lawful and what she was doing was constitutional, and the entire -- and because you did something during that, executive branch, when she was there to see what you were doing, you can be prosecuted for that.

JUDGE BIBAS:  Thank you, Mr. Fishman.

MR. FISHMAN:  Thank you, Judge.

JUDGE BIBAS:  We'll take the matter under advisement.  I want to thank both counsel.

(Court adjourned)

CERTIFICATION

I, Lewis Parham, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Lewis Parham*                    7/17/26

_____          _____
Signature of Transcriber              Date